## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

WESTPORT INSURANCE CORPORATION,  )
            )
        Plaintiff,  )
            )
vs.             )   Civil Action No.: AMD-02-1774
            )
ST. PAUL FIRE & MARINE INSURANCE  )
COMPANY,         )
            )
        Defendant. )

### WESTPORT'S MEMORANDUM OF LAW IN SUPPORT OF WESTPORT' S CROSS MOTION FOR  SUMMARY JUDGMENT AND IN OPPOSITION TO ST. PAUL'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Westport Insurance Corporation ("Westport"), for its Memorandum of Law In Support Of Westport's Cross Motion For Summary Judgment And In Opposition To St. Paul's Motion for Summary Judgment, hereby states as follows:

## I.  INTRODUCTION

In this action, Westport seeks reimbursement from St. Paul of defense expenses incurred relative to multiple underlying claims asserted against their mutual insured, Irving Cohn "Cohn." Although Westport immediately assumed Cohn's defense upon receipt of notice, St. Paul steadfastly refused to defend such claims.

The St. Paul Policy at issue is an "occurrence" policy, which provided professional liability coverage to Cohn for conduct occurring during the period of 1972 through 1975.   It is undisputed that that the claims asserted against Cohn alleged conduct that occurred, in part, during the St. Paul Policy period.  Plaintiff, Westport also issued a professional liability policy that covered Cohn, however, the Westport Policy is a "claims-made" policy that provided

1

coverage only for claims made during the Westport policy year – 1999 to 2000. It is also undisputed that the claims were first asserted against Cohn during the Westport policy year.

Additionally, although St. Paul argues that such fees should be apportioned under the methodology of Texas law, and Sixth Circuit authority, Maryland law requires that the parties' obligations be determined by reference to the "other insurance" clauses contained in the respective policies. The Westport policy contains an "excess" clause, while the St. Paul Policy contains a "pro rata" clause. Westport asserts that Maryland law unequivocally holds that Westport's "excess" clause "trumps" St. Paul's "pro rata" clause, and renders the St. Paul Policy primary as a matter of law. As such, if St. Paul had a duty to defend, St. Paul is liable to reimburse Westport for <u>all</u> defense expenses incurred by Westport, with no permissible proration or other allocation.

Westport submits that St. Paul had an obligation to defend Cohn against multiple underlying claims arising from Cohn's handling of numerous trusts for the Shapiro family, and other unrelated trusts. Once placed on notice of claims against Cohn, St. Paul had a duty to defend Cohn under the terms of its Policy, and Maryland law, which duty was breached by St. Paul. Westport further asserts that under the Maryland Court of Appeals decision in *Sherwood Brand*, St. Paul's breach renders St. Paul liable for all defense expenses incurred, including those incurred prior to St. Paul's receipt of notice of the claims.

Westport's position is set forth in greater detail below.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

All of the material facts in this case are undisputed.

### A.    <u>The Relevant Insurance Policies</u>

2

1.      St. Paul issued a three-year Lawyers Professional Liability Policy, no. 619NA0039, to the law firm of Burke, Gerber & Wilen for the policy period of April 1, 1972 to April 1 1975 ("St. Paul policy"). *A true and accurate copy of the St. Paul Policy was produced to Westport by St. Paul, and is attached hereto as Exhibit A.* The Policy named Irving Cohn ("Cohn") as an additional insured. *See Defendant's Response to Plaintiff's Request for Admission No. 1[1]; Defendant's Counterclaim at Page 5.*

2.      The St. Paul Policy is an "occurrence" policy, which provides coverage for claims, whenever made, provided such claims arise from an "occurrence" or "events" that occurred during the St. Paul Policy Period. The Insuring Agreements of the St. Paul Policy state, in pertinent part, as follows:

> The Company, in consideration of the payment of the agreed premium(s) and subject to the terms of this Policy and its Insuring Agreements, agree to indemnify or pay to or on behalf of the Insured in accordance with such Insuring Agreements with respect to the occurrence of any of the there-in mentioned casualties or events during the policy period.

> **2.      COVERAGE**

> The Company agrees to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages arising out of the performance of professional services for others in the Insured's capacity as a lawyer and caused by the Insured or any other person for whose acts the Insured is legally liable. (The performance of professional services shall be deemed to include the Insured's acts as an administrator, conservator, executor, guardian, trustee, or any similar fiduciary capacity, but only to the extent for which in the usual attorney-client relationship the Insured would be legally responsible as attorney for fiduciary

*See Exhibit A, bates numbers STP 001166 and STP 001172.*

---

[1] A true and accurate copy of Defendant's Responses to Plaintiff's Request for Admission and accompanying exhibits thereto, except for a copy of the St. Paul Policy already noted as Exhibit A herein, is attached as Exhibit B.

3.    The St. Paul Policy also contains a defense obligation.  The General Terms and Conditions section of the St. Paul Policy contains the following provision, in relevant part, concerning St. Paul's defense obligations:

32.    Defense, Settlement, Supplementary Payments: As respects any insurance afforded by the terms of this Policy, the Company shall:

(A)    Defend in the name and on behalf of the Insured any suit against the Insured alleging injury, sickness or disease; damage or destruction, and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; . . .

*See Exhibit A, bates number STP 001180.   See also Defendant's Response to Plaintiff's Request for Admission No. 1; Defendant's Answer to Plaintiff's Interrogatory No. 8 in the form of a document labeled as bates numbers STP000072-79.[2]*

4.    Westport issued a claims made and reported professional liability policy to Blum Yumkas, Gutman & Denick, P.A. ("Blum Yumkas"), No. MDL-022344-3 for the policy period of January 1, 1999 to January 1, 2000 ("the Westport Policy").  *A true and accurate copy of the Westport Policy is attached hereto as Exhibit D.*   By virtue of his status as an attorney acting on behalf of Blum, Yumkas, Cohn was also insured under the Westport Policy. *See Westport Policy Section VIII Definitions (B) ("Definition of Insured").*   The Westport Policy is a "claims made and reported" policy, which provides coverage for any claims made during the policy period, regardless of when the alleged acts, errors or omissions occurred, subject to the retroactive date contained in the Westport Policy.

5.    The Insuring Agreement contained in the Lawyers Professional Liability Coverage Unit of the Westport Policy contains the following Insuring Agreement:

---

[2] A true and accurate copy of Defendant's Answers to Plaintiff's First Set of Interrogatories and the documents referenced therein are attached hereto as Exhibit C.

A.   The Company shall pay on behalf of any Insured all Loss in excess of the deductible which any Insured becomes legally obligated to pay as a result of Claims first made against any Insured during the Policy Period and reported to the Company in writing during the Policy Period or within sixty (60) days thereafter, by reason of any Wrongful Act occurring on or after the Retroactive Date, if any.

*See Exhibit D.*

6.   The General Terms and Conditions section of the St. Paul Policy contains the following provision regarding the existence of other insurance:

35.   OTHER INSURANCE.  The insurance afforded by this Policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance.  When this insurance is primary and the Insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the Company's liability under this Policy shall not be reduced by the existence of such other insurance.

