B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WESTPORT INSURANCE CORPORATION,)
                                        )
                Plaintiff,              )
                                        )     Civil Action No.:  AMD-02-1774
        vs.                             )
                                        )
ST. PAUL FIRE & MARINE INSURANCE        )
COMPANY,                                )
                                        )
                Defendant.              )
_____)

### DEFENDANT'S ANSWERS TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION

Defendant St. Paul Fire & Marine Insurance Company ("St. Paul"), by and through

its attorneys, Ross, Dixon & Bell, LLP, for its Answers, pursuant to Federal Rules of Civil

Procedure, Rule 36 answers as follows:

### REQUESTS FOR ADMISSION

1.      Admit that Irving Cohn was an insured pursuant to the terms of St. Paul
Policy No. 619NA0039 issued to the law firm of Burke, Gerber & Wilen for the policy
period of April 1, 1972 to April 1, 1975.

**RESPONSE:**      Admitted that Irving Cohn was an insured pursuant to the
terms of the St. Paul Policy provided to St. Paul by Irving Cohn's insurance broker, policy
no. 619NA0039 issued to the law firm of Burke, Gerber & Wilen for the policy period of
April 1, 1972 to April 1, 1975.

2.      Admit that Exhibit A is a true and accurate copy of policy St. Paul Policy No.
619NA0039.

**RESPONSE:**      Admitted that Exhibit A is a copy of a St. Paul Policy
provided to St. Paul by Irving Cohn's insurance broker.

3.      Admit that you first received notice of claims against Irving Cohn for the
alleged mishandling of the Shapiro Trusts in May of 2000.

**RESPONSE:**      Admitted that around May of 2000 St. Paul received notice of
claim against Irving Cohn in connection with the Shapiro Trusts.

930059 v3

4.    Admit that Phil C. Smith of Hearne & Bailey, P.A. orally notified you on May 31, 2000, of claims against Irving Cohn for the alleged mishandling of the Shapiro Trusts.

**RESPONSE:**        Admitted that St. Paul was orally notified by Hearne & Bailey, P.A. on May 31, 2000 with respect to a claim against Irving Cohn in connection with the Shapiro Trusts.

5.    Admit that you received the correspondence attached hereto as Exhibit B.

**RESPONSE:**        Admitted.

6.    Admit that Exhibit B is a true and accurate copy of the correspondence you received from Phil C. Smith of Hearne & Bailey, P.A.

**RESPONSE:**        Admitted.

7.    Admit that Exhibit B notified you of a claim against Irving Cohn for his alleged mismanagement of the Shapiro Trusts.

**RESPONSE:**        Admitted that Exhibit B informed St. Paul that a potential lawsuit by Roberta and Jeffrey Borenstein against Mr. Cohn existed relating to the Shapiro Trusts.

8.    Admit that Exhibit B included a copy of a draft Complaint naming Irving Cohn as a defendant.

**RESPONSE:**        Admitted.

9.    Admit that prior to February 16, 2001, you informed Phil C. Smith of Hearne & Bailey, P.A., that you intended to send him a letter stating your coverage position related to the claims against Irving Cohn.

**RESPONSE:**        Admitted that prior to February 16, 2001 St. Paul inform Hearn & Bailey, P.A. that St. Paul intended to send a more comprehensive statement of its coverage position.

10.    Admit that you never sent Phil C. Smith of Hearne & Bailey, P.A., any correspondence stating your coverage position related to the claims against Irving Cohn prior to April 6, 2001.

**RESPONSE:**        Denied that St. Paul never sent Hearne & Baily, P.A. any correspondence stating its coverage position related to the claims against Irving Cohn prior to April 6, 2001.

930059 v3

2

11.    Admit that you never orally notified Phil C. Smith of Hearne & Bailey, P.A., of your coverage position related to the claims against Irving Cohn prior to April 6, 2001.

**RESPONSE:**    Denied.

12.    Admit that you never sent Irving Cohn any correspondence stating your coverage position related to the claims against him prior to April 6, 2001.

**RESPONSE:**    Admitted.

13.    Admit that you never notified orally Irving Cohn of your coverage position related to the claims against him prior to April 6, 2001.

**RESPONSE:**    Admitted.

14.    Admit that prior to May 3, 2001, you never offered or agreed to provide Irving Cohn with a defense against the claims asserted against him related to his alleged mismanagement of the Shapiro Trusts.

**RESPONSE:**    Admitted.

15.    Admit that you did not inquire as to the status of claims against Irving Cohn for his alleged mismanagement of the Shapiro Trusts during the period of June 1, 2000 to April 6, 2001.

**RESPONSE:**    Denied.

16.    Admit that prior to May 3, 2001, you did you [sic] request information from Phil C. Smith of Hearne & Bailey, P.A. regarding the status of the claims against Irving Cohn for his alleged mismanagement of the Shapiro Trusts.

**RESPONSE:**    Admitted.

17.    Admit that prior to May 3, 2001, you did you [sic] request information from Irving Cohn regarding the status of the claims against him for his alleged mismanagement of the Shapiro Trusts.

**RESPONSE:**    Denied.

18.    Admit that you never undertook any investigation of the claims asserted against Irving Cohn for the alleged mismanagement of the Shapiro Trusts.

**RESPONSE:**    Denied.

930059 v3

3

19.    Admit that you never requested information from Irving Cohn regarding the claims asserted against him for the alleged mismanagement of the Shapiro Trusts.

**RESPONSE:**    Admitted that St. Paul never requested information directly from Irving Cohn regarding the claims asserted against him in connection with the Shapiro Trusts.

20.    Admit that you received notice of the Waller lawsuit on April 6, 2001.

**RESPONSE:**    Admitted that St. Paul first received a copy of the Waller lawsuit from Westport's coverage counsel on April 6, 2001.

21.    Admit that your first communication with Irving Cohn regarding the claims asserted against him for the alleged mismanagement of the Shapiro Trusts was on May 3, 2001.

**RESPONSE:**    Denied.

22.    Admit that Exhibit C is a true and accurate copy of correspondence you directed to Phil C. Smith of Hearne & Bailey, P.A.

**RESPONSE:**    Admitted.

23.    Admit that Exhibit C was the first correspondence you sent to Phil C. Smith of Hearne & Bailey, P.A. regarding the claims asserted against him for the alleged mismanagement of the Shapiro Trusts.

**RESPONSE:**    Denied.

24.    Admit that you received the correspondence attached hereto as Exhibit D.

**RESPONSE:**    Admitted.

25.    Admit that Exhibit D is a true and accurate copy of the letter you received from Westport's counsel.

**RESPONSE:**    Admitted.

26.    Admit that in Exhibit D Westport's counsel requested that you assume Irving Cohn's defense of all claims and lawsuits asserted against him for the alleged mismanagement of the Shapiro Trusts.

**RESPONSE:**    Admitted.

930059 v3

4

27.    Admit that in correspondence to Westport's counsel dated July 12, 2001, you refused to defend Irving Cohn against the claims asserted against him for the alleged mismanagement of the Shapiro Trusts.

**RESPONSE:**          Denied.

28.    Admit that Exhibit E is a true and accurate copy of correspondence you directed to Westport's counsel.

**RESPONSE:**          Admitted.

29.    Admit that in correspondence to Westport's counsel dated July 12, 2001, you stated that you refused to fully defend and indemnify Cohn for the Waller lawsuit.

**RESPONSE:**          Denied.

Respectfully submitted,

ROSS, DIXON & BELL, LLP

Dated:  July 13, 2004                    By:_____
                                                Michael P. Tone
                                                Ross, Dixon & Bell, LLP
                                                Three First National Plaza, Suite 525
                                                Chicago, IL 60602
                                                Phone – 312-759-1920
                                                Facsimile – 312-759-1939

                                                *Attorney for Defendant St. Paul Insurance Company*

930059 v3                                5

## CERTIFICATE OF SERVICE

I certify that on this 13th day of July, 2004, service of a true and complete copy of the above and forgoing pleading was made upon the following by depositing in the U.S. Mail, postage prepaid:

| Paul Cottrell<br>Tighe, Cottrell & Logan, P.A.<br>First Federal Plaza, Suite 500<br>P.O. Box 1031<br>Wilmington, DE 19899 | Michelle M. Bracke, Esq.<br>Bollinger Ruberry & Garvey<br>500 W. Madison Street, Suite 2300<br>Chicago, Illinois 60661-2511 |
| --- | --- |

_____
Michael P. Tone

930059 v3                                6

LAW OFFICES

# HEARNE & BAILEY, P. A.

FREDERIC E. WIERMAN
CHARLES R. DASHIELL, JR.
CHRISTOPHER F. DAVIS
PHILIP C. SMITH

CHARLES E. HEARNE, JR. (1909 - 1995)
JAMES P. BAILEY (1922 - 1987)

COLONIAL BUILDING
128 EAST MAIN STREET
SALISBURY, MD 21801

**PLEASE REPLY TO:**

P. O. BOX 138
SALISBURY, MD 21803-0138

TELEPHONE: (410) 749-8144
FAX NO:        (410) 749-8273
e-mail:
psmith@shore.intercom.net

June 1, 2000

Joseph W. Schmitt, Esq.
385 Washington Street
508A
St. Paul, Minnesota   55102-1396

RE:      Irving F. Cohn Matter

Dear Mr. Schmitt:

It was a pleasure talking to you on May 31, 2000 about the above-captioned case.  Pursuant to our telephone conversation, I have enclosed a copy of a Complaint that we received from one of the beneficiaries of the Trust that were administered by Mr. Cohn.  Please note that at this time this Complaint has not been filed nor served.

If you have any questions concerning this matter, please call me.

Very truly yours,

Philip C. Smith

PCS:sdf
Enc.

F:\Users\SF\34237Smitt



05/11/2001 10:15 FAX 1312759195ð      ROSS, DIXON & BELL      ☑002

**he St Paul**

385 Washington Street
St Paul, Minnesota 55102-1396
651-310-7911

May 3, 2001

Philip C. Smith, Esq.
Christopher F. Davis, Esq.
Hearne & Bailey, P.A.
Colonial Building
126 E. Main Street
Salisbury, MD 21801

Re: Insured:            Irving F. Cohn/Burke, Gerber & Wilen
    Claimant:           Eric Waller
    Potential Claimants: Roberta and Jeffrey Borenstein
    Policy No.:         619NA0039
    Claim No.:          0619NA0039-09T001

Dear Messrs. Smith and Davis:

By correspondence dated May 23, 2000, St. Paul Fire and Marine Insurance Company ("St. Paul") was advised of circumstances relative to Irving F. Cohn's involvement as Trustee of the so-called Shapiro Flex Trusts (the "Trusts"). On June 1, 2000, St. Paul was provided a copy of a draft complaint, entitled Roberta Borenstein, et al. v. Blum, Yumkas, Mailman, Gutman & Denick, P.A., et al. We understand that, to date, the Borenstein complaint has not been filed.