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the Company shall not be liable under this Policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

*See Exhibit A, bates numbers STP 001170*

7.   The Westport Policy contains the following provision regarding the existence of other insurance.

VI.   OTHER INSURANCE OF A PRIOR LAW FIRM
If a Prior Firm has other insurance applicable to a Claim against the Insured(s) covered by this Coverage Unit, this Policy is specifically issued as excess insurance over and above the applicable limits of liability of all such other insurance regardless of whether such other insurance is written as primary, contributory, excess, contingent or otherwise.

*See Exhibit D.*

B.   **The Underlying Claims**

5

8.     Irving Cohn ("Cohn") acted as Trustee for numerous trusts originally created by members of the Shapiro family in the late 1950s and early 1960s. In 1972-1975, during the St. Paul Policy Period, Cohn was acting as a Trustee *See Defendant's Answer to Plaintiff's Request to Admit No. 28; and Defendant's Counterclaim at Page 5, ¶ 7.* In 1988, Burke, Gerber & Wilen dissolved, at which point Cohn became associated with the firm of Blum, Yumkas, Gutman & Denick, P.A. Cohn continued to act as Trustee while associated with Blum, Yumkas. *See Defendant's Answer to Plaintiff's Interrogatory No. 8 and Defendant's Counterclaim at Page 5, ¶ 8.*

9.     In September of 1999, Westport first received notice of a potential claim against Irving Cohn, based on several letters sent by Sam Shapiro (Roberta Borenstein's uncle) to the firm. This potential claim concerned Trust No. 8, the beneficiaries of which are Ronald, Kenneth and Susan Shapiro. The notice of potential claim advised that "one or more Trusts may potentially have a claim against our member (Irving F. Cohn) and/or our Firm for malpractice." *See correspondence from counsel for Westport to Blum Yumkas dated May 23, 2000, and correspondence from Westport to Blum Yumkas dated November 1, 1999, which are attached hereto as Group Exhibit E.* About that time, various beneficiaries of the Shapiro Trusts began contacting Cohn and Blum Yumkas threatening litigation for Cohn's alleged mishandling and mismanagement of the trusts. *See Defendant's Counterclaim at Page 5, ¶9 and Plaintiff's Complaint at Page 2, ¶10.*

10.     Upon receipt of the notice, on November 1, 1999, Westport agreed to defend Cohn and Blum Yumkas against the beneficiaries' claims, subject to a reservation of rights. *See Defendant's Counterclaim at Page 5 ¶. 10 and Plaintiff's Complaint Page 2 ¶. 7; Defendant's Answer to Plaintiff's Interrogatory No. 8 in the form of a document bates numbers STP 000072.*

6

On May 23, 2000, Westport supplemented its reservation.  True and accurate copies of Westport's reservation letters are attached hereto as Group Exhibit E.

11.  In May of 2000, Cohn's defense counsel discovered the existence of the St. Paul Policy, and, on May 31, 2000, tendered the defense of the beneficiaries' claims to St. Paul.  *See Plaintiff's Complaint at Page 4 ¶ 19; Defendant's Answer to Plaintiff's Complaint at Page 2 and 19 and Page 3  ¶ 20.  See also Defendant's Answer to Plaintiff's Interrogatory No. 4.*

12.  On June 1, 2000,  Cohn's counsel provided St. Paul with a copy of a draft complaint prepared by two of the trust beneficiary claimants styled <u>Roberta Borenstein, et, al. v. Blum, Yumkas, Mailman Gutman & Denick, PA</u>., ("Borenstein Complaint"),  which complaint named Cohn as a defendant.  *See Defendant's Answers to Plaintiff's Interrogatories No. 3 and 5 as well as Defendant's Answer to Plaintiff's Interrogatory No. 8 in the form of a document bates numbers STP 000072.  A true and accurate copy of Cohn's tender letter is attached hereto as Exhibit F.*  The Complaint was not filed, but only because of a Tolling Agreement entered into by the parties, and because Westport agreed to retain an accountant to evaluate the numerous claims against Cohn.  *A true and accurate copy of the Tolling Agreement is attached hereto as Exhibit G.  See also Defendant's Memorandum Page 6*

13.  Despite the notice, and receipt of the draft complaint, and although St. Paul advised Cohn's counsel that St. Paul was "reviewing the matter for coverage," St. Paul failed to respond to the notice in any manner, conduct an investigation, or otherwise assume its obligation to defend Cohn against the imminent suit.   St. Paul had no further communication with Cohn, his attorney, representative or insurers until May 3, 2001. *See Defendant's Answer to Plaintiff's Interrogatory No. 3 and 7; See also Defendant's Answer to Plaintiff's Interrogatory No. 8.*

14. On April 6, 2001, Westport provided St. Paul with a copy of the lawsuit filed by another trust beneficiary in the Circuit Court for Baltimore City, styled Eric Waller v. Blum, Yumkas, Mailman Gutman & Denick, PA and Irving Cohn, ("Waller Suit"). *See Defendant's Answer to Plaintiff's Interrogatory No. 4.*

15. On May 3, 2001, St. Paul responded, for the first time, to Cohn's tender. *See Defendant's Response to Plaintiff's Request for Admission No. 14; Defendant's Answer to Plaintiff's Interrogatory No. 4. A true and accurate copy of St. Paul's letter is attached hereto as part of Group Exhibit B and Exhibit C therein.*

16. In the letter, St. Paul did not acknowledge any duty to defend the beneficiaries' claims. *See Defendant's Answer to Plaintiff's Interrogatory No. 8, and referenced document bates-numbered STP 000072.*

17. On May 29, 2001, Westport responded to its Insured's tender of the Waller suit. *A true and accurate copy of Westport's letter is attached hereto as part of Group Exhibit B, Exhibit D therein.* In the letter, Westport advised Cohn that St. Paul Insurance Company had the primary duty to defend Irving Cohn for this matter, but stated that if St. Paul did not meet its obligations to Irving Cohn, Westport would agree to pay reasonable fees and costs to defend Irving F. Cohn in this matter, subject to a reservation of rights. When Westport learned of St. Paul's refusal to pay all of the defense costs incurred with respect to the Waller suit, by letter dated April 3, 2002, Westport agreed to pay the other 50% of defense costs, subject to a full reservation of rights.

18. Also on May 29, 2001, Westport, through counsel, provided St. Paul with further information regarding the claims asserted against Cohn by other beneficiaries of the Shapiro Trusts. *A true and accurate copy of Westport's May 29, 2001 letter, as authenticated by St.*

*Paul, is attached hereto as part of Group Exhibit B, Exhibit D therein.    See Defendant's Response to Request for Admission No.s 25 and 25.*

19.    In Westport's letter, Westport advised St. Paul that there were multiple claims asserted against Cohn alleging conduct that occurred during the St. Paul policy period, and that, as such,  St. Paul had the primary duty to defend Cohn. *See Group Exhibit B, Exhibit D therein.*

20.    Westport also advised St. Paul of an addition claim by Marion Smith and Christine Geer, two claimants not associated with the Shapiro Flex beneficiaries.    Westport advised St. Paul that it received notice of claims by these individuals, based upon conduct occurring from 1974 through 1996.  Westport advised that "Presently, there is a "gentlemen's agreement,"as the claimants have agreed to hold off the filing of a suit while counsel [defense counsel for Cohn] continues its investigation." *See Group Exhibit B, Exhibit D therein.*