We also recently received a copy of a complaint filed in the Circuit Court for Baltimore City, Maryland, entitled Eric F. Waller v. Blum, Yumkas, Mailman, Gutman & Denick, P.A., et al. We understand that although independent counsel has been offered to Mr. Cohn at the expense of Westport Insurance Company ("Westport"), Mr. Cohn has chosen you to defend this matter on his behalf at Westport's expense. We understand that you are proceeding to prepare a responsive pleading to the Waller Complaint on behalf of Mr. Cohn accordingly. In light of the fact that Mr. Cohn is being represented by counsel with respect to the Waller lawsuit, we direct this correspondence to you on Mr. Cohn's behalf and request that you provide a copy of this letter to Mr. Cohn for his review.

As we confirmed with Chris Davis on April 18, 2001, we understand that the Waller Complaint has not yet been tendered for defense and/or indemnity to St. Paul. Please notify us immediately should Mr. Cohn choose to tender the Waller Complaint to St. Paul for defense and/or indemnity. At this time, St. Paul reserves the right to challenge coverage for pre-tender defense fees, and reserves its right to allocate any defense fees and costs incurred as well.



EXHIBIT
C

Philip C. Smith, Esq.
Christopher F. Davis, Esq.
May 3, 2001
Page 2

Although no Complaint has yet been tendered to St. Paul for defense and/or indemnity, we would like to proceed to explain to you the provisions of the above-captioned Policy. We hope you can appreciate that by calling these provisions of the Policy to your attention, we do not mean to imply that the allegations made concerning Mr. Cohn have any merit whatsoever. We also hope you can appreciate that by directing your attention to these coverage concerns; we do not mean to waive any other coverage concerns which may come to our attention as further-developed facts so warrant.

We enclose a copy of the Policy for your review. The Policy, issued to named Insured Burke, Gerber & Wilen, contains several Sections, one of which is entitled "Lawyers Professional Liability", found at Section II of the Policy. The Lawyers Professional Liability Policy effective date is April 1, 1972, at which time the Policy contained a limit of liability of $100,000 each occurrence with a deductible amount of $2,500. The Policy continued through April 1, 1974, at which time the deductible amount was changed to $500. The Policy terminated on April 1, 1975.

As to the policy period, Paragraph 6.C. of the Policy provides as follows:

> C.    Policy Period; Territory. This Insuring Agreement applies within the United States of America, its territories or possessions or Canada to professional services performed for others (1) during the period of this Insuring Agreement (2) prior to the effective date of this Insuring Agreement if claim is made or suit is brought during the period of this Insuring Agreement and providing the Insured had no knowledge or could not have reasonably foreseen any circumstances which might result in a claim or suit at the effective date of this Insuring Agreement. With respect to an Insured who becomes an Insured under this Insuring Agreement subsequent to its effective date, the Insuring Agreement period under (1) and (2) shall begin as of that effective date.

St. Paul reserves its rights as to whether the Policy requires that a claim be made or suit be brought during the policy period in order for coverage to apply.

Pursuant to Paragraph 4 of the Policy, the $100,000 each occurrence limit of liability is the limit of St. Paul's liability for all damages arising out of the same professional services regardless of the number of claims or claimants. Therefore, to the extent that claims and claimants may make allegations against Mr. Cohn alleging damages arising out of the same professional services, the $100,000 each occurrence limit of liability is the limit of St. Paul's liability.

904230 v1

05/11/2001 10:16 FAX 13127591939          ROSS, DIXON & BELL                    ☒004

Philip C. Smith, Esq.
Christopher F. Davis, Esq.
May 3, 2001
Page 3

Amounts payable under the Policy are also subject to the Policy deductible.  Paragraph 3 of the Policy, entitled "Deductible", provides as follows:

> It is agreed that in the event of a claim the amount indicated in the Schedule shall be deducted from the total amount resulting from each occurrence and the Company shall be liable only for the difference between such deductible amount and the amount of insurance otherwise applicable to each claim.  Such deductible amount shall not apply to the coverage provided under General Condition 32, Defense, Settlement, Supplementary Payments of this Policy or Special Condition C of this Insuring Agreement.

The Policy provides the following relative to defense of Insureds at Paragraph 6 A. of the Policy:

> A.  Defense, Settlement, Supplementary Payments.  As respects such insurance as is afforded by the other terms of this Insuring Agreement the Company shall (a) defend in his name and behalf any suit against the Insured alleging damages, even if such suit is groundless, false, or fraudulent; but the Company shall have the right to make such investigation and negotiation of any claim or suit as may be deemed expedient by the Company.  The Company, however, shall not make settlement or compromise any claim or suit without the written consent of the Insured.

Paragraph 32 of the Policy then continues:

> The Company will pay, in addition to the applicable limit of liability:

> (B)  All expenses incurred by the Company, all costs taxed against the Insured in any suit defended by the Company and all interest on the entire amount of any judgment therein which does not exceed the limit of the Company's liability thereon;

> (C)  Premiums on appeal bonds required in any such suit, premiums on bonds to release attachments in any such suit for an amount not in excess of the applicable limit of liability of this Policy, and the cost of bail bonds required of the Insured because of accident or traffic law violation

904230 v1

05/11/2001 10:16 FAX 13127591939          ROSS, DIXON & BELL                                    ☒005

Philip C. Smith, Esq.
Christopher F. Davis, Esq.
May 3, 2001
Page 4

        arising out of the use of any vehicle to which this Policy
        applies, but the Company shall have no obligation to apply
        for or furnish any such bonds;

(D)    Expenses incurred by the Insured for first aid to others at
        the time of an accident, for bodily injury to which this
        Policy applies;

(E)    Reasonable expenses incurred by the Insured at the
        Company's request, including actual loss of wages or
        salary (but not loss of other income) not to exceed $25 per
        day because of his attendance at hearings or trials at such
        request.

St. Paul reserves its rights relative to whether defense fees and costs incurred on behalf of
Insureds would deplete the Policy's limit of liability.

    The "Coverage" portion of the Policy, contained at Paragraph 2, provides as follows:

        The Company agrees to pay on behalf of the Insured all sums
        which the Insured shall become legally obligated to pay as
        damages arising out of the performance of professional services for
        others in the Insured's capacity as a lawyer and caused by the
        Insured, or any other person for whose acts the Insured is legally
        liable. (The performance of professional services shall be deemed
        to include the Insured's acts as an administrator, conservator,
        executor, guardian, trustee or any similar fiduciary capacity, but
        only to the extent for which in the usual attorney-client relationship
        the Insured would be legally responsible as attorney for a
        fiduciary.)

St. Paul reserves its rights as to whether Mr. Cohn was acting in the performance of professional
services for others in his capacity as a lawyer. St. Paul also reserves its rights to the extent any
claimants request injunctive relief against Mr. Cohn, rather than damages, and as to whether Mr.
Cohn has become legally obligated to pay as damages any amounts under the Policy to date.

    We also bring to your attention Exclusion 5.A. of the Policy which provides that the
Policy does not apply "to any dishonest, fraudulent, criminal, malicious act or omission of the
Insured ...". St. Paul reserves its rights concerning this Policy exclusion as well and reserves its
rights as to whether Maryland law allows the insurability of intentional acts and/or punitive
damages.

904230 v1

Philip C. Smith, Esq.
Christopher F. Davis, Esq
May 3, 2001
Page 5

We also bring to your attention Paragraph 30 of the Policy which provides as follows:

INSURED'S DUTIES IN THE EVENT OF LOSS,
OCCURRENCE, CLAIM OR SUIT

(A)    Upon the occurrence of any casualty or event for which
       coverage is afforded by this Policy, written notice
       containing particulars sufficient to identify the Insured and
       also reasonably obtainable information with respect to the
       time, place and circumstances thereof, and the names and
       addresses of the injured and of available witnesses, shall be
       given by or for the Insured to the Company or any of its
       authorized agents as soon as practicable. The Named
       Insured shall promptly take at his expense all reasonable
       steps to prevent other bodily injury or property damage
       from arising out of the same or similar conditions, but such
       expense shall not be recoverable under this Policy.

(B)    If claim is made or suit is brought against the Insured, the
       Insured shall immediately forward to the Company every
       demand, notice summons or other process received by him
       or his representative.

(C)    The Insured shall cooperate with the Company and, upon
       the Company's request, assist in making settlements, in the
       conduct of suits and in enforcing any right of contribution
       or indemnity against any person or organization who may
       be liable to the Insured because of bodily injury or property
       damage with respect to which insurance is afforded under
       this Policy; and the Insured shall attend hearings and trial
       sand assist in securing and giving evidence and obtaining
       the attendance of witnesses. The Insured shall not, except
       at his own cost, voluntarily make any payment, assume any
       obligation or incur any expense other than for first aid to
       others at the time of accident.

(D)    Upon request of the Company the Insured shall, within a
       reasonable time after determining the amount of any loss
       submit to the Company an itemized proof of loss, duly
       sworn to.

904230 v1

Philip C. Smith, Esq.
Christopher F. Davis, Esq.
May 3, 2001
Page 6

Moreover, St. Paul reserves its rights with regard to Paragraph 31 of the Policy, which provides as follows:

### ASSISTANCE AND COOPERATION OF THE INSURED

The Insured shall cooperate (except in a pecuniary manner) with the Company and, at the Company's request and expense, shall attend hearings and trials and shall assist in effecting settlements, securing and given evidence, obtaining the attendance of witnesses and in the conduct of suits. The Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the casualty or event.

We bring to your attention Paragraph 37 of the Policy which provides as follows:

### FRAUD AND MISREPRESENTATION.

This Policy and its Insuring Agreements shall be void if the Insured has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof or in case of any fraud, attempted fraud or false swearing by the Insured pertaining to this insurance or the subject thereof, whether before or after a loss. However, unintentional errors or omissions on the part of the Insured shall not operate to prejudice the rights of the Insured under this Policy and its Insuring Agreements.

Paragraph 40 of the Policy provides as follows:

### DECLARATIONS. By acceptance of this Policy, the Named Insured agrees that the statements in the Declarations are his agreements and representations, that this Policy is issued in reliance upon the truth of such representations and that this Policy embodies all agreements existing between himself and the Company or any of its agents relating to this Policy.