21.    On July 12, 2001, St. Paul responded to Westport's tender letter in a rather curt fashion.  St. Paul continued to deny its obligation to defend Cohn against any claims apart from the Waller Suit.  *See Group Exhibit B, Exhibit E therein.*

22.    The numerous beneficiaries of the Shapiro Flex trusts alleged that, during the 1970's, Cohn allowed trust assets to escheat to certain states, did not deposit dividend checks into the Trusts, which checks date back to 1972, and did not file appropriate tax returns. *See January 7, 2000 Letter from Michael Himeles to Cohn, and May 23, 2000 Letter from Phillip Smith to David Cohn attached as Group Exhibit H, as authenticated by Defendant's Answer To Plaintiff's Interrogatories, ¶8; Defendant's Responses to Plaintiff's Request For Admission ¶¶5-8.*  A large part of the claim concerns funds that were apparently abandoned in bank accounts, and have not been invested since the 1970s.  These funds were paid to the Borensteins in April of 1999.  Counsel provided various methods for computing the anticipated appreciation of the

9

funds, had they been invested in a prudent manner. Using the S & P as a benchmark, the estimated loss as calculated by the Borensteins' counsel was $4,777,537 (assuming investment beginning in 1975)." *See Group Exhibit H as authenticated by Defendant's Answer To Plaintiff's Interrogatories, ¶8; Defendant's Responses to Plaintiff's Request For Admission ¶¶5-8.*

23.    Accordingly, it is undisputed that, separate and apart from the Waller suit, other claims against Cohn alleged actionable conduct that occurred during the St. Paul policy period. *See also Defendant's Memorandum at pages 2 and 8.*

24.    Despite Cohn's tender, and Westport's tender, St. Paul refused to provide Cohn with a defense to any of the claims asserted against Waller, with the exception of the <u>Waller</u> suit.. *See Defendant's Answer to Plaintiff's Interrogatory No. 12.* With respect to the <u>Waller</u> suit, however, St. Paul offered only a qualified defense. *See Defendant's Answer to Plaintiff's Interrogatory No. 8 , and referenced document bates- numbered STP 000072.*

25.    To defend Irving Cohn, Westport incurred fees and expenses from four sources, which expenses totaled $1,539,363.28:

| | | |
|---|---|---|
| 1. | Eccleston & Wolfe (primary defense counsel): | $135,589.23 |
| 2. | Hearne & Bailey (Cohn's defense counsel on non-Waller matters) | $ 76,442.53 |
| 3. | Adelberg, Rudow (Cohn's defense for Waller suit) | $ 81,062.40 |
| 4. | American Express Tax & Business Services (accounting expert) | $1,246, 269.12 |

*A copy of an itemized list of Westport's expenses, prepared by Westport's counsel as part of its mediation submission, is attached hereto as Exhibit I See also St. Paul Memorandum, pg. 13.*

C.     **Westport's Declaratory Action**

26.     On January 17, 2001, Westport filed a Complaint for Rescission and Declaratory Relief in this Court, no. 01 CV 00141.  Westport amended its Complaint to add all known claimants against Irving Cohn as necessary party defendants, which included the following parties: Roberta Borenstein, Jeffrey Borenstein, Ronald Shapiro, Kenneth Shapiro, Susan Shapiro, Eric F. Waller, Arlette Shapiro Mosher, Frederick Shapiro, Roger D. Shapiro, Michael J. Shapiro, Douglas Shapiro, Peter Chernis, Marilyn Chernis Morris, Donald R. Shapiro, Randi Shapiro Cohen, Cindi Shapiro, Herbert M. Bank, Penny Bank, Jane Shapiro, Eileen Shapiro Eaves, Jack Kontigias, Albert Shapiro, Barbara P. Adler, Earl W. Shapiro, James A. Shapiro, Sue Pariser Moss, Christine Geer, Marion Groves Smith, Mary Ann Carley, Mabel Groves Downs, George Groves, Hammilton Coutrell, Mark T. Willen, Marshall A. Smith, and Bertha Smith.

27.     St. Paul participated in the settlement of the claims asserted against Cohn, which settlement was mediated and facilitated by the Honorable Judge Paul Grimm.  *See Defendant's Counterclaim, at pg. 7, 17.*

28.     Ultimately, the parties reached a global settlement of all known claims against Cohn, including the Shapiro Trust claims, and subject to a mutual releases of all parties. However, St. Paul and Westport agreed to except the present dispute.  *See St. Paul Counterclaim.*

11

## II.     ARGUMENT

### A.     St. Paul's Admitted Receipt Of Notice Of Claims Asserted Against Irving Cohn Triggered Its Defense Obligations Under The St. Paul Policy

#### 1.     Under Maryland Law, The Duties To Defend And Indemnify Are Separate Duties; An Insurer Has An Obligation To Defend Any Claim In Its Entirety, As Long As Any One Allegation Is "Potentially" Covered Under The Policy

Maryland courts recognize that liability insurance policies are in essence "litigation insurance" protecting the insured from the expense of defending suits brought against it. *Sherwood Brands, Inc. v. Hartford Accident & Indemnity Co.*, 347 Md. 32, 43, 698 A.2D 1078, 1083 (Ct. App. 1997). The duty to defend is therefore broader than the duty to indemnify, and exists even though the claims asserted against the insured have no basis in law or fact. *Id. See also Teletronics Int'l, Inc. v. CNA Ins.*, 302 F.Supp. 442, 447-48 (D.Md. 2004) ("the duty to defend is broader than the duty to indemnify").

Under Maryland law, an insurance company must defend an insured if the underlying claim is *potentially* covered by the insurance policy. *Teletronics*, at 448. *See also Litz v. State Farm Fire & Cas. Co.*, 346 Md. 217, 695 A.2d 566, 570 (1997) ("under the potentiality rule, the insurer will be obligated to defend more cases than it will be required to indemnify because the mere possibility that it will be required to indemnify triggers the duty to defend"). The insurer must defend if it appears from a suit or other sources available at the time that there is a potential of liability under the policy. *Teletronics*, at 448; *Litz*, at 570 ("when extrinsic evidence, but not the allegations of the complaint, establish a potentiality of coverage, the insured may rely on evidence outside of the complaint"). Additionally, any doubt as to whether there is a potentiality of coverage under the policy is to be resolved in favor of the insured. *Id.*

As long as any one allegation against the insured is potentially covered under the policy, the insurer has a duty to defend the entire claim or suit. *Utica Mutual Ins. Co. v. Miller*, 130 Md. App. 373, 383 (2000) [internal citations omitted]. *See also Mutual Benefit Group v. Wise M. Bolt Co.*, 227 F.Supp.2d 475 (D.Md. 2002) ("if some of the same claims against an insured fall within the terms of coverage and some without, the insurer must still defend the entire claim").

In contrast, the duty to indemnify is based upon a determination of the actual facts. Thus, while the duty to defend depends only upon the facts as alleged, the duty to indemnify depends on liability. *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 852 A.2d 98, 106 (2004). *See also USAA Casualty Ins. Co. v. Mummert*, 213 F.Supp.2d 538, 541 (D.Md. 2002) ("Generally, the question of whether a company must indemnify 'turns on a comparison of the ultimate findings of fact concerning the alleged occurrence with the policy coverage").