St. Paul reserves its rights as to whether Mr. Cohn has complied with these notice and cooperation clauses of the Policy and as to whether St. Paul maintains a right to rescind the Policy pursuant to these Policy provisions and the common law of the State of Maryland. St. Paul also reserves its rights relative to the common law doctrines of expected/intended loss,

9C4230 v1

Philip C. Smith, Esq.
Christopher F. Davis, Esq.
May 3, 2001
Page 7

known loss, and as to the prior acts and/or knowledge of Mr. Cohn and his firm before inception of the Policy.

The Policy's "Other Insurance" provision, contained at Paragraph 4.D. of the Policy, provides as follows:

> D.    Other Insurance. If the Insured has other insurance against a loss covered by this Insuring Agreement, the Company shall not be liable under this Insuring Agreement for a greater proportion of such loss than the applicable limit of liability stated in the Schedule bears to the total limit of liability of all valid and collectible insurance against such loss. However, with respect to professional services rendered prior to the effective date of this Insuring Agreement the insurance hereunder shall apply only as excess insurance over any other valid and collectible insurance and shall then apply only if the amount by which the applicable limit of liability of this Insuring Agreement exceeds the sum of the applicable limits of liability of all such other insurance.

At your earliest convenience, please provide us with all information concerning other insurance which may be available for these matters, including copies of your letters of notice to such insurers and these other insurers' responses to said notice, along with copies of the other insurers' policies.

Again, please notify us immediately if you wish to tender the defense of the Waller Complaint to St. Paul. Should such tender be made, Mr. Cohn is entitled to retain independent counsel to represent him in the Waller matter at the expense of St. Paul, consistent with Maryland law. Mr. Cohn's right to independent counsel arises as a result of actual conflicts of interest which may arise due to the rights St. Paul will likely reserve under the Policy in the event the Waller lawsuit is tendered. At this time, St. Paul reserves the right to appoint panel counsel to participate with Mr. Cohn's independent counsel in representing Mr. Cohn's interests in the Waller lawsuit and further reserves the right to review the relevant experience and billing rates of Mr Cohn's chosen counsel.

We hope that you can appreciate that we are acting under a complete reservation of St. Paul's rights, remedies and defenses under the Policy and under applicable law. We look forward to your providing the requested information to us at your earliest convenience. Of course, in the interim, should you have any questions or concerns, please do not hesitate to call the undersigned.

904230 v1

05/11/2001 10:17 FAX 1312758193ᵈ        ROSS, DIXON & BELL                        ☒009

Philip C. Smith, Esq.
Christopher F. Davis, Esq.
May 3, 2001
Page 8

Very truly yours,

By _____

Joseph W.E. Schmitt
Professional E&O Claim Attorney

JS:mld

Enclosure

INGER, RUBERRY & GAR

**FILE COPY**

ATTORNEYS AT LAW
CITICORP CENTER
SUITE 2300
500 WEST MADISON STREET
CHICAGO, ILLINOIS 60661-2511
(312) 466-8000
FACSIMILE (312) 466-8001

MICHELLE M. BRACKE
WRITER'S DIRECT DIAL NUMBER

May 29, 2001

(312) 466-7232

Kristi A. Gleim, Esq.
Ross, Dixon & Bell
70 West Madison Street
Suite 525
Chicago, IL 60602

RE:    *Various Claimants*
       **Westport Insured:**   **Blum, Yumkas, Gutman & Denick, P.A.**
       **St. Paul Insured:**   **Irving F. Cohn**
       **Our File No.:**   **02919-531 MAIL**

Dear Kristi:

    We represent Westport Insurance Corporation ("Westport"). As detailed below, Westport hereby submits the bills incurred in the defense of the above-captioned matters for reimbursement by St. Paul and requests that St. Paul assume the defense of these matters.

    As you know, Irving Cohn ("Cohn") was previously a partner in the firm of Burke, Gerber & Wilen. A large client of the firm was Maryland Cup Company. In the late 1950s, the Shapiro family, owners of the Maryland Cup Company, formed trusts for their children and grandchildren. The trustees were Cohn, Gunther Borris, an accountant, and Arthur Strausberger. Borris resigned almost immediately, and Strausberger was killed in an automobile accident in 1986 or 1987. These trusts were known as the "Shapiro-Flex Trusts."

    On June 30, 1988, Burke, Gerber dissolved and Cohn became associated with the Blum, Yumkas firm.

    On January 7, 2000, Roberta and Jeffrey Borenstein's counsel wrote to the firm, and enclosed a complaint (which is now the subject of a Tolling Agreement). The draft complaint asserts five counts against the Insureds: Accounting (Count I); Breach of Fiduciary Duty Against Cohn (Count II); Breach of Fiduciary Duty Against Blum, Yumkas (Count III); Negligence Against Cohn (Count IV); and Negligence Against Blum, Yumkas (Count V). The complaint generally alleges that, over a period of twenty years, Cohn failed to account for and prudently manage the investment of trust assets. Further, Cohn failed to terminate the trust until eight years after he was required to do so (once the Borensteins turned 35 years of age).


EXHIBIT
D

BOLLINGER, RUBERRY & GARVEY

Kristi Gleim, Esq.
May 29, 2001
Page 2

More specifically, the allegations contained in the complaint, and those garnered from counsel's investigation, include the following: failure to account; commingling of trust assets; allowing an escheat to the state; failure to invest many funds at all; failing to keep accurate and precise records; and failing to make investments that were reasonably prudent.

First, the Borensteins allege that the assets of the various trusts were commingled with each other, rendering it difficult to determine what assets belong to which particular trust. Particularly, the assets of Trusts No. 8 (Shapiro) and No. 9 were apparently intertwined. The Borensteins allege that in 1969, the trust acquired shares of the Windsor and Morgan mutual funds, which were taken over by Vanguard Group. In 1989 (well after the date the trusts should have been dissolved by reason of the Borensteins reaching the age of 35), $150,000 was distributed to the Borensteins; however, according to the Borensteins, that amount represented only half the amount to which they were entitled. Although Cohn first contended that the monies belonged to Trust No. 8, apparently, in November of 1999, he acknowledged that roughly one-third belonged to the Borenstein Trust (No. 9). At present, there remains a dispute as to what portion belonged to No. 9, and what portion actually belonged to No. 8. The Borensteins contend they are owed $225,000, while the firm places that figure at $100,000.

The Borensteins also allege that Cohn and the firm refused to provide them with an accounting, and interfered with their attempts to obtain the documentation independently.

Second, approximately $25-27,000 belonging to the Borenstein's Trust escheated to the State of Maryland. The money was subsequently recovered by Cohn; however, for a three year period, the money earned no interest. It is unclear when exactly the escheat was discovered by Cohn; however, the money was apparently returned to the Borensteins in April of 1999.

Third, a large part of the claim concerns funds that were apparently abandoned in bank accounts, and have not been invested since the 1970s. These funds were paid to the Borensteins in April of 1999. Counsel provided various methods for computing the anticipated appreciation of the funds, had they been invested in a prudent manner. Using the S & P as a benchmark, the estimated loss by the Borenstein's counsel is $4,777,537 (assuming investment beginning in 1975).

The complaint contains a prayer for damages seeking the return of any funds due the Borensteins, a declaration that Cohn breached his fiduciary duty, and that Blum, Yumkas is liable for Cohn's breach, damages including the lost appreciation of and income from assets of the trust that were abandoned or imprudently invested, with interest, and the costs of the action.

On October 28, 1999, Blum, Yumkas forwarded to Westport a copy of a letter dated October 25, 1999, from Sam Shapiro (Roberta Borenstein's uncle) to Irving Cohn, which stated:

BULLINGER, RUBERRY & GARVEY

Kristi Gleim, Esq.
May 29, 2001
Page 3

As You know from that letter [an October 22, 1999 letter to Bernard Denick], it is my intention to bring legal action against You and the law firm of Blum, Yumkas, Mailman, Gutman & Denick for violation of fiduciary responsibilities and mismanagement of assets regarding the 1963 trusts my brother, Arthur, established for his three children.

You can avoid this legal action by providing the information requested in my October 22 letter.

This is the <u>only</u> way out!

On October 31, 2000, Marshall Waller wrote to Blum, Yumkas and requested an audit of the 1960 Marshall Waller Trust. In March of 2000, Blum, Yumkas further advised Westport that Eric Waller (Marshall's brother) also requested an accounting of the 1960 trusts created by his mother, Anne Shapiro Waller. The request was made by Waller's attorney, William McDaniel, Esq., who wrote to Blum, Yumkas on March 29, 2000. In May of 2000, Blum, Yumkas advised that it had discovered approximately $83,144.37 worth of undeposited checks that should have gone into the 1960 trust for Eric Waller. Counsel for Waller subsequently requested audits of both the Susan Waller and Eric Waller trusts and, on July 18, 2000, Blum, Yumkas advised that it was asking Irving Cohn to pay for the audits. On July 20, 2000, Irving's counsel advised that Cohn was not willing to take any responsibility for the costs of any audit in relation to the matter. The 1960 Waller trusts are distinct from the Shapiro Flex trusts, and were created by separate instrument in 1960. As you know, Eric Waller recently filed suit against Irving Cohn, Blum, Yumkas, and Westport regarding both the 1960 trusts, and Shapiro Flex Trust No. 3.

In May of 2000, counsel for Marion Smith provided notice to Blum, Yumkas of a claim against Irving Cohn. On October 5, 2000, counsel for Christine Geer (nee Burton), provided similar notice. It appears that on October 2, 1973, Christine O. Burton executed a Trust Agreement with an initial corpus of $1,000 appointing David Gerber, Esq., Charles R. Connor, and Catherine R. Oppenheim[1], Esq. as Trustees. One month later, Gerber died, and Irving Cohn became a substitute Trustee. According to Cohn and Connor, Ms. Oppenheimer managed the trust from 1974 through 1996. Mr. Connor believes that someone threw out the trust records while he was in the hospital. Some records were in the possession of Blum, Yumkas, and have been produced to Cohn's counsel, Chris Davis, and to the plaintiffs. However, the parties are unable to locate any records for the time period of 1974-1990. Presently, there is a "gentlemen's

---

[1]Ms. Oppenhein was employed by Burke, Gerber & Gilen. She passed away in 1996.

BOLLINGER, RUBERRY & GARVEY

Kristi Gleim, Esq.
May 29, 2001
Page 4

agreement," as the claimants have agreed to hold off the filing of a suit while counsel continues its investigation.