In the case at bar, indemnity is not at issue. Thus it, is irrelevant whether the claims asserted against Cohn are actually covered under either policy. The only issue is whether any one allegation against Cohn was *potentially* within the scope of coverage provided by the St. Paul Policy, thereby triggering St. Paul's defense obligations.

## 2.    In May of 2000, And Again in 2001 St. Paul Received Notice Of Potentially Covered Claims Against Irving Cohn

It is undisputed that in May of 2000, and again in 2001, St. Paul received notice of potentially covered claims asserted against Irving Cohn. The underlying claims against Cohn were tendered to St. Paul on at least three separate occasions, yet St. Paul declined to assume Cohn's defense, as required by the St. Paul Policy and Maryland law.

The St. Paul Policy issued for the period of April 1, 1972 to April 1, 1975 provides coverage on an "occurrence" basis. By the terms of the St. Paul Policy, St. Paul agreed to

13

indemnify Cohn for claims arising out of his performance of professional services for others as an attorney, or as administrator, conservator, executor, guardian, trustee, or any similar fiduciary capacity, provided the occurrence of such "casualties or events" occurred during the St. Paul policy period. *See Statement of Facts ("SOF"), ¶2. See also, Exhibit A.* The St. Paul Policy also contains a defense obligation. SOF, ¶3.

In May of 2000, St. Paul received notice of at least one potentially covered claim asserted against Cohn by two Shapiro Flex beneficiaries, Roberta and Jeffrey Borenstein, which notice also included a copy of a draft complaint. SOF, ¶ ¶11, 12.

Subsequently, in April of 2001, another beneficiary, Eric Waller, filed a civil action against Cohn in the Circuit Court of Baltimore County, Maryland, which complaint was tendered to St. Paul for defense shortly thereafter, on April 6, 2001. SOF, ¶14. With respect to the Waller suit, St. Paul agreed to pay only 50% of Cohn's defense fees. SOF, ¶16.

On May 29, 2001, Westport, through counsel, provided St. Paul with further information regarding multiple claims asserted against Cohn by other beneficiaries of the Shapiro Trusts, and by non-Shapiro claimants, Smith and Geer. SOF, ¶18, 20, *See also, Group Exhibit B (Exhibit D therein).* Westport further advised St. Paul that the Geer/Smith claimants had only temporarily agreed to hold off filing suit, and only because of the involvement of defense counsel. In Westport's letter, Westport advised St. Paul that there were multiple claims asserted against Cohn alleging conduct that occurred during the St. Paul policy period, and that St. Paul had a primary duty to defend Cohn. *Id.*

As admitted by St. Paul, Cohn's alleged conduct occurred, at least in part, during the St. Paul Policy period. SOF, ¶¶8, 23. The Borenstein Complaint, which St. Paul acknowledges receiving on June 1, 2000, alleges that for at least 20 years following the creation of Flex Trust

No. 9 in 1969, Cohn, in his capacity as Trustee, allowed the trust to sit idle and lost track of its assets. SOF, ¶22. As detailed in Westport's letter to St. Paul, a large part of the Borenstein claim concerned funds that were apparently abandoned in bank accounts, and have not been invested since the 1970s. SOF, ¶¶17-20, *See also Group Exhibit B (Exhibit D therein).* Westport also advised St. Paul that the Borensteins, <u>and</u> the other numerous beneficiaries of the Shapiro Flex trusts alleged that, during the 1970's, Cohn allowed trust assets to escheat to certain states, failed to invest funds, commingled funds, did not deposit dividend checks into the Trusts, which checks date back to 1972, and did not file appropriate tax returns. *Id.* Lastly, Westport also tendered an additional claim to St. Paul, by non-Shapiro trust claimants. SOF, ¶20. Westport advised St. Paul of claims by Marion Smith and Christine Burton, which were based upon conduct occurring from 1974 through 1996. Westport advised St. Paul that "Presently, there is a "gentlemen's agreement," as the claimants have agreed to hold off the filing of a suit while counsel [defense counsel for Cohn] continues its investigation." *Id.*

Based on St. Paul's admissions, as well as the terms of the St. Paul policy, it is clear that at least some of the beneficiaries' allegations were potentially covered under the St. Paul Policy, thereby invoking St. Paul's defense obligation. Moreover, as long as St. Paul had a duty to defend any one allegation asserted against Cohn, St. Paul had a duty to defend the entire suit[3]. *See, e.g., Utica Mutual Ins. Co. v. Miller*, 130 Md. App. 373, 383 (2000).

---

[3] In its response to Westport's tender, St. Paul erroneously contended that it had no obligation to defend Cohn against the claims asserted against him until Cohn officially "tendered" the defense. *See Group Exhibit B (Exhibit E therein).* However, in *Scottsdale v. American Empire Surplus Lines Co. v. American Empire Surplus Lines Co.,* 791 F.Supp. 1079 (D.Md. 1992), this Court rejected the identical argument. Further, even when presented with an official "tender," St. Paul continued to refuse to defend and indeed, never assumed the defense of any claim against Cohn, or indeed any "suit" asserted against Cohn. When Cohn tendered the <u>Waller</u> suit, St. Paul agreed only to pay 50% of Cohn's defense fees, and refused to pay any amount of the costs associated with the accountant retained by defense counsel to assist in the investigation and defense of all the claims, including <u>Waller</u>. St. Paul appears to have now abandoned this argument.

St. Paul erroneously states in its Memorandum that "an argument exists that the St. Paul's Policy is triggered only for wrongful acts that occur during the policy periods from 1972 to 1975." *St. Paul Memorandum, pg.* 8. However, the issue in this case is St. Paul's duty to defend, not St. Paul's duty to indemnify. As the court in *Utica* recognized, whether the insurer will ultimately have to indemnify an insured for a claim does not effect its duty to defend. *Utica Mutual Ins. Co. v. Miller*, 130 Md. App. 373, 383 (2000) [internal citations omitted]. Thus, St. Paul's arguments regarding its ultimate indemnity exposure are irrelevant to this Court's analysis, as St. Paul plainly, and undisputedly, had an absolute duty to defend.

> **3.    St. Paul Had An Obligation To Defend Cohn Against All Claims Because It Was Clear That Lawsuits Were Imminent And Were Only Prevented Because Of The Actions Of Defense Counsel, And The Tolling Agreement Executed By The Parties**

Contrary to St. Paul's assertions. the duty to defend is not limited to claims asserted in the form of a lawsuit. Rather, the duty to defend runs to both claims and suits. Courts agree that the requirement that an insurer defend a "suit" includes the payment of expenses incurred by the insured in pre-suit settlement of claims when a suit is threatened but not filed.

Faced with this issue, courts have generally agreed that the term "suit" without more, should be construed to provide a form of "litigation insurance" that will protect against any and all attempts to assess liability against the insured which are based on covered activities. *See Continental Cas. Co. v. Cole*, 809 F.2d 891, 896 (D.D.C. 1987); and *Alderman v. Hanover Insurance Group*, 169 Conn. 603, 363 A.2d 1102 (1975) (holding that the duty to defend clause required the insurer to pay expenses incurred by the insured in a pre-suit settlement when a suit was threatened but not filed). *See also Ryan v. Royal Ins. Co. of America*, 916 F2d 731 (1st Cir. 1990) ("To argue that the word 'suit' is to be accorded talismanic

16

significance brings to the language of the policy a precision that the drafter omitted and that the parties were not bound to anticipate . . . We are unprepared to say that the cryptic phrases "any suit" and "legally obligated to pay," unqualified by clear and unmistakable language in the policy's text, necessarily require (1) that a civil case be commenced in a court of law before the duty to defend arises and (2) that a money judgment be entered against the insured before the payment obligations vest [*citations omitted*]."