From the onset of these matters, the parties have attempted to determine what, if any, other insurance policies existed that might potentially provide coverage for this claim. Ultimately, in May of 2001, Irving Cohn's defense counsel located some of the policies issued by St. Paul to Burke, Gerber, Cohn's previous firm.

On May 23, 2000, Phil C. Smith, Esq. of Hearne & Bailey, P.A. wrote to David H. Cohen of the Harry Cohen Insurance Agency regarding the Shapiro Flex trusts. A copy of the letter is attached. On May 31, 2000, Mr. Smith apparently spoke with Joe Schmitt at St. Paul regarding the Irving F. Cohn matter. On June 1, 2000, Mr. Smith wrote as follows:

". . . pursuant to our telephone conversation, I have enclosed a copy of a Complaint that we received from one of the beneficiaries of the Trust that were administered by Mr. Cohn. Please note that at this time this Complaint has not been filed or served."

We were advised by Phil Smith, counsel for Irving Cohn, on February 16, 2001 as follows: "Enclosed is the tender letter to St. Paul as well as the letter of confirmation of my telephone conversation with Jose Schmitt of St. Paul Insurance Company. I have talked to Joe Schmitt of St. Paul on two occasions and he has informed me that he is reviewing the file for coverage and that he intends to send us a letter stating the position of St. Paul and coverage. At this time, I have still not received St. Paul's position on coverage from Mr. Schmitt."

To our knowledge, St. Paul never responded to Cohn's notice. St. Paul never inquired regarding the status of the Borenstein matter, or requested any further information regarding the other trusts. Despite Cohn's tender, St. Paul declined to participate in the defense, or provide its coverage position.

Similarly, on April 6, 2001, we tendered to St. Paul the lawsuit filed against Irving Cohn by Eric Waller. Despite the contentions in your recent letter to Irving Cohn, Westport's tender is sufficient to invoke St. Paul's obligation to defend, as the St. Paul Policy requires only that notice be given "by or on behalf of the Insured." *See Scottsdale Ins. Co. v. American Empire Surplus Lines Ins. Co.*, 791 F.Supp. 1079, 1084 (1992), overruled, in part, on other grounds, by *Sherwood Brands v. Htfd. Acc. & Indem. Co.*, 347 Md. 32, 698 A.2d 1078 (Md. 1997).

We also wish to point out Maryland case law that contradicts your letter. If you review the decision of the Maryland Supreme Court in *Sherwood Brands v. Htfd. Acc. & Indem. Co.*, you will learn that in Maryland an insured is not obligated to formally tender a lawsuit for defense. Moreover, an insurer is liable for pre-tender costs especially when, as here, the insurer has

BOLLINGER, RUBERRY & GARVEY

Kristi Gleim, Esq.
May 29, 2001
Page 5

breached its obligation to defend. The Court described the situation, as here, where an insurer declines to defend for some other reason than late notice (here, no reason at all), the situation

> is the most clear cut. . . . If, . . . the court concludes that the claim was potentially within the policy coverage and that, as a result, the insurer did breach its duty to defend, the insurer is liable for all damages incurred by the insured as a result of that breach. (*Citations omitted*). In that setting as well, the timing of the notice is ordinarily irrelevant. If the delay in giving notice is not a factor in the insurer's decision not to defend—if it would have declined the defense in any event based on its mistaken conclusion that there was no potential coverage—the insurer should not later be allowed to use the delay as a bar to reimbursing the insured for the reasonable expenses incurred in defending the covered claim. 698 A.2d at 1086-87.

St. Paul Fire & Marine Insurance Company issued Policy No. 619NA0039 to Burke, Gerber & Wilen for the policy period of April 1, 1972 through April 1, 1975. St. Paul has thus far refused to provide a copy of the Policy to Westport and, despite the representations contained in your letter, has not produced a copy to Irving Cohn's counsel. We have, however, reviewed a copy of portions of the Policy provided to Irving Cohn's counsel by his insurance agent.

The Policy states:

> The Company, in consideration of the payment of the agreed premium(s), and subject to the terms of this Policy and its Insuring Agreements, agrees to indemnify or pay to or on behalf of the Insured in accordance with such Insuring Agreements, with respect to the occurrence of any of the therein-mentioned casualties or events during the policy period.

The Policy was billed in annual installments. The first year's premium was due at inception, with subsequent premium to "be determined at the rates in effect at each anniversary" to be due at each subsequent anniversary.

The Policy contains the following provision:

39.    MULTI-YEAR POLICY. If this Policy is issued for a period of more than one year, the limits of the Company's liability shall apply separately to each consecutive annual period thereof.

BOLLINGER, RUBERRY & GARVEY

Kristi Gleim, Esq.
May 29, 2001
Page 6

In the General Terms and Conditions section, the St. Paul Policy contains the following "Other Insurance" clause:

> 35.   OTHER INSURANCE.   The insurance afforded by this Policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance.   When this insurance is primary and the Insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the Company's liability under this Policy shall not be reduced by the existence of such other insurance.
>
> When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the Company shall not be liable under this Policy for a greater proportion of the loss than that stated in the applicable contribution provision below:
>
> \*\*\*

Both Westport Policies contain the following clause:

VI.   OTHER INSURANCE OF A PRIOR LAW FIRM

If a Prior Firm has other insurance applicable to a Claim against the Insured(s) covered by this Coverage Unit, this Policy is specifically issued as excess insurance over and above the applicable limits of liability of all such other insurance regardless of whether such other insurance is written as primary, contributory, excess, contingent or otherwise.

"Prior firm" is defined in the Policy as:

> Any law firm or professional corporation engaged in the private practice of law for which any lawyer listed in the application was a partner, officer, director, stockholder, shareholder, or employee prior to such lawyer joining the Named Insured;

In Maryland, as in most states, an "excess" clause trumps a "pro rata" clause.   In other words, an excess clause in one policy conflicts with a pro rata clause from a concurrently effective policy, the court will disregard the pro rata clause in favor of the excess clause. *Nolt v. U.S.F.&G*, 329 Md. 52, 617 A.2d 578 (1993); *Consolidated Mutual Ins. Co. v. Bankers Ins. Co. of Penn.*, 244 Md. 392, 223 A.2d 594 (1966). The Westport Policy plainly provides that it is "excess" over any other insurance policy covering an insured while employed by a "prior firm." The St. Paul Policy, on the other hand, provides that the St. Paul Policy is primary, regardless of whether other insurance exists, and states that St. Paul will participate pro-rata with any other

BOLLINGER, RUBERRY & GARVEY

Kristi Gleim, Esq.
May 29, 2001
Page 7

insurer. St. Paul is therefore primary with respect to these matters, and Westport is obligated to defend only after the St. Paul Policy is exhausted.

You previously intimated that St. Paul did not have a duty to defend or, apparently, respond to Cohn's tender of the draft Borenstein complaint because no "suit" was actually filed. As you know, the Borenstein claimants agreed to sign a tolling agreement, and refrain from filing the suit, only because the Insured retained counsel, and an accountant, to attempt to identify what, if any, funds were due to the Borensteins. Your argument appears to be that Irving Cohn, to obtain a defense from St. Paul, should have refused Borenstein's request, and instead awaited service of the suit, without taking any steps to avoid litigation, and potential ultimate liability.

We respectfully disagree, and believe that a Maryland court will also disagree. Faced with this issue, courts have generally agreed that the term "suit," without more, should be construed to provide a form of "litigation insurance" that will protect against any and all attempts to assess liability against the insured which are based on covered activities. *See Continental Cas. Co. v. Cole*, 809 F.2d 891, 896 (D.D.C. 1987); and *Alderman v. Hanover Insurance Group*, 169 Conn. 603, 363 A.2d 1102 (1975) (holding that the duty to defend clause required the insurer to pay expenses incurred by the insured in a pre-suit settlement when a suit was threatened but not filed). *See also Ryan v. Royal Ins. Co. of America*, 916 F2d 731 (1st cir. 1990) ("To argue that the word "suit" is to be accorded talismanic significance brings to the language of the policy a precision that the drafter omitted and that the parties were not bound to anticipate . . . We are unprepared to say that the cryptic phrases "any suit" and "legally obligated to pay: unqualified by clear and unmistakable language in the policy's text, necessary require (1) that a civil case be commenced in a court of law before the duty to defend arises and (2) that a money judgment be entered against the insured before the payment obligations vest [*citations omitted*]").

The Borenstein claimants drafted a suit, which is clearly potentially within the scope of coverage provided by the St. Paul policy, and which clearly sought "damages." Likewise, all other claimants, those with "Shapiro-Flex" trusts and otherwise, have agreed to refrain from filing suits only after being advised that counsel, and accountants, would be retained to investigate the matters. As such, St. Paul had an obligation to step up and defend its Insured, regardless of whether formal proceedings had commenced. St. Paul did not do so and, in fact, never responded to the Insured's tender. We know of no law, in Maryland or otherwise, that permits an insurer to sit idle after notice of a claim, or threatened suit, without providing so much as an acknowledgment letter.

Enclosed are copies of many of the bills generated by defense counsel for all of the foregoing matters. In general, to avoid duplication of efforts and expenses, Alvin Frederick, Esq. has taken the lead in the defense. The bills, which also include the costs of an accountant retained to audit the trusts, and to assist in resolving the tax matters, total $876,609.76. We are continuing to compile any remaining bills, and will provide them as soon as they are available.

BULLINGER, RUBERRY & GARVEY

Kristi Gleim, Esq.
May 29, 2001
Page 8

Finally, please also note that on the face of the St. Paul Policy, it indicates that the "former policy no." was 681NA0511. Therefore, it appears that St. Paul had prior coverage for Burke, Gerber & Wilen. We and Irving Cohn would appreciate it if St. Paul would check its records in this regard.

We look forward to your prompt response.

Very truly yours,

Michelle M Bracke

Michelle M. Bracke

MMB/sgb

cc:    Kristina Miller, Westport Insurance Corporation (432600)
       Andrew J. Graham
       David B. Applefeld

# ROSS, DIXON & BELL, L.L.P.

WASHINGTON, D.C. ■ IRVINE ■ SAN DIEGO ■ CHICAGO

THREE FIRST NATIONAL PLAZA
70 WEST MADISON STREET
SUITE 525
CHICAGO, ILLINOIS 60602-4261
(312) 759-1920
FACSIMILE (312) 759-1939

KRISTI A. GLEIM
TELEPHONE: (312) 759-1923
EMAIL: KGLEIM@RDBLAW.COM

July 12, 2001

<u>VIA MESSENGER</u>

Michelle M. Bracke, Esq.
Bollinger Ruberry & Garvey
500 W. Madison Street, Suite 2300
Chicago, IL 60661

> Re: Insured:   **Irving F. Cohn/Burke, Gerber & Wilen**
> Claimants:   **Roberta and Jeffrey Borenstein**
> Policy No.:   **619NA0039**
> Claim No.:   **0619NA0039-09T001**
> Our File No.: **00493.0140**

Dear Ms. Bracke:

   Now that your client, Westport Insurance Corporation ("Westport") has returned the waiver of conflict form I sent you, I can proceed to respond to your May 29, 2001 correspondence. I thought it might be helpful to begin with a recitation of the actual facts underlying the issues discussed in your May 29, 2001 correspondence.