St. Paul cites *Haines v. St. Paul Fire & Marine Ins. Co.*, 428 F.Supp. 435 (D.Md. 1977), and *Maryland Cas. Co. v. Armco, Inc.*, 822 F.2d 1348 (4th Cir. 1987) for the proposition that "Under Maryland law, it is a condition precedent to the duty to defend that an actual suit be filed where the policy provides coverage for 'any suit against the insured.'" This statement completely misstates the holdings of these cases. In both *Haines* and *Armco*, the issue was whether injunctive relief sought by government entities constitutes "damages" as those terms are used in a general liability policy of insurance. These cases did not even address the issue of whether an insurer's obligation to defend is limited to "suits." As such, these holdings are not relevant here. *See also Provident Bk of Maryland v. Travelers Prop. & Cas. Co.,* 236 F.3d 138, 145 (4th Cir. 2000) (holding that insurer's duty to defend is triggered only when a lawsuit is at least potentially covered under the policy; issue of "claim" vs. "suit" or "imminent suit" was not before the court)

Likewise, in *Ryan v. Royal Ins. Co.*, 916 F.2d 731, 737 (1st Cir. 1990) (applying New York law), also mischaracterized by St. Paul, the court held only that a written invitation to a landowner by the state environmental protection agency inviting the insured to voluntary initiate clean up of toxic waste on his property was not sufficiently adversarial to be the

17

functional equivalent of a "suit." The court did hold, however, that "if the Government assumes an adversarial posture, making sufficiently clear that the force of the State will be brought promptly to bear in a way that threatens the insured with probable and imminent financial consequences, then the functional equivalent of a suit may be in progress and the insured might reasonably expected the insurer to defend." 916 F.2d at 741. Thus, the *Ryan* holding actually supports Westport's position, and not St. Paul's.

St. Paul also cites *Sherwood Brands, Inc. v. Hartford Acc. & Indem. Co.*, 347 Md. 32, 698 A.2d 1078 (1997) for the apparent proposition that St. Paul's obligation to defend is limited to suits. However, a reading of the full quote in *Sherwood Brands* indicates that the Maryland Court of Appeals recognized an obligation to defend as soon as the insurer had a right to exercise "control." The Court stated, in pertinent part:

> Although the issue does not appear to have been litigated, it would seem clear that the right to control the defense necessarily attaches as soon as there is something to defend . . . The same principle would seem to be applicable with respect to the duty to defend . . . The duty to defend rationally should attach at the same moment the correlative right to control attaches, i.e., when the claim is made or, if the policy so provides, when an insured occurrence happens. If that is when the insurer has the right to exercise control, that is also when its duty should arise.

698 A.2d at 1083-84.

On this point, the St. Paul Policy gave St. Paul "control" over claims, and not just "suits." The St. Paul Policy provision regarding defense states, in pertinent part, as follows:

> **32.    Defense, Settlement, Supplementary Payments.**
> As respects any insurance afforded by the terms of this Policy, the Company shall:
>
> (A)    Defend in the name and on behalf of the Insured any suit against the Insured alleging injury, sickness or disease, damages or destruction, and seeking

18

damages [emphasis added] on account thereof, even if such suit is groundless, false or fraudulent; but *the Company shall have the right to make such investigation, negotiation and settlement of any claim or suit as may be deemed expedient by the Company.*

Pursuant to this language, the St. Paul Policy confirms that St. Paul had the right to not only control and investigate, but also settle the beneficiaries' "claims[4]." Therefore, under the "control" analysis articulated by the *Sherwood Brands* Court, and cited by St. Paul, St. Paul's duty to defend arose when the occurrence happened and/or when "claims" were asserted, by which time St. Paul was afforded such "control."

The Borenstein claimants drafted a suit, which was clearly potentially within the scope of coverage provided by the St. Paul Policy, and which clearly sought "damages." Likewise, all other claimants, those related "Shapiro-Flex" trusts and otherwise, agreed to refrain from filing suits only after being advised that counsel, and accountants, would be retained to investigate the matters. Additionally, the Smith/Burton claimants also drafted a suit, but entered into a "gentlemen's agreement' to refrain from filing it, also based upon the promised investigation by counsel, and engagement of an accountant. Therefore, it is clear that the matter was adversarial, and that suit was "imminent." *See Ryan. See also St. Paul's Memorandum, pg. 6* ("Each of the various parties asserting claims against Cohn reached tolling agreements and other agreements, to refrain from filing suit against Cohn and Blum,

---

[4] An additional issue is created by St. Paul's interchangeable use of the terms "claim" and "suit." Although St. Paul contends that it only has an obligation to defend "suits," the Policy also states that St. Paul has the right make such investigation, negotiation and settlement of any "claim" *or* 'suit' as it deems expedient. To the extent this creates an ambiguity as to whether St. Paul, by its own language, also has an obligation to defend "claims," any such ambiguity should be construed against the drafter, St Paul, and in favor of Cohn. *See, e.g., O'Quinn v. Maryland Auto. Ins. Fund*, 157 Md.App. 214, 850 A.2d 386, 389 (2004).

19

Yumkas in exchange for Cohn's and Blum, Yumkas' continued agreements to investigate the negligence allegations, and attempt to audit the trusts. . ."

As such, St. Paul had an obligation to step up and defend its Insured, regardless of whether formal proceedings had commenced. St. Paul did not do so and, in fact, never responded to the Insured's tender. St. Paul did, however, benefit from the assistance of defense counsel and the accountant, in defending the claims, staving off full-blown litigation and, ultimately, achieving a global settlement – all at Westport's expense. St. Paul also received the benefit of a complete release, without contributing anything other than 50% of the defense costs incurred solely in the defense of the Waller state court suit[5].

By its position, St. Paul suggests that, to obtain a defense from St. Paul, Cohn should have ignored the claimant's requests that he notify his insurers to retain counsel, take no steps to avoid litigation, and instead await service of suit. Westport submits that no law, in Maryland or otherwise, would or should permit an insurer to sit idle after notice of a claim and threatened suit without providing so much as an acknowledgment letter. This is clearly contrary to the intention of insurance coverage, as expressed by Maryland courts. *See e.g., Sherwood Brands,* 698 A.2d at 1083. (Ct. App. 1997) ("the promise to defend is in the nature of litigation insurance, 'protecting the insured from the expense of defending suits brought against him.' Not infrequently, that expense may approximate or even exceed the amount of any judgment rendered in the action"). And, St. Paul's position was clearly unfair, and contrary to

---

[5] As this Court is aware, the Waller suit was stayed, and ultimately dismissed in favor of the Westport action, and the global settlement proceedings.

the duty of good faith and fair dealing (implied in every insurance contract)[6], given St. Paul's limited indemnity exposure of $300,000, in relation to the multi-million dollar potential exposure faced by Cohn.