   As you correctly point out in your letter, on or about June 1, 2000, St. Paul was provided a copy of a draft complaint involving Roberta and Jeffrey Borenstein, beneficiaries of Shapiro-Flex Trust 9. I think it is a fact that the draft <u>Borenstein</u> complaint has never been filed or served. Please correct me if I am wrong.

   On April 6, 2001, Joe Schmitt of St. Paul and I met with you in your offices, at which time you handed Mr. Schmitt a copy of a lawsuit filed on or about March 27, 2001 in the Circuit Court for Baltimore City, Maryland, entitled <u>Eric F. Waller v. Blum, Yumkas, Mailman, Gutman & Denick, P.A., et al.</u>. You informed us that the <u>Waller</u> lawsuit had not yet been served on Irving Cohn. You further informed us that Chris <u>Davis</u>, an attorney your client, Westport, hired to protect Mr. Cohn's interests, was prepared to represent Mr. Cohn's interests in the <u>Waller</u> Complaint, should he be served. You also informed Mr. Schmitt and me that Westport had instituted a declaratory judgment action against Mr. Cohn and that Mr. Cohn was being represented by Andrew Radding and David Applefeld of Adelberg, Dorf & Hendler, LLC, in that action.

905948 v1



EXHIBIT
E

Michelle M. Bracke, Esq.
July 12, 2001
Page 2

On April 18, 2001, I finally was able to reach Chris Davis, who confirmed that he had been hired by Westport to represent Mr. Cohn's interests. Mr. Davis confirmed that the Borenstein complaint had not been filed or served. Mr. Davis further informed me in this conversation that Mr. Cohn had been served with the Waller Complaint but had not yet taken a position regarding whether Mr. Cohn wanted to tender the Waller lawsuit to St. Paul. This conversation was confirmed in correspondence dated May 3, 2001 to Messrs. Smith and Davis of Hearne & Bailey, P.A., from Joe Schmitt of St. Paul. In the May 3, 2001 correspondence, Mr. Schmitt specifically states: "We understand that the Waller Complaint has not yet been tendered for defense and/or indemnity to St. Paul. Please notify us immediately should Mr. Cohn choose to tender the Waller Complaint to St. Paul for defense and/or indemnity."

By correspondence dated May 14, 2001, Mr. Smith, for the first time, purported to tender the defense of the Waller lawsuit, by way of correspondence to Joe Schmitt of St. Paul. As you know, St. Paul has expressed a willingness to provide a defense to Mr. Cohn for the Waller lawsuit pursuant to a full reservation of its rights, remedies and defenses under the Policy and under applicable law.

In sum, St. Paul is aware of one lawsuit involving Mr. Cohn under the above-captioned Policy: the Waller lawsuit. Chris Davis, counsel for Mr. Cohn, specifically informed the undersigned that Mr. Cohn did not choose to tender the Waller lawsuit to St. Paul for a defense or indemnity. This position was unchanged until Mr. Smith's correspondence dated May 14, 2001, at which time the Waller lawsuit was tendered for a defense and indemnity, which defense St. Paul accepted pursuant to a reservation of rights.

I do not recall you or any other of Westport's agents tendering the Waller lawsuit to St. Paul for defense or indemnity on behalf of Mr. Cohn. Your assertion now that you did is inconsistent with the fact that when we met on April 6, 2001, you informed us that Mr. Cohn had not even been served with the Waller Complaint. Moreover, it is inconsistent with Mr. Cohn's own counsel's representation on April 18, 2001, that Mr. Cohn did not intend to tender the defense of the Waller Complaint to St. Paul. I find it strange that you now state you tendered the Waller Complaint to St. Paul "on behalf of" Mr. Cohn at a time you concurrently informed Mr. Schmitt and me that you had sued Mr. Cohn on behalf of Westport. I do not understand how you were ethically able to do anything "on behalf of" Mr. Cohn once your client, Westport, sued him.

I have reviewed Scottsdale Ins. Co. v. American Empire Surplus Lines Ins. Co., 791 F.Supp. 1079 (1992), which, as you note, has been overruled by Sherwood Brands v. Hartford Accident and Indemnity Co., 347 Md. 32, 698 A.2d 1078, 1084 (Md. 1997). In Sherwood, the Court held that the duty to defend arises "when an insured claim is filed … but that that duty is not breached … until the insurer is apprised of the claim or occurrence and thereafter, without legal justification, fails to undertake a defense in accordance with its obligation." Id. at 1085. St. Paul has most certainly not breached the duty to defend when no claim or occurrence existed until the filing of the Waller lawsuit and where Mr. Cohn's own counsel, upon my affirmative inquiry, denied that Mr. Cohn wanted to tender the Waller Complaint for defense. Once Mr.

Michelle M. Bracke, Esq.
July 12, 2001
Page 3

Smith's correspondence dated May 14, 2001 was received, St. Paul timely responded to, and accepted, Mr. Cohn's tender.

Perhaps the most prudent thing for you to do at this point is to speak to Mr. Davis to clarify what actually happened relative to tender of the Waller lawsuit.

In your May 29, 2001 correspondence, you go on to reference a letter dated October 25, 1999 from Sam Shapiro to Irving Cohn. This matter has not been reported to or tendered to St. Paul. You also advise that "the 1960 Waller trusts are distinct from the Shapiro-Flex Trusts." While I appreciate your personal opinion in that regard, St. Paul does not agree with your opinion that the trusts are unrelated.

You also inform in your May 29, 2001 correspondence that counsel for Marion Smith provided notice to Blum, Yumkas of a claim against Irving Cohn in May, 2000. St. Paul has not been provided this notice. You further state that on October 5, 2000, counsel for Christine Geer (nee Burton) provided similar notice, and that an attorney variously described in your letter as Ms. "Oppenhein", Ms. "Oppenheim", and Ms. "Oppenheimer", apparently now deceased, had some involvement with Ms. Burton's trust. St. Paul has not been advised of this notice either, nor has it been tendered this matter.

Please clarify whether it is Westport's position that none of these matters are resolved by way of Westport's $800,000 contribution to attempted settlement. In light of the complete lack of knowledge St. Paul has concerning all of these "new" matters discussed in your May 29, 2001 correspondence, St. Paul reserves its rights, remedies and defenses under the Policy and under applicable law with regard to these matters, including concerns relative to late and insufficient notice, and breach of the cooperation clause of the Policy. Obviously, if Mr. Cohn intends to provide notice of these matters to St. Paul, Mr. Cohn or one of his representatives should immediately provide all information relative to these matters to St. Paul. As you will note, I have carbon copied Mr. Cohn's counsel accordingly.

I also find it curious that you complain that St. Paul has failed to produce a copy of its Policy to Westport and yet you then go on to cite the terms of the St. Paul Policy. St. Paul has no legal obligation to provide you with a copy of the St. Paul Policy. In this regard, I note that by correspondence dated May 16, 2001, I provided a copy of the Policy to Mr. Cohn's counsel, David Applefeld. You yourself admit that Mr. Cohn's counsel and insurance agent have a copy of the St. Paul Policy. You state that "despite the representations" contained in my letter, St. Paul has not produced a copy of the Policy to Irving Cohn's counsel. Please tell me what representations of mine to which you are referring.

As regards my request to you for a copy of Westport's policy, which you have thus far failed to provide, I note that I only obtained a copy of the Westport DJ Complaint against Mr. Cohn and purported copies of the Westport policies attached thereto as Exhibits by requesting them directly from the clerk of court, as you previously refused to provide them to me despite the fact that they are publicly-filed documents.

905948 v1

Michelle M. Bracke, Esq.
July 12, 2001
Page 4

I find your legal analysis concerning whether a suit must be filed in order for a duty to defend to arise to be wrong. Under Maryland law, it is a condition precedent to the duty to defend that an actual suit be filed where the insurance policy provides the duty to defend "any suit against the Insured alleging damages", as does the instant St. Paul Policy. See Haines v. St. Paul Fire and Marine Ins. Co., 428 F.Supp. 435 (D. Md. 1977). See also, Provident Bank of Maryland v. Travelers Property Casualty Corp., 236 F.3d 138 (4th Cir. 2000). The St. Paul Policy does not provide for a duty to defend until a suit alleging damages against the Insured is lodged.[1]

While I further appreciate your opinion that the Borensteins did not file suit because Blum, Yumkas retained counsel and an accountant to attempt to identify what, if any, funds were due to the Borensteins, I personally (and St. Paul) have/has no idea why the Borensteins agreed to not bring suit.

I obviously cannot counsel your client as to whether the Waller lawsuit triggers its duty to defend. However, I would note that in Maryland, the duty to defend an insured is broader than the duty to indemnify. Utica Mutual Ins. Co. v. Miller, 746 A.2d 935 (Md. 2000) (citations omitted). In St. Paul Fire and Marine Ins. Co. v. Pryseski, 438 A.2d 282 (Md. 1981), the Court articulated the following test:

> In determining whether a liability insurer has a duty to provide its insured with a defense in a tort suit, two ... questions ordinarily must be answered: (1) What is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) Do the allegations in the tort action potentially bring the tort claim within the policy's coverage?

438 A.2d 282. To answer these questions, a court "must ascertain the scope and limitations of coverage under the ... insurance policies and then determine whether the allegations in the [underlying] action would potentially be covered under those policies." Aetna Casualty and Surety Co. v. Cochran, 651 A.2d 859 (Md. 1995).

Under the second part of the Pryseski test, it must be determined whether the lawsuit at issue alleges an action which is potentially covered under the insurance policy. Sullins v. Allstate Ins. Co., 667 A.2d 617 (Md. 1995). Generally, Maryland courts look to the allegations made in the complaint to determine whether claims may potentially be covered. Additionally, a court may look toward extrinsic evidence to determine whether a lawsuit alleges an action that is potentially covered because "allowing an insured the opportunity to establish a defense to tort

---

[1] While I appreciate your citation to out-of-state caselaw, Continental Cas. Co. v. Cole, 809 F.2d 891 (D.D.C. 1987), Alderman v. Hanover Ins. Group, 169 Conn. 603, 363 A.2d 1102 (Conn. 1975), and Ryan v. Royal Ins. Co. of America, 916 F.2d 731 (1st Cir. 1990) (applying New York law), these cases do not discuss or apply Maryland law.