### B. St. Paul Breached It Duty To Defend Cohn Against The Underlying Claims And Is Therefore Liable For Pre-Tender Defense Expenses

#### 1. St. Paul's Refusal To Defend Cohn Was A Breach Of Its Obligations Under The St. Paul Policy, And Maryland Law

By its refusal to assume the defense of the potentially covered claims asserted against Cohn, St. Paul breached its duty to defend as a matter of law. *See, e.g., Sherwood Brands 689 A.2d. at 1083* (Ct. App. 1997) (a breach occurs when, after the insurer is notified of the claim, and without legal justification, the insurer declines to undertake the defense).

St. Paul clearly breached its duty to defend Cohn when, after St. Paul was notified of potentially covered claims against Cohn, nevertheless failed to provide Cohn with a defense. St. Paul's receipt of such notice is undisputed, as is the fact that St. Paul did not provide a defense, or even agree to participate in the defense of any claim asserted by the beneficiaries of the Shapiro Trusts. Moreover, St. Paul did not even acknowledge the notice until May 3, 2001, almost a year after it had been notified of the claims, at which point St. Paul denied its obligations. Even when St. Paul finally made an offer to defend the *Waller* suit, it offered only a partial defense, as St. Paul agreed to pay only 50% of Cohn's fees, but refused to pay any of the costs associated with the accountant retained by defense counsel to assist in the investigation and defense of all the claims, including the Waller Suit. Further, despite being provided with notice

---

[6] *See, e.g. State Farm Mut. Auto Ins.Co. v. White, 248 Md 324, 236 A.2d 269 (1967)*

of additional claims on May 29, 2001, including another imminent lawsuit by a claimant unrelated to the Shapiro claimants, St. Paul continued to refuse to accept its defense obligations.

St. Paul has no legal justification for its failure to defend the claims asserted against Cohn.    Therefore, St. Paul breached its duty to defend as a matter of law. *Id.*

### 2.    Maryland Law Is Clear That When An Insurer Breaches Its Duty To Defend, It Is Liable For All Defense Expenses, Including Those Incurred Prior To Notice Of The Claim

Maryland law is clear that when an insurer declines to defend, and a court later concludes that the claim was potentially within the policy coverage, the insurer is liable for all damages incurred as a result of the breach.    This includes <u>all</u> litigation expenses incurred, including those both <u>before and after</u> notice of the claim was given. *Sherwood Brands,* 698 A.2d at 1083, *abrogating, Washington v. Federal Kemper* Ins., 60 Md. App. 288 (Md. App. 1984); *Oweiss v. Erie Ins. Exchange*, 67 Md. App. 712 (Md. App. 1986); and *Mount Vernon v. Scottsdale Ins.*, 99 Md. App. 545 (Md. App. 1994)

In *Sherwood Brands*, the Maryland Court of Appeals recognized that an insurer's <u>duty</u> to defend arises when, pursuant to the terms of the policy, an insurer has a right to exercise control over a claim or suit.  698 A.2d at 1083-84.    More specifically, a liability insurer's duty to defend a claim arises at the same moment the correlative right to control that claim attaches, *i.e.,* "when the claim is made or, if the policy so provides, when an insured occurrence happens." *Id*.    The *Sherwood* court expressly rejected the proposition that the duty to defend does not arise "until notice of the claim is provided, or until the suit papers are forwarded, or until a formal request is made."  698 A.2d at 1085.

It is true that the duty is not breached until, as here, the insurer is notified of the claim and then, without legal justification, declines to undertake the defense. *Id*.    However, as stated

by the *Sherwood* court, the duty to defend is recognized as pre-existing the notice of the claim, although the outcome of whether the insurer owes defense costs depends upon the insurer's conduct following the notice. 698 A.2d 1084-85.

The *Sherwood* court evaluated liability for pre-tender costs under three scenarios, only one of which is applicable here. Where the insurer declines to defend solely because, in its view, the claim is not even potentially within the policy coverage, and the court concludes that the claim *was* potentially within the policy coverage, the insurer has breached its duty to defend. As a result, the insurer is liable for all damages incurred as a result of that breach, which includes all pre-notice fees and expenses incurred in the defense. 698 A.2d at 1086-87. *See also Teletronics International Inc. v. CNA Ins. Co.*, 302 F. Supp. 2d 442, 449 (D.Md. 2004), wherein this Court recognized the holding in *Sherwood Brands* as authoritative on this issue.

St. Paul acknowledges the holding in *Sherwood Brands*[7], but attempts to distinguish it by stating that "St. Paul did not breach it duty to defend." *See St. Paul Memorandum, pg. 7.* To the contrary, as detailed above, St. Paul was placed on notice of potentially covered claims and imminent suits, yet declined to even acknowledge the tender for over a year, and consistently refused to defend. Moreover, even when St. Paul received a tender of the <u>Waller</u> suit, St. Paul refused to completely accept the defense, by agreeing only to pay one-half of Cohn's defense counsel fees, and continuing to refuse to pay any amount of fees associated with the accountant

---

[7]    St. Paul also cites *Nationwide Mutual Ins. Co  v. LaFarge Corp*, 910 F. Supp. 1104 (D.Md. 1996), as "Maryland authority" for the proposition that pre-tender fees and costs are not reimbursable.  However, the *LaFarge* case was decided under Texas, and not Maryland, law.  *See generally Nationwide Mutual Ins. Co  v. LaFarge Corp*, 121 F.3d 699 (4th Cir. 1997); *LaFarge Corp. v. Nat'l Union*, 935 F.Supp. 675 (D.Md. 1996).  In that case, the policies were issued to Texas insureds in Texas and thus, Maryland law was not at issue.  In this case, however both policies were issued in Maryland to a Maryland insured.  Thus, Maryland law is applicable, and Texas law is irrelevant, given that it directly contradicts Maryland law on the issue.

retained by defense counsel to assist in the investigation and defense of all of the claims, including *Waller*.

Accordingly, having breached its duty to defend Cohn as a matter of law, St. Paul is liable for all defense costs incurred, from the moment the occurrence happened and/or the claims were made, including those fees incurred prior to notice.  *Sherwood Brands.*

C.    **Maryland Renders The St. Paul Policy Primary, Based Upon The "Other Insurance" Clauses Contained In the Competing Policies**

1    **St. Paul and Westport Each Had A Potential Obligation To Defend The Claims At Issue**

The St. Paul Policy at issue is an "occurrence" policy, meaning that St. Paul agrees to provide coverage to its insured for occurrences or events that occur during the policy period. Thus, the St. Paul Policy applies to claims, whenever made, provided that the "occurrence" happened during the policy period  *St. Paul Policy, Exhibit A.  See also Klein v. Fidelity & Deposit Co. of America*,  117 Md.App. 317, 700 A.2d 262, 263, n. 1 (1997) ("generally speaking, 'occurrence' policies cover liability inducing events occurring during the policy term, irrespective of when the actual claim is presented.  Conversely, 'claims made' (or 'discovery') policies cover liability inducing events if and when a claim is made during the policy term, irrespective of when the events occurred').

In contrast, the Westport Policy is a " claims made"  policy, which applies only to claims first made and reported during the Westport Policy Period, regardless of when the act, error or omission occurred, subject to any applicable retroactive date.  *See Westport Policy, Exhibit B. See also, Klein*, 700 A.2d at 263, n. 1.