Michelle M. Bracke, Esq.
July 12, 2001
Page 5

allegations which may provide a potentiality of coverage under an insurance policy ... is precisely what the insured bargained for under the insurance contract." Cochran, 651 A.2d 859.

Furthermore, under Maryland law, if any claims potentially come within the policy coverage, the insurer is obligated to defend all claims, "notwithstanding alternative allegations outside the policy's coverage, until such time ... that the claims have been limited to ones outside the policy coverage." Southern Maryland Agricultural Assoc., Inc. v. Bituminious Casualty Corp., 539 F.Supp. 1295, 1299 (D. Md. 1982) (citations omitted). Doubt as to whether an allegation indicates the possibility of coverage should be resolved in the insured's favor. See, United States Fidelity and Guaranty Co. v. National Paving and Contracting Co., 178 A.2d 872 (Md. 1962).

As in other states, where a doubt exists as to whether the duty to defend is owed, the safest course is to provide a defense and file a declaratory judgment action to determine whether a defense is truly owed. Nationwide Mutual Ins. Co. v. Regional Electric Contractors, Inc., 680 A.2d 547 (Md. App. 1996). It is my understanding that Westport has instituted such a declaratory judgment action but that no ruling has yet issued relieving Westport of the duty to defend.

As regards your analysis of St. Paul's and Westport's respective "other insurance" clauses, I think it unlikely that in attempting to allocate defense fees for the Waller lawsuit a Maryland court would turn to an analysis of the "other insurance" clauses. As discussed in Utica Mutual Ins. Co. v. Miller, 746 A.2d 935 (Md. App. 2000), "excess" or "other insurance" clauses have been recognized as not applying to the duty to defend because, unless stated otherwise, that obligation is independent of liability and any limitations thereon. 746 A.2d at 946 (citations omitted). Moreover, such "other insurance" clauses apply only when coverage is concurrent. St. Paul Fire and Marine Ins. Co. v. Vigilant Ins. Co., 919 F.2d 235 (4th Cir. 1990). Where, as here, the policy periods do not overlap at all, and where, as here, St. Paul and Westport do not even insure identical interests, such "other insurance" clauses are simply not applicable.

We believe a more appropriate inquiry would be to examine what allocation of the defense fees and costs should appropriately be made as between St. Paul and Westport. Mr. Cohn is alleged to have mismanaged the Shapiro trusts for approximately 43 years, from 1957 to 2000. St. Paul's Policy, an occurrence-type policy, provides coverage only for professional services performed for others during the policy period from 1972 to 1975. Westport's policies appear to be triggered for claims made during its policy period by reason of wrongful acts occurring on or after July 1, 1988.

With respect to defense and indemnity obligations where multiple policies with co-primary defense obligations are triggered by a series of wrongful acts that occur over time, Maryland courts generally apply an "injury-in-fact" pro rata allocation of liability for indemnity and defense, following the Sixth Circuit decision in Insurance Co. of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212 (6th Cir. 1980). In Nationwide Mutual Ins. Co. v. LaFarge Corp., 910 F.Supp. 1104 (D. Md. 1996), aff'd, 121 F.3d 699 (4th Cir. 1997), the court adopted

Michelle M. Bracke, Esq.
July 12, 2001
Page 6

the Forty-Eight Insulations allocation methodology concerning defense expenses for liability that
occurred over a period of years and triggered numerous policies.

The LaFarge court rejected the argument that the duty to defend is an absolute duty to
defend the entire action, joint and severable among the insurers, indicating instead that where
allocation was possible this was the preferred outcome. The LaFarge court earlier cited Forty-
Eight Insulations for the proposition that an insurer must bear the full expense of the defense
only where there is no reasonable way to apportion defense costs. Nationwide Mutual Ins. Co. v.
LaFarge Corp., 1994 WL 706538 at 10 (D. Md. June 22, 1994); See also, Southern Maryland,
539 F.Supp. 1295.

The court in Southern Maryland suggested that an allocation should take into
consideration what liability-producing acts occurred in which years to determine which policies
should indemnify for which liabilities. The Southern Maryland court cited with approval
Loewenthal v. Security Ins. Co., 436 A.2d 493 (Md. 1981), wherein an earlier Maryland court
held that where a reasonable means of prorating the cost of defense between covered and
uncovered items exists, defense costs should be apportioned. In Southern Maryland, the court
distinguished this holding of Loewenthal from those cases that have rejected apportionment of
defense costs where the insurer wrongfully refused to defend a suit involving covered and non-
covered claims. 539 F.Supp. at 1304.

It is St. Paul's position that St. Paul should pay only for defense costs attributable to
professional services occurring from April 1, 1972 to April 1, 1975, and that Westport should
pay for wrongful acts occurring during the 13 years arguably covered by its policies. This leaves
27 years for which Mr. Cohn and his firms have no available insurance coverage, which risk,
according to Forty-Eight Insulations, 633 F.2d 1212, should be borne by Mr. Cohn and/or his
firms. Due to the harshness of this result, as we understand that Mr. Cohn and his firms have no
resources with which to pay for Mr. Cohn's defense, St. Paul agrees to bear 20 percent of Mr.
Cohn's defense costs and expenses on a going-forward basis, with Westport to bear the
remaining 80 percent. This allocation is consistent with the indemnity allocation Westport has
already established and agreed to with St. Paul.

We are searching our records to determine whether there is a previous St. Paul Policy,
Policy No. 681NA0511. I would note we are searching for policies issued over 35 years ago,
unlike the Westport policies, which were issued in the late 1990s. In turn, I would appreciate
your advising whether there is predecessor policy issued by Westport to Blum, Yumkas to those
attached to the Westport DJ complaint. In this regard, I note that Exhibit A to the Westport DJ
complaint, the 1999-2000 Westport policy, attaches a "Lawyers Professional Liability Insurance
Renewal Application," executed on November 13, 1998 by Blum, Yumkas. This indicates the
1999-2000 Westport policy may have been the renewal of a predecessor policy.

Moreover, I note that the Declarations page of the 1999-2000 Westport policy references
a Policy Number MDL-022139-1 although, oddly, only the words "... of Policy" appear on the
Declarations Page in the upper right hand corner: the word "Renewal", which should appear in

Michelle M. Bracke, Esq.
July 12, 2001
Page 7

front of the words "... of Policy" on the Declarations Page (as it does on the 2000-2001 Westport policy Declaration Page), has apparently been redacted by Westport.

I would also appreciate your confirming that you and/or others have searched the Insureds' and Westport's records and have been unable to find any other policies issued to Blum, Yumkas, Burke, Gerber & Wilen or Irving Cohn by Westport, or others. As to Westport's policies, we request a notarized affidavit from an appropriate Westport representative that no other Westport policies issued to Burke, Gerber & Wilen, Blum, Yumkas or Irving Cohn. I would also appreciate your providing me with copies of your correspondence to Mr. Cohn and/or Blum, Yumkas relative to Westport's coverage position vis a vis Mr. Cohn. I would further appreciate your searching Westport's underwriting materials as it is likely that the application for the first policy issued by Westport to Blum, Yumkas reflects the identity of the predecessor insurer. St. Paul has been unable to date to discover any underwriting information in its files concerning the Policies issued to Burke, Gerber & Wilen.

Finally, you have enclosed with your correspondence "many of the bills generated by defense counsel for all of the foregoing matters." As I earlier indicated, St. Paul would prefer that we all concentrate at this time on protecting Mr. Cohn's interests by attempting to settle these matters through the efforts of Al Frederick, leaving these past fees and costs issues for a later date. From my cursory review of the bills you have provided, I would simply note at this time that Al Frederick has confirmed to me in correspondence dated May 17, 2001, that he represents only the Blum, Yumkas firm. St. Paul does not insure the Blum, Yumkas firm. Moreover, as discussed above, it appears these costs and fees were incurred prior to the filing of any lawsuit and I am not aware that St. Paul was advised of or consented to the incurrence of these costs and fees. Your assertion that Westport is not obligated to pay any costs and fees on behalf of Mr. Cohn until St. Paul "exhausts" its Policy actually supports the notion that Westport incurred these costs and fees as a volunteer. St. Paul certainly reserves its rights as to whether these costs and fees are reasonable as well.

Again, we would prefer to "table" this dispute until the outcome of our attempt to settle these matters is known.

Nothing in your May 29, 2001 correspondence has altered the position taken in St. Paul's previously-stated reservation of rights. St. Paul expressly incorporates herein its previously-stated reservation of rights, which should not be construed to constitute a waiver of any further rights it may reserve in the future. St. Paul expressly reserves all such rights, remedies and defenses under the Policy and under applicable law herein, including the right to amend, supplement or alter its coverage position based upon later-discovered facts.

We look forward to hearing from you concerning Westport's position on defending the Waller lawsuit by July 23, 2001. Should I hear nothing from you by July 23, 2001, St. Paul will proceed to protect its and Mr. Cohn's rights accordingly.

Michelle M. Bracke, Esq.
July 12, 2001
Page 8

Very truly yours,

ROSS, DIXON & BELL, L.L.P.

By _____
Kristi A. Gleim

KAG:mld

cc: Andrew J. Graham, Esq.
Kramon & Graham, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202-3201

David B. Applefeld, Esq.
Adelberg, Rudow, Dorf & Hendler, LLC
600 Mercantile Bank & Trust Building, 2 Hopkins Plaza
Baltimore, MD 21201-2927

Christopher F. Davis, Esq.
Hearne & Bailey, P.A.
Colonial Building
126 E. Main Street
Salisbury, MD 21801

# ROSS, DIXON & BELL, L.L.P.

WASHINGTON, D.C. ■ IRVINE ■ SAN DIEGO ■ CHICAGO

THREE FIRST NATIONAL PLAZA
70 WEST MADISON STREET
SUITE 525
CHICAGO, ILLINOIS 60602-4261
(312) 759-1920
FACSIMILE (312) 759-1939

KRISTI A. GLEIM
TELEPHONE: (312) 759-1923
EMAIL: KGLEIM@RDBLAW.COM

July 12, 2001

<u>VIA MESSENGER</u>

Michelle M. Bracke, Esq.
Bollinger Ruberry & Garvey
500 W. Madison Street, Suite 2300
Chicago, IL 60661

|       |              |                                           |
|-------|--------------|-------------------------------------------|
| Re:   | **Insured:** | **Irving F. Cohn/Burke, Gerber & Wilen**  |
|       | **Claimants:** | **Roberta and Jeffrey Borenstein**      |
|       | **Policy No.:** | **619NA0039**                          |
|       | **Claim No.:** | **0619NA0039-09T001**                   |
|       | **Our File No.:** | **00493.0140**                       |

Dear Ms. Bracke:

Now that your client, Westport Insurance Corporation ("Westport") has returned the waiver of conflict form I sent you, I can proceed to respond to your May 29, 2001 correspondence. I thought it might be helpful to begin with a recitation of the actual facts underlying the issues discussed in your May 29, 2001 correspondence.