24

As detailed above,  it is undisputed that the underlying claims asserted against Irving

Cohn alleged conduct during the time period of 1973, and continuing through 1999, and the

claims were first made in 1999, during the Westport policy period.  Accordingly, the claims at

issue were "first made" during the Westport Policy Period, and concerned events that occurred,

at least in part, during the St. Paul policy period.   Therefore, both Westport and St. Paul

potentially had an obligation to defend.  *See, e.g., Utica Mutual Ins. Co. v. Miller*, 130 Md. App.

373, 395 (Ct.App. 2000) (if any claims potentially come within the policy coverage, the insurer

is obligated to defend all claims, "'notwithstanding alternative allegations outside the policy's

coverage, until such times ... that the claims have been limited to ones outside the policy

coverage).

St. Paul cites North Carolina law for the proposition that "other insurance" clauses apply

only when coverage is "concurrent."  *See St. Paul Memorandum, pg. 12,* citing, *St. Paul Fire &*

*Marine Ins. Co. v. Vigilant Ins. Co.*, 919F.2d 235 (4th Cir. 1990).  However Maryland law is

applicable here.    Under Maryland law, "double" or "overlapping" insurance exists when more

than one insurance policy potentially covers a claim.  *See, e.g.,  National Indemnity Co. v.*

*Continental Ins. Co.*, 61 Md. App. 575,  487 A.2d 1191, 1193 (Ct. App. 1985).  Thus, the issue is

not whether the time periods coincide, rather, the issue is whether  both policies provide

overlapping coverage for the same risk involved.  *See Consolidated Mutual Ins. Co. v. Bankers*

*Ins. Co. of Pennsylvania*, 244 Md. 392, 223 A.2d 594, 595, fn.2  (Ct. App.  1966) (Maryland

courts acknowledge that "other insurance" clauses can conflict between current and prior

policies); *See also National Indemnity ,* at 1193 (definition of overlapping insurance is not

limited to insurance policies with coinciding policy periods; "double coverage exists when more

than one insurance policy covers a claim…these 'other insurance' clauses indicate the allocation of responsibility among the insurance companies involved").

      2.      **Under Maryland Law, The St.. Paul "Other Insurance" Clause Is "Pro Rata," and The Westport "Other Insurance" Clause Is "Excess"**

Where, as here, there is concurrent coverage by multiple insurers with regard to a claim, Maryland courts resort to "other insurance" clauses to determine the insurers' respective obligations. *Centennial Ins. Co. v. State Farm Mutual Automobile Ins. Co.*, 71 Md. App. 152, 157, 524 A.2d 110 (Ct.App. 1987). *See also Allstate Ins. Co. v. Federal Ins. Co.*, 23 Md. App. 105, 120 (Ct. Spec. App. 1974).

Like most states, Maryland courts distinguish between three separate types of "other insurance" clauses: (1) an escape clause; (2) an excess clause; or (3) a pro rata clause. *Centennial,* 524 A.2d at 113. An escape clause states that the insurer will not pay benefits when other insurance exists to compensate the claimant. An excess clause renders a specific policy excess to the other insurance. A pro rata clause limits an insurer's liability to its proportionate share in relation to all available coverage. *See Centennial. See also National Indemnity,* a.2d at 1194.

The St. Paul Policy contains the following "other insurance" clause:

> OTHER INSURANCE. The insurance afforded by this Policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the Insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the Company's liability under this Policy shall not be reduced by the existence of such other insurance.

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the Company shall not be liable under this Policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

SOF, ¶6.

As expressly stated in the provision, where the St. Paul "primary" policy, and other insurance, both apply to a claim, St. Paul agrees to pay its proportionate share. Thus, under Maryland law, the St. Paul "other insurance" clause is a "pro rata" clause. *See, e.g. Centennial.*

In contrast, the Westport Policy contains the following "other insurance" clause:

> VI.    OTHER INSURANCE OF A PRIOR LAW FIRM
> If a Prior Firm has other insurance applicable to a Claim against the Insured(s) covered by this Coverage Unit, this Policy is specifically issued as excess insurance over and above the applicable limits of liability of all such other insurance regardless of whether such other insurance is written as primary, contributory, excess, contingent or otherwise.

SOF, ¶7.

Thus, as expressly stated in the Westport Policy, where other insurance applies to any claim, the Westport Policy is deemed "excess" of such insurance, regardless of whether such insurance is written as primary, contributory, excess, contingent or otherwise. Thus, under Maryland law, the Westport "other insurance clause" is an "excess" clause. *Id.*

### 3.    Under Maryland Law, An "Excess" "Other Insurance" Clause Trumps A "Pro Rata" "Other Insurance" Clause, Thereby Rendering The Westport Policy Excess To The St. Paul Primary Policy

In Maryland, as in most states, an "excess" clause "trumps" a "pro rata" clause. That is, when an "excess" clause in one policy conflicts with a "pro rata" clause from a concurrently effective policy, the court will disregard the pro rata clause in favor of the excess. As such, the policy containing the "pro rata" clause becomes primary, and the "excess" insurer is secondarily liable. *See National Indemnity Co. v. Continental Ins. Co*, 61 Md.App. 575, 487 A.2d. 1191, 1194 (1985) ("an excess clause always prevails over an escape or prorata clause. In effect, the

policy with either of the latter two clauses becomes primary coverage, and the excess insurer becomes secondary liable") *Nolt v. United States Fidelity and Guaranty Co.,* 329 Md. 52, 60-61, 617 A.2d 578 (Ct. App. 1993); *Centennial Ins. Co. v. State Farm Mutual Automobile Ins. Co.,* 71 Md. App. 152, 524 A.2d 110 (Ct. App. 1987); *Allstate Ins. Co. v. Federal Ins. Co.,* 23 Md. App. 105, 120, 326 A.2d 29, 38, fn.5 (Ct. App. 1974); and *Consolidated Mutual Ins. Co. v. Bankers Ins. Co. of Pennsylvania*, 244 Md. 392, 223 A.2d 594, 595 (Ct. App. 1966)

In *Nolt,* the Maryland Court of Appeals held that the applicable rules for reconciling "other insurance" clauses are: (1) where an *excess* clause from one policy conflicts with a *pro rata* clause from a concurrently effective policy, we disregard the *pro rata* clause in favor of the *excess* clause; (2) where both policies provide for excess coverage only, liability is shared equally by the insurers; and (3) where the policies' *pro rata* clauses are in conflict and there are no other provisions limiting liability, the insurers share liability proportionately. *Id.* at 582. *See also, National Indemnity.*

St. Paul argues that Westport's citation to *Nolt* is "mistaken" because *Nolt* "involved two identical primary policies which had identical "other insurance" provisions which both had an excess clause and a pro rata clause." *St. Paul Memorandum, pg. 9.* It is true that in *Nolt*, unlike here, both policies had identical "other insurance" clauses. 617 A.2d at 581. Whereas in this case, St. Paul would have the primary obligation because Westport's excess clause "trumps" St. Paul's pro rata clause, in *Nolt,* because the clauses were identical, neither insurer was rendered excess. Where *Nolt* differs from this case, however, is that in *Nolt,* each policy also contained an "ICC" endorsement, which rendered each policy primary. By reason of the endorsement, the court deemed both policies primary, and liable on a *pro rata* basis. Accordingly, while the ICC analysis is not applicable, the *Nolt* Court's general holding regarding the appropriate method of

resolving conflicts between "other insurance" clauses properly confirms the law in Maryland. *See, e.g., National Indemnity,* 487 A.2d at 1194; *Consolidated Mutual,* at 396-97.