As you correctly point out in your letter, on or about June 1, 2000, St. Paul was provided a copy of a draft complaint involving Roberta and Jeffrey Borenstein, beneficiaries of Shapiro-Flex Trust 9. I think it is a fact that the draft <u>Borenstein</u> complaint has never been filed or served. Please correct me if I am wrong.

On April 6, 2001, Joe Schmitt of St. Paul and I met with you in your offices, at which time you handed Mr. Schmitt a copy of a lawsuit filed on or about March 27, 2001 in the Circuit Court for Baltimore City, Maryland, entitled <u>Eric F. Waller v. Blum, Yumkas, Mailman, Gutman & Denick, P.A., et al.</u>. You informed us that the <u>Waller</u> lawsuit had not yet been served on Irving Cohn. You further informed us that Chris Davis, an attorney your client, Westport, hired to protect Mr. Cohn's interests, was prepared to represent Mr. Cohn's interests in the <u>Waller</u> Complaint, should he be served. You also informed Mr. Schmitt and me that Westport had instituted a declaratory judgment action against Mr. Cohn and that Mr. Cohn was being represented by Andrew Radding and David Applefeld of Adelberg, Dorf & Hendler, LLC, in that action.

905948 v1



**ROSS, DIXON & BELL, L.L.P.**

Michelle M. Bracke, Esq.
July 12, 2001
Page 2

On April 18, 2001, I finally was able to reach Chris Davis, who confirmed that he had been hired by Westport to represent Mr. Cohn's interests. Mr. Davis confirmed that the Borenstein complaint had not been filed or served. Mr. Davis further informed me in this conversation that Mr. Cohn had been served with the Waller Complaint but had not yet taken a position regarding whether Mr. Cohn wanted to tender the Waller lawsuit to St. Paul. This conversation was confirmed in correspondence dated May 3, 2001 to Messrs. Smith and Davis of Hearne & Bailey, P.A., from Joe Schmitt of St. Paul. In the May 3, 2001 correspondence, Mr. Schmitt specifically states: "We understand that the Waller Complaint has not yet been tendered for defense and/or indemnity to St. Paul. Please notify us immediately should Mr. Cohn choose to tender the Waller Complaint to St. Paul for defense and/or indemnity."

By correspondence dated May 14, 2001, Mr. Smith, for the first time, purported to tender the defense of the Waller lawsuit, by way of correspondence to Joe Schmitt of St. Paul. As you know, St. Paul has expressed a willingness to provide a defense to Mr. Cohn for the Waller lawsuit pursuant to a full reservation of its rights, remedies and defenses under the Policy and under applicable law.

In sum, St. Paul is aware of one lawsuit involving Mr. Cohn under the above-captioned Policy: the Waller lawsuit. Chris Davis, counsel for Mr. Cohn, specifically informed the undersigned that Mr. Cohn did not choose to tender the Waller lawsuit to St. Paul for a defense or indemnity. This position was unchanged until Mr. Smith's correspondence dated May 14, 2001, at which time the Waller lawsuit was tendered for a defense and indemnity, which defense St. Paul accepted pursuant to a reservation of rights.

I do not recall you or any other of Westport's agents tendering the Waller lawsuit to St. Paul for defense or indemnity on behalf of Mr. Cohn. Your assertion now that you did is inconsistent with the fact that when we met on April 6, 2001, you informed us that Mr. Cohn had not even been served with the Waller Complaint. Moreover, it is inconsistent with Mr. Cohn's own counsel's representation on April 18, 2001, that Mr. Cohn did not intend to tender the defense of the Waller Complaint to St. Paul. I find it strange that you now state you tendered the Waller Complaint to St. Paul "on behalf of" Mr. Cohn at a time you concurrently informed Mr. Schmitt and me that you had sued Mr. Cohn on behalf of Westport. I do not understand how you were ethically able to do anything "on behalf of" Mr. Cohn once your client, Westport, sued him.

I have reviewed Scottsdale Ins. Co. v. American Empire Surplus Lines Ins. Co., 791 F.Supp. 1079 (1992), which, as you note, has been overruled by Sherwood Brands v. Hartford Accident and Indemnity Co., 347 Md. 32, 698 A.2d 1078, 1084 (Md. 1997). In Sherwood, the Court held that the duty to defend arises "when an insured claim is filed ... but that duty is not breached ... until the insurer is apprised of the claim or occurrence and thereafter, without legal justification, fails to undertake a defense in accordance with its obligation." Id. at 1085. St. Paul has most certainly not breached the duty to defend when no claim or occurrence existed until the filing of the Waller lawsuit and where Mr. Cohn's own counsel, upon my affirmative inquiry, denied that Mr. Cohn wanted to tender the Waller Complaint for defense. Once Mr.

905948 v1

**ROSS, DIXON & BELL, L.L.P.**

Michelle M. Bracke, Esq.
July 12, 2001
Page 3

Smith's correspondence dated May 14, 2001 was received, St. Paul timely responded to, and accepted, Mr. Cohn's tender.

Perhaps the most prudent thing for you to do at this point is to speak to Mr. Davis to clarify what actually happened relative to tender of the Waller lawsuit.

In your May 29, 2001 correspondence, you go on to reference a letter dated October 25, 1999 from Sam Shapiro to Irving Cohn. This matter has not been reported to or tendered to St. Paul. You also advise that "the 1960 Waller trusts are distinct from the Shapiro-Flex Trusts." While I appreciate your personal opinion in that regard, St. Paul does not agree with your opinion that the trusts are unrelated.

You also inform in your May 29, 2001 correspondence that counsel for Marion Smith provided notice to Blum, Yumkas of a claim against Irving Cohn in May, 2000. St. Paul has not been provided this notice. You further state that on October 5, 2000, counsel for Christine Geer (nee Burton) provided similar notice, and that an attorney variously described in your letter as Ms. "Oppenhein", Ms. "Oppenheim", and Ms. "Oppenheimer", apparently now deceased, had some involvement with Ms. Burton's trust. St. Paul has not been advised of this notice either, nor has it been tendered this matter.

Please clarify whether it is Westport's position that none of these matters are resolved by way of Westport's $800,000 contribution to attempted settlement. In light of the complete lack of knowledge St. Paul has concerning all of these "new" matters discussed in your May 29, 2001 correspondence, St. Paul reserves its rights, remedies and defenses under the Policy and under applicable law with regard to these matters, including concerns relative to late and insufficient notice, and breach of the cooperation clause of the Policy. Obviously, if Mr. Cohn intends to provide notice of these matters to St. Paul, Mr. Cohn or one of his representatives should immediately provide all information relative to these matters to St. Paul. As you will note, I have carbon copied Mr. Cohn's counsel accordingly.

I also find it curious that you complain that St. Paul has failed to produce a copy of its Policy to Westport and yet you then go on to cite the terms of the St. Paul Policy. St. Paul has no legal obligation to provide you with a copy of the St. Paul Policy. In this regard, I note that by correspondence dated May 16, 2001, I provided a copy of the Policy to Mr. Cohn's counsel, David Applefeld. You yourself admit that Mr. Cohn's counsel and insurance agent have a copy of the St. Paul Policy. You state that "despite the representations" contained in my letter, St. Paul has not produced a copy of the Policy to Irving Cohn's counsel. Please tell me what representations of mine to which you are referring.

As regards my request to you for a copy of Westport's policy, which you have thus far failed to provide, I note that I only obtained a copy of the Westport DJ Complaint against Mr. Cohn and purported copies of the Westport policies attached thereto as Exhibits by requesting them directly from the clerk of court, as you previously refused to provide them to me despite the fact that they are publicly-filed documents.

**ROSS, DIXON & BELL, L.L.P.**

Michelle M. Bracke, Esq.
July 12, 2001
Page 4

I find your legal analysis concerning whether a suit must be filed in order for a duty to defend to arise to be wrong. Under Maryland law, it is a condition precedent to the duty to defend that an actual suit be filed where the insurance policy provides the duty to defend "any suit against the Insured alleging damages", as does the instant St. Paul Policy. See Haines v. St. Paul Fire and Marine Ins. Co., 428 F.Supp. 435 (D. Md. 1977). See also, Provident Bank of Maryland v. Travelers Property Casualty Corp., 236 F.3d 138 (4th Cir. 2000). The St. Paul Policy does not provide for a duty to defend until a suit alleging damages against the Insured is lodged.[1]

While I further appreciate your opinion that the Borensteins did not file suit because Blum, Yumkas retained counsel and an accountant to attempt to identify what, if any, funds were due to the Borensteins, I personally (and St. Paul) have/has no idea why the Borensteins agreed to not bring suit.

I obviously cannot counsel your client as to whether the Waller lawsuit triggers its duty to defend. However, I would note that in Maryland, the duty to defend an insured is broader than the duty to indemnify. Utica Mutual Ins. Co. v. Miller, 746 A.2d 935 (Md. 2000) (citations omitted). In St. Paul Fire and Marine Ins. Co. v. Pryseski, 438 A.2d 282 (Md. 1981), the Court articulated the following test:

> In determining whether a liability insurer has a duty to provide its insured with a defense in a tort suit, two ... questions ordinarily must be answered: (1) What is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) Do the allegations in the tort action potentially bring the tort claim within the policy's coverage?

438 A.2d 282. To answer these questions, a court "must ascertain the scope and limitations of coverage under the ... insurance policies and then determine whether the allegations in the [underlying] action would potentially be covered under those policies." Aetna Casualty and Surety Co. v. Cochran, 651 A.2d 859 (Md. 1995).