Contrary to St. Paul's statement, "other insurance" clauses do apply in the context of the duty to defend. Maryland courts hold that where an insurer rendered excess by reason of an "other insurance" clause incurs defense costs, it has the right to obtain <u>full</u> reimbursement from the insurer deemed "primary." *See Utica Mutual Ins. Co. v. Miller,* 130 Md.App. 373, 746 A.2d 935 (2000); *Employer's Liability Assur. Corp. v. Indemnity Ins. Co. of North America,* 228 F.Supp. 896 (D.Md. 1964)

St. Paul cites *Utica,* 746 A.2d 935, for the proposition that "Maryland law is clear that excess or other insurance clauses do not apply to the duty to defend issues because, unless stated otherwise, that obligation is independent of liability and any limitations thereon." *St. Paul Memorandum, pgs 11-12.* However, St. Paul takes that limited statement out of context and ignores the remainder of the *Utica* holding[8].

In *Utica,* the insurer attempted to use the "other insurance" clause to abrogate its duty to defend, despite the fact that no other insurer had even been identified. The court stated, "We agree with appellant that an excess carrier does not have the obligation to provide a defense, provided a primary carrier has been identified. . . We do not agree, however, that [the insurer] is entitled to discovery in order to ascertain whether there was a primary carrier." 746 A.2d at 946-

---

[8] St. Paul's citation to *Southern Maryland Agricultural Assn. v. Bituminous Cas. Co.,* 539 F.Supp. 1295 (D.Md. 1982) is equally unavailing, given that the issue in *Bituminous* was whether an insurer could decline to pay defense costs incurred for a clearly uncovered claim. There, the court rejected the insurer's attempts to such apportionment, and held the insurer liable for all fees. On the issue of whether the insurer could refuse to pay defense costs for claims that should have been covered under any other policy period, the court stated that such allocation was not feasible, because such a motion was not before the court, and because such facts were not in the record. Therefore, *Bituminous* has no relevance here.

29

47.    Thus, the court merely acknowledged that an insurer cannot use an "other insurance" clause to refute its obligations to its insured, absent the confirmed existence of other coverage.

However, the *Utica* court also noted that "If and when a primary carrier is identified, appellant will have a claim against the primary carrier for the costs of defense." *Id.* Similarly, in *Employer's Liability Assur. Corp. v. Indemnity Ins. Co. of North America*, 228 F.Supp. 896 (D.Md. 1964) cited in *Utica*, two insurers' policies potentially applied to a claim and therefore, each had a duty to defend.  Employers' policy contained an "escape" clause, while Indemnity's policy contained a "pro rata" clause.  Indemnity refused to defend, but Employers properly assumed the obligation.  After determining that an "escape" clause trumps a "pro rata" clause under Maryland law, this Court ordered Indemnity to reimburse Employers for all the costs it incurred in defending the action.  228 F.Supp. at 902 ("Under these circumstances, Indemnity is the sole insurer, and Indemnity is the only insurer which has covenanted to defend").

In this case, as in *Employers Liability*, Westport and St. Paul do not have co-primary obligations with respect to underlying claims asserted against Cohn.  The Westport Policy contains an "excess" clause, and the St. Paul Policy contains a "pro rata" clause.  Under Maryland law, this renders the St. Paul Policy primary, and the Westport Policy excess.  In accord with *Utica* and *Employers*, Westport assumed Cohn's defense, and continued to defend Cohn, even after St. Paul was identified as the primary insurer, and refused to defend.  Pursuant to Maryland authority, Westport is therefore entitled to full reimbursement of all of the fees and costs incurred in defense of these matters,[9] without proration or other apportionment.[10]

---

[9] Westport's fees and expenses total $1,539,363.28.  In St. Paul's Memorandum, St. Paul asserts that "the American Express Tax & Business Services costs and fees were incurred, at the direction of Westport, prior to the tender of the Waller lawsuit to St. Paul on April 6, 2001 [sic].  St. Paul offers no support for its assertion that the fees were incurred "at the direction of Westport," as opposed to the direction of Cohn's defense counsel.  Moreover, as indicated by the itemized invoice list contained in Exhibit I, and as known to this Court, American Express

## IV.    CONCLUSION

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56.*

For all of the foregoing reasons, and based upon the undisputed material facts, and applicable case law, Westport Insurance Corporation respectfully requests that this Honorable Court deny St. Paul's Motion for Summary Judgment and enter Summary Judgment in favor of Westport declaring that, as a matter of law: (1) St. Paul's obligation to defend was triggered by St. Paul's notice of the underlying claims asserted against Irving Cohn; (2) St. Paul breached its duty to defend Cohn, thereby obligating St. Paul to pay all defense costs and fees incurred with respect to the underlying claims; and (3) the St. Paul Policy is primary, by virtue of the "other insurance clauses contained in the St. Paul, and Westport policies, thereby obligating St. Paul to

---

continued to provide services from April of 2000 (just one month prior to St. Paul's notice of these claims), up until the settlement of this matter, in 2003.   St. Paul also asserts that it incurred "approximately $90,000 in connection with the defense of the Waller suit," which it apparently believes supports some sort of set-off, but offers no evidentiary support this statement.

[10] St. Paul's alternate "apportionment" analysis would seriously prejudice the rights of insureds, and is contrary to Maryland law. Under St. Paul's analysis, based upon the Texas law, applied in *LaFarge*, and the Sixth Circuit opinion in *North America v. Forty-Eight Insulations*, 633 F.2d 1212 (6th Cir. 1980), defense costs should be apportioned based upon the time on the risk, including allocating costs to Cohn during any period for which no carrier is identified. St. Paul contends that Westport insures Cohn for 13 years, and St. Paul for only 3, and "this leaves 29 years for which Mr. Cohn and his firms have no available insurance, which should be born by Cohn and his firms." *See St. Paul Memorandum, pg. 8.*  This statement in itself is incorrect-- Westport provided only one year of coverage – January 1, 1999 through January 1, 2000, while St. Paul provided three – April of 1972 through April of 1975.

Regardless, this outcome could not be upheld in Maryland because it is well-established that where an insurer has a duty to defend any one allegation contained in a claim against the insured, it has a duty to defend the entire claim. *See, e.g., Utica.*  In the face of this holding, it is unclear to Westport how St. Paul could justifiably "allocate" more than 50% of the defense fees to "Cohn," yet still comply with its defense obligations.

reimburse Westport for all defense costs and fees incurred with respect to the underlying claims asserted against Cohn.

Respectfully Submitted:

**WESTPORT INSURANCE CORPORATION**

By:  /s/  Paul Cottrell
M.D. I.D. #06364

Paul Cottrell, Esquire
TIGHE, COTTRELL & LOGAN
First Federal Plaza
704 North King Street
Suite 500
Wilmington, Delaware 19801
Telephone:  (302) 658-6400

Michelle M. Bracke, Esq., admitted pro hac vice
BOLLINGER, RUBERRY & GARVEY
500 West Madison Street
Suite 2300
Chicago, IL  60661
Telephone:  (312) 466-8000