Under the second part of the Pryseski test, it must be determined whether the lawsuit at issue alleges an action which is potentially covered under the insurance policy. Sullins v. Allstate Ins. Co., 667 A.2d 617 (Md. 1995). Generally, Maryland courts look to the allegations made in the complaint to determine whether claims may potentially be covered. Additionally, a court may look toward extrinsic evidence to determine whether a lawsuit alleges an action that is potentially covered because "allowing an insured the opportunity to establish a defense to tort

---

[1] While I appreciate your citation to out-of-state caselaw, Continental Cas. Co. v. Cole, 809 F.2d 891 (D.D.C. 1987), Alderman v. Hanover Ins. Group, 169 Conn. 603, 363 A.2d 1102 (Conn. 1975), and Ryan v. Royal Ins. Co. of America, 916 F.2d 731 (1st Cir. 1990) (applying New York law), these cases do not discuss or apply Maryland law.

**ROSS, DIXON & BELL, L.L.P.**

Michelle M. Bracke, Esq.
July 12, 2001
Page 5

allegations which may provide a potentiality of coverage under an insurance policy ... is precisely what the insured bargained for under the insurance contract." Cochran, 651 A.2d 859.

Furthermore, under Maryland law, if any claims potentially come within the policy coverage, the insurer is obligated to defend all claims, "notwithstanding alternative allegations outside the policy's coverage, until such time ... that the claims have been limited to ones outside the policy coverage." Southern Maryland Agricultural Assoc., Inc. v. Bituminous Casualty Corp., 539 F.Supp. 1295, 1299 (D. Md. 1982) (citations omitted). Doubt as to whether an allegation indicates the possibility of coverage should be resolved in the insured's favor. See, United States Fidelity and Guaranty Co. v. National Paving and Contracting Co., 178 A.2d 872 (Md. 1962).

As in other states, where a doubt exists as to whether the duty to defend is owed, the safest course is to provide a defense and file a declaratory judgment action to determine whether a defense is truly owed. Nationwide Mutual Ins. Co. v. Regional Electric Contractors, Inc., 680 A.2d 547 (Md. App. 1996). It is my understanding that Westport has instituted such a declaratory judgment action but that no ruling has yet issued relieving Westport of the duty to defend.

As regards your analysis of St. Paul's and Westport's respective "other insurance" clauses, I think it unlikely that in attempting to allocate defense fees for the Waller lawsuit a Maryland court would turn to an analysis of the "other insurance" clauses. As discussed in Utica Mutual Ins. Co. v. Miller, 746 A.2d 935 (Md. App. 2000), "excess" or "other insurance" clauses have been recognized as not applying to the duty to defend because, unless stated otherwise, that obligation is independent of liability and any limitations thereon. 746 A.2d at 946 (citations omitted). Moreover, such "other insurance" clauses apply only when coverage is concurrent. St. Paul Fire and Marine Ins. Co. v. Vigilant Ins. Co., 919 F.2d 235 (4th Cir. 1990). Where, as here, the policy periods do not overlap at all, and where, as here, St. Paul and Westport do not even insure identical interests, such "other insurance" clauses are simply not applicable.

We believe a more appropriate inquiry would be to examine what allocation of the defense fees and costs should appropriately be made as between St. Paul and Westport. Mr. Cohn is alleged to have mismanaged the Shapiro trusts for approximately 43 years, from 1957 to 2000. St. Paul's Policy, an occurrence-type policy, provides coverage only for professional services performed for others during the policy period from 1972 to 1975. Westport's policies appear to be triggered for claims made during its policy period by reason of wrongful acts occurring on or after July 1, 1988.

With respect to defense and indemnity obligations where multiple policies with co-primary defense obligations are triggered by a series of wrongful acts that occur over time, Maryland courts generally apply an "injury-in-fact" pro rata allocation of liability for indemnity and defense, following the Sixth Circuit decision in Insurance Co. of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212 (6th Cir. 1980). In Nationwide Mutual Ins. Co. v. LaFarge Corp., 910 F.Supp. 1104 (D. Md. 1996), aff'd, 121 F.3d 699 (4th Cir. 1997), the court adopted

**ROSS, DIXON & BELL, L.L.P.**

Michelle M. Bracke, Esq.
July 12, 2001
Page 6

the <u>Forty-Eight Insulations</u> allocation methodology concerning defense expenses for liability that occurred over a period of years and triggered numerous policies.

The <u>LaFarge</u> court rejected the argument that the duty to defend is an absolute duty to defend the entire action, joint and severable among the insurers, indicating instead that where allocation was possible this was the preferred outcome. The <u>LaFarge</u> court earlier cited <u>Forty-Eight Insulations</u> for the proposition that an insurer must bear the full expense of the defense only where there is no reasonable way to apportion defense costs. <u>Nationwide Mutual Ins. Co. v. LaFarge Corp.</u>, 1994 WL 706538 at 10 (D. Md. June 22, 1994); <u>See also</u>, <u>Southern Maryland</u>, 539 F.Supp. 1295.

The court in <u>Southern Maryland</u> suggested that an allocation should take into consideration what liability-producing acts occurred in which years to determine which policies should indemnify for which liabilities. The <u>Southern Maryland</u> court cited with approval <u>Loewenthal v. Security Ins. Co.</u>, 436 A.2d 493 (Md. 1981), wherein an earlier Maryland court held that where a reasonable means of prorating the cost of defense between covered and uncovered items exists, defense costs should be apportioned. In <u>Southern Maryland</u>, the court distinguished this holding of <u>Loewenthal</u> from those cases that have rejected apportionment of defense costs where the insurer wrongfully refused to defend a suit involving covered and non-covered claims. 539 F.Supp. at 1304.

It is St. Paul's position that St. Paul should pay only for defense costs attributable to professional services occurring from April 1, 1972 to April 1, 1975, and that Westport should pay for wrongful acts occurring during the 13 years arguably covered by its policies. This leaves 27 years for which Mr. Cohn and his firms have no available insurance coverage, which risk, according to <u>Forty-Eight Insulations</u>, 633 F.2d 1212, should be borne by Mr. Cohn and/or his firms. Due to the harshness of this result, as we understand that Mr. Cohn and his firms have no resources with which to pay for Mr. Cohn's defense, St. Paul agrees to bear 20 percent of Mr. Cohn's defense costs and expenses on a going-forward basis, with Westport to bear the remaining 80 percent. This allocation is consistent with the indemnity allocation Westport has already established and agreed to with St. Paul.

We are searching our records to determine whether there is a previous St. Paul Policy, Policy No. 681NA0511. I would note we are searching for policies issued over 35 years ago, unlike the Westport policies, which were issued in the late 1990s. In turn, I would appreciate your advising whether there is predecessor policy issued by Westport to Blum, Yumkas to those attached to the <u>Westport</u> DJ complaint. In this regard, I note that Exhibit A to the <u>Westport</u> DJ complaint, the 1999-2000 Westport policy, attaches a "Lawyers Professional Liability Insurance <u>Renewal</u> Application," executed on November 13, 1998 by Blum, Yumkas. This indicates the 1999-2000 Westport policy may have been the renewal of a predecessor policy.

Moreover, I note that the Declarations page of the 1999-2000 Westport policy references a Policy Number MDL-022139-1 although, oddly, only the words "... of Policy" appear on the Declarations Page in the upper right hand corner: the word "Renewal", which should appear in

905948 v1

**ROSS, DIXON & BELL, L.L.P.**

Michelle M. Bracke, Esq.
July 12, 2001
Page 7

front of the words "… of Policy" on the Declarations Page (as it does on the 2000-2001 Westport policy Declaration Page), has apparently been redacted by Westport.

I would also appreciate your confirming that you and/or others have searched the Insureds' and Westport's records and have been unable to find any other policies issued to Blum, Yumkas, Burke, Gerber & Wilen or Irving Cohn by Westport, or others. As to Westport's policies, we request a notarized affidavit from an appropriate Westport representative that no other Westport policies issued to Burke, Gerber & Wilen, Blum, Yumkas or Iving Cohn. I would also appreciate your providing me with copies of your correspondence to Mr. Cohn and/or Blum, Yumkas relative to Westport's coverage position vis a vis Mr. Cohn. I would further appreciate your searching Westport's underwriting materials as it is likely that the application for the first policy issued by Westport to Blum, Yumkas reflects the identity of the predecessor insurer. St. Paul has been unable to date to discover any underwriting information in its files concerning the Policies issued to Burke, Gerber & Wilen.

Finally, you have enclosed with your correspondence "many of the bills generated by defense counsel for all of the foregoing matters." As I earlier indicated, St. Paul would prefer that we all concentrate at this time on protecting Mr. Cohn's interests by attempting to settle these matters through the efforts of Al Frederick, leaving these past fees and costs issues for a later date. From my cursory review of the bills you have provided, I would simply note at this time that Al Frederick has confirmed to me in correspondence dated May 17, 2001, that he represents only the Blum, Yumkas firm. St. Paul does not insure the Blum, Yumkas firm. Moreover, as discussed above, it appears these costs and fees were incurred prior to the filing of any lawsuit and I am not aware that St. Paul was advised of or consented to the incurrence of these costs and fees. Your assertion that Westport is not obligated to pay any costs and fees on behalf of Mr. Cohn until St. Paul "exhausts" its Policy actually supports the notion that Westport incurred these costs and fees as a volunteer. St. Paul certainly reserves its rights as to whether these costs and fees are reasonable as well.

Again, we would prefer to "table" this dispute until the outcome of our attempt to settle these matters is known.

Nothing in your May 29, 2001 correspondence has altered the position taken in St. Paul's previously-stated reservation of rights. St. Paul expressly incorporates herein its previously-stated reservation of rights, which should not be construed to constitute a waiver of any further rights it may reserve in the future. St. Paul expressly reserves all such rights, remedies and defenses under the Policy and under applicable law herein, including the right to amend, supplement or alter its coverage position based upon later-discovered facts.

We look forward to hearing from you concerning Westport's position on defending the Waller lawsuit by July 23, 2001. Should I hear nothing from you by July 23, 2001, St. Paul will proceed to protect its and Mr. Cohn's rights accordingly.

**ROSS, DIXON & BELL, L.L.P.**

Michelle M. Bracke, Esq.
July 12, 2001
Page 8

Very truly yours,

ROSS, DIXON & BELL, L.L.P.

By
Kristi A. Gleim

KAG:mld

cc:    Andrew J. Graham, Esq.
       Kramon & Graham, P.A.
       One South Street, Suite 2600
       Baltimore, Maryland 21202-3201

       David B. Applefeld, Esq.
       Adelberg, Rudow, Dorf & Hendler, LLC
       600 Mercantile Bank & Trust Building, 2 Hopkins Plaza
       Baltimore, MD 21201-2927

       Christopher F. Davis, Esq.
       Hearne & Bailey, P.A.
       Colonial Building
       126 E. Main Street
       Salisbury, MD 21801

905948 v1