

LAW OFFICES

# HEARNE & BAILEY, P. A.

FREDERIC E. WIERMAN
CHARLES R. DASHIELL, JR.
CHRISTOPHER F. DAVIS
PHILIP C. SMITH

---

CHARLES E. HEARNE, JR. (1909 - 1995)
JAMES P. BAILEY (1922 - 1987)

COLONIAL BUILDING
128 EAST MAIN STREET
SALISBURY, MD 21801

---

**PLEASE REPLY TO:**

P. O. BOX 138
SALISBURY, MD 21803-0138

---

TELEPHONE: (410) 749-5144
FAX NO:    (410) 749-8273
e-mail:
psmith@shore.intercom.net

June 1, 2000

Joseph W. Schmitt, Esq.
385 Washington Street
508A
St. Paul, Minnesota   55102-1396

RE:    Irving F. Cohn Matter

Dear Mr. Schmitt:

It was a pleasure talking to you on May 31, 2000 about the above-captioned case.  Pursuant to our telephone conversation, I have enclosed a copy of a Complaint that we received from one of the beneficiaries of the Trust that were administered by Mr. Cohn.  Please note that at this time this Complaint has not been filed nor served.

If you have any questions concerning this matter, please call me.

Very truly yours,

Philip C. Smith

PCS:sdf
Enc.

F:\Users\SF\34237Smitt

EXHIBIT

# DRAFT

|  |  |  |
|---|---|---|
| ROBERTA BORENSTEIN<br>18 Windy Ridge Place<br>Wilton, Connecticut  06897 | : | IN THE |
| | : | CIRCUIT COURT |
| and | . : | OF MARYLAND |
| JEFFREY BORENSTEIN<br>37 Walnut Street #2<br>Wellesley Hills, Massachusetts  02481, | :<br>: | FOR BALTIMORE CITY |
| Plaintiffs, | : | |
| | : | Case No. _____ |
| v. | : | |
| IRVING F. COHN,<br>8206 Anita Road<br>Baltimore, MD 21208-1940 | : | |
| and | : | |
| BLUM, YUMKAS, MAILMAN,<br>  GUTMAN & DENICK, P.A.<br>1200 Mercantile Bank & Trust Bldg.<br>2 Hopkins Plaza<br>Baltimore, Maryland  21201-2914, | :<br><br>:<br><br>: | |
| Defendants. | : | |

:    :    :    :    :    :    :

## COMPLAINT

Roberta Borenstein and Jeffrey Borenstein, Plaintiffs, by their attorneys,
Zuckerman, Spaeder, Goldstein, Taylor & Better, L.L.P., sue Irving F. Cohen and
Blum, Yumkas, Mailman, Gutman & Denick, P.A., Defendants, and respectfully
submit:

STP 000669

1.    This action seeks an accounting in order to identify assets of a trust of which Plaintiffs are the beneficiaries and to recover damages caused by the trustee, Irving Cohn, and his law firm, Blum, Yumkas, Mailman Gutman & Denick, P.A. ("Blum Yumkas"). Cohn violated the most basic standards of conduct for fiduciaries in administering a series of trusts established by the family that founded Maryland Cup Corporation, including the trust of which Plaintiffs were the beneficiaries. Over a period of more than twenty years, Cohn so thoroughly failed to account for and manage the prudent investment of trust assets that at least one bank account of the trust escheated to the State of Maryland, and funds were left in other bank accounts in which they earned little or no interest. He failed to terminate the trust until eight years after he was required to do so, and then, although he claimed to distribute all trust assets, retained mutual fund investments and bank accounts of the trust that had substantial value. Since 1987, Cohn acted under the auspices of and with the support and assistance of Blum Yumkas. Only a complete and full accounting, and the payment of all amounts determined to be due to the trust, including damages, can remedy these complete failures to satisfy fiduciary standards.

2.    Plaintiff Roberta Borenstein is an individual residing in Connecticut.

3.    Plaintiff Jeffrey Borenstein is an individual residing in Massachusetts. Jeffrey Borenstein is the brother of Roberta Borenstein.

4.    Defendant Irving F. Cohn ("Cohn") is an individual residing in Baltimore County, Maryland. Cohn is a member of the Maryland bar as well as a certified public accountant, and he regularly conducts business in Baltimore City. Cohn is

2

STP 000670

the sole remaining trustee and Plaintiffs are the beneficiaries under the Trust Agreement (the "Trust Agreement") dated April 28, 1957 between D. Anne Borenstein, grantor, and Arthur C. Strasburger, Gunther R. Borris and Irving F. Cohn, trustees.

5.    Defendant Blum, Yumkas, Mailman, Gutman & Denick, P.A. ("Blum, Yumkas") is a professional corporation organized under the laws of Maryland with its primary place of business in Baltimore, Maryland. Blum, Yumkas regularly engages in business in Baltimore, Maryland. Cohn is a principal, and has been since 1987 a principal, of Blum, Yumkas.

## FACTS

### A.    The Formation of the Trust

6.    In 1957 and at all other times material to the Complaint, Maryland Cup Corporation ("Maryland Cup"), a prominent Maryland business located in Baltimore County, Maryland, was engaged in the manufacture and sale of, among other things, disposable cups and drinking straws. Flex Straw International Corporation ("Flex Straw") was an affiliate of Maryland Cup and the owner of proprietary technology which enabled the manufacture of bending straws.

7.    In the early 1900's, four Shapiro brothers – Nathan Shapiro, Joseph Shapiro, Isaac Shapiro and Samuel Shapiro (collectively, the "Shapiro Brothers") – founded the entities that became Maryland Cup. The four Shapiro brothers, their families and descendants were principal stockholders of and served as officers and directors of Maryland Cup through 1983.

3

STP 000671

8.    In April, 1957, the children or spouses of the children of the Shapiro Brothers established twelve irrevocable trusts, the primary beneficiaries of which were the grantors' children (the grandchildren of the Shapiro Brothers). These trusts were funded, both at the time of their creation and subsequently, with distributions from Flex Straw, and they were therefore referred to as the Shapiro-Flex Trusts. The trust agreements assigned to each of the Shapiro-Flex Trusts a number from 1 through 12 by which the trust would be known.

9.    The total amount of the initial funding and subsequent distributions to the trusts was divided per stirpes among the families of the Four Brothers. Thus, the trusts established by the children of each brother were collectively allocated twenty-five percent of the total funding of the trusts, and that twenty-five percent was divided among two, three or four trusts, depending on the number of the brother's children. The different trusts each received 6.25 percent (in the case of the Isaac Shapiro family, in which there were four children), 8.33 percent (in the case of the Samuel and Nathan Shapiro families, in which there were three children), or 12.5 percent (in the case of the Joseph Shapiro family, in which there were two children) of the total funds distributed to the Shapiro-Flex Trusts.

10.    The trustees under each of the trust agreements were Arthur C. Strasburger, Gunther Borris and Irving F. Cohn. Gunther Borris withdrew as a trustee soon after the trusts were established and Arthur Strasburger died in 1987, leaving Irving F. Cohn as the sole surviving trustee for each of the Shapiro-Flex Trusts.

4

STP 000672

11.    Plaintiffs Roberta Borenstein and Jeffrey Borenstein are the children of D. Anne Shapiro Borenstein, one of three children of Nathan Shapiro. D. Anne Shapiro Borenstein was the grantor and Roberta and Jeffrey Borenstein were and remain the beneficiaries of Shapiro-Flex Trust No. 9. A copy of the Trust Agreement establishing Shapiro-Flex Trust No. 9, dated April 28, 1957, is attached as Exhibit A.

12.    The Trust Agreement provided that, when the beneficiaries of the trust reached twenty-one years of age, the trustee could in his discretion distribute to the beneficiaries portions of the principal. The Agreement further provided that, when the beneficiaries of the trust reached thirty-five years of age, the trustee "shall pay over and deliver absolutely unto the Primary Beneficiary any remaining balance of the share of the Trust, freed of any further trust."

13.    Flex Trust No. 9 was funded at its inception with $3,200. Additional amounts were paid into the trust from Flex Straw distributions through approximately 1969, when there was a final addition to the trust.

14.    From 1957, when the Shapiro Flex Trusts were formed, until 1987, Cohn practiced law and public accounting as a principal in law and accounting firms. In 1987, Cohn became a principal of Blum, Yumkas. Since 1987, he has carried out all of his duties as trustee of Shapiro-Flex Trust No. 9, as well as the other Shapiro-Flex Trusts, under the auspices of and within the scope of his employment with Blum, Yumkas, and with the full support and approval of the firm. For Shapiro-Flex Trust No. 9 as well as the other Shapiro-Flex Trusts, Cohn has corresponded on Blum, Yumkas letterhead, concerning trust matters, has managed

5

On information and belief, the total value of the accounts of all Shapiro-Flex Trusts that escheated to the State exceeded $500,000, of which approximately $27,000 belonged to Shapiro-Flex Trust No. 9. The accounts were held by the State as unclaimed property for a period not yet known to Plaintiffs but believed to be more than twenty years, during which time the funds in the accounts did not earn interest or otherwise appreciate. Throughout that period, which lasted until in or about 1998 for Shapiro-Flex Trust No. 9, Cohn failed to fulfill his fiduciary obligation to identify the accounts, take action to recover them from the State, and invest the funds in the accounts with a reasonable degree of prudence and care.

18.    On information and belief, other accounts, including bank accounts of Shapiro-Flex Trust 9, were allowed to sit idle for a period not yet known to Plaintiffs but believed to be at least twenty years. Cohn simply lost track of the existence of these accounts, and was unable to identify all the assets of Shapiro-Flex Trust No. 9 or any of the other Shapiro-Flex Trusts. With respect to these accounts, like the funds that escheated to the State, Cohn failed to fulfill his fiduciary obligation to identify the accounts and invest the funds in the accounts with a reasonable degree of prudence and care. Cohn's failure to take such action continued until a date no earlier than 1998 for Shapiro-Flex Trust No. 9.

19.    There were additional assets of Shapiro-Flex Trust No. 9 that Cohn did not abandon. He commingled those assets with assets of one or more other Shapiro-Flex Trusts, and he failed to maintain clear records of the source or ownership of the assets.

7

STP 000674

20.    Specifically, in 1969 and 1970, Cohn purchased on behalf of Shapiro-Flex Trust No. 9 shares in two Wellington Management Company mutual funds that were later taken over by The Vanguard Group, Inc. ("Vanguard"). On information and belief, the shares in both mutual funds were purchased with funds from a checking account that was maintained for all of the Shapiro-Flex Trusts, in which funds of the different trusts were commingled.

21.    The shares of the two mutual funds were held in two accounts in the name of the trustees for "Shapiro-Flex Trust," without reference to any specific trust.   The taxpayer identification number for both accounts was the number of Roberta Borenstein, beneficiary of Shapiro-Flex Trust No. 9.

22.    Plaintiffs Jeffrey and Roberta Borenstein reached age 35 in 1976 and 1981, respectively.  Cohn did not distribute any portion of their respective shares of the trust corpus or terminate the trust at that time, as required by the Trust Agreement, and failed to do so until 1989, notwithstanding Plaintiffs' earlier requests that Cohn distribute the assets and terminate the trust.

23.    In or about January, 1989, Cohn finally distributed to Plaintiffs shares of the two Vanguard funds and a third mutual fund, which he represented to Plaintiffs were all of the assets in Shapiro-Flex Trust No. 9. Each Plaintiff received mutual fund shares worth approximately $75,000 (the "1989 Distribution").

24.    In light of the relatively small amount of the 1989 Distribution, Roberta and Jeffrey Borenstein both questioned Cohn about whether the 1989 Distribution represented all of the funds in Shapiro-Flex Trust No. 9.  Whenever such questions were raised, Cohn repeated his representation that these

8

STP 000675

distributions constituted all assets of the trust and that he considered Shapiro-Flex Trust No. 9 to be closed.

25.    On numerous occasions after the 1989 Distribution, both Jeffrey and Roberta Borenstein asked Cohn to provide an accounting of Shapiro-Flex Trust No. 9. Cohn repeatedly and consistently failed to provide an accounting.

26.    In or about January, 1999, Plaintiffs received a letter from Herbert Bank, their cousin and a beneficiary of another Shapiro-Flex Trust, advising them that an accountant had been working to bring about the closing of the Shapiro-Flex Trusts. The letter revealed to Plaintiffs for the first time that Cohn had allowed a substantial amount of money from Shapiro-Flex Trust accounts to escheat to the State and that the funds had been held by the State for some time, interest free. It described the failure to observe "good accounting standards," and concluded that "[t]he exact account balance for each beneficiary is cloudy at best. . . ." A copy of the letter is attached as Exhibit B.

27.    In April of 1999, Plaintiffs received checks totaling $111,222 (the "1999 Distribution"), which they were advised for the second time was the final distribution from Shapiro-Flex Trust No. 9. On information and belief, approximately $27,000 of the 1999 Distribution consisted of funds that had escheated to the State and were subsequently recovered from the State's Unclaimed Property Division, and the balance had been held in bank accounts of which Cohn had lost track for years, during which time they earned little or no interest.

9

STP 000676

28.    Beginning soon after their receipt of the letter from Herbert Bank describing the abandonment of funds to the State, the disarray of other trust accounts and the poor state of the records of the trusts, Plaintiffs repeatedly inquired whether there were additional funds that belonged to Shapiro-Flex Trust No. 9. In addition, Plaintiffs repeatedly requested copies of documents that would permit them to determine whether they were entitled to additional funds. Inquiries and requests were communicated to Cohn himself and to Bernard Denick, another principal of Blum, Yumkas who regularly addressed matters concerning Shapiro-Flex Trust No. 9 and the other Shapiro-Flex Trusts. Cohn and Denick assured Plaintiffs that there were no additional funds left in Shapiro-Flex Trust No. 9, and that after the 1999 distribution, Shapiro-Flex Trust No. 9 had been depleted.

29.    Cohn and Denick not only refused to provide the documents Plaintiffs requested, they interfered with the attempts of Plaintiff Roberta Borenstein to obtain the documents independently. Plaintiffs learned for the first time in November, 1999 that the Vanguard mutual fund accounts, which they believed had been distributed to them in their entirety, remained open, and that only one-half of the accounts' contents had been distributed to them. According to Denick, the remaining half of the Vanguard mutual fund accounts, by then worth more than $300,000, belonged to Shapiro-Flex Trust No. 8, the beneficiaries of which were cousins of Plaintiffs. Denick insisted that Plaintiffs could not have access to records regarding the Vanguard accounts for the period after the 1989 Distribution, because Plaintiffs purportedly had no further interest in the Vanguard accounts.

10

STP 000677

30.   Plaintiff Roberta Borenstein asked Vanguard to provide statements concerning the mutual fund accounts, but Vanguard refused to provide the statements without authorization from the trustee. By letter dated November 24, 1999, Vanguard explained that it had contacted Cohn to seek his approval to release account information, and "Mr. Cohn specifically requested that Vanguard not release Trust account information to you." A copy of the letter is attached as Exhibit C.

31.   Within a few days of Vanguard's letter, Cohn was forced to acknowledge yet again that there were additional assets in the supposedly closed Shapiro-Flex Trust No. 9, and indeed, that this trust owned approximately one-third of the remaining Vanguard mutual fund accounts. Denick advised Plaintiffs that upon further analysis it had been confirmed that Shapiro-Flex Trust No. 9 had owned more than the one-half of the Vanguard mutual fund accounts before the 1989 Distribution, and that approximately one-third of the remaining Vanguard mutual fund holdings, worth approximately $100,000, belonged to Shapiro-Flex Trust No. 9. Plaintiffs were assured, as they had been twice before, that this distribution would complete the distribution of assets of Shapiro-Flex Trust No. 9.

32.   In light of the commingling of trust assets, the poor or nonexistent documentation, the abandonment of assets, and the trustee's ever-changing positions, Plaintiff Roberta Borenstein communicated to Cohn and Denick her refusal to accept without further information their latest conclusion, that two-thirds of the remaining Vanguard mutual fund holdings belonged to another trust, and again demanded documentation and information regarding the Vanguard accounts.

11

STP 000678

On or about November 30, 1999, Roberta Borenstein finally received from Vanguard copies of the Vanguard account statements from 1989 to date. On the same date she received from Denick a letter summarizing what he described as Cohn's position concerning ownership of the Vanguard accounts and providing a few pages of Vanguard account statements. Notwithstanding the unresolved and substantial dispute concerning ownership of the Vanguard accounts, Cohn instructed Vanguard on November 30, 1999 to distribute to the beneficiaries of Shapiro-Flex Trust No. 8 approximately two-thirds of the contents of the Vanguard accounts, worth more than $200,000. Vanguard complied with the request on December 1, 1999.

    33.    Plaintiffs have continued to request an accounting of Shapiro-Flex Trust No. 9, as well as copies of specific records necessary to verify any accounting. No accounting has been supplied, and no records have been provided.

**COUNT I**
Accounting (Against Irving F. Cohn)

    34.    Plaintiffs adopt by reference the allegations contained in paragraphs 1 through 33 of this Complaint with the same effect as if herein fully set forth.

    35.    In violation of his fiduciary obligations as trustee and of the requirements of Maryland law, Cohn has refused to provide a written accounting of Shapiro-Flex Trust No. 9 to Plaintiffs, even while asserting on two separate occasions that all assets of the trust had been distributed and the trust was terminated.

12

STP 000679

36.    Plaintiffs desire that the Court assume jurisdiction over the administration of the trust estate and grant an accounting to them of the full amount of the trust, including damages it has sustained.

### COUNT II
#### Breach of Fiduciary Duty (Against Cohn)

37.    Plaintiffs adopt by reference the allegations contained in paragraphs 1 through 33 of the Complaint with the same effect as if herein fully set forth.

38.    By virtue of his position as trustee, under the Trust Agreement and Maryland law Cohn was under a fiduciary duty, in dealing with the trust's assets, requiring him to exercise the care, skill and diligence of a reasonably prudent person dealing with his or her own property, to exercise reasonable watchfulness over the investments of the trust, and to maintain full, accurate and precise records.

39.    Cohn breached his fiduciary duty to the Plaintiffs by his continuing course of conduct, beginning at least twenty years ago and continuing until the present, which included a) allowing funds in Flex Trust No. 9 to escheat to the State, where they sat for years earning absolutely no interest; b) failing to take action to recover these funds from the State; c) allowing funds to sit for years in bank accounts earning little or no interest; d) commingling the assets of Shapiro-Flex Trust No. 9 with those of other Shapiro-Flex Trusts; e) failing to maintain full, accurate and precise records of Shapiro-Flex Trust No. 9; and f) failing to make investments that were reasonably prudent.

13

STP 000680

40.    By virtue of Cohn's breach of his fiduciary duty to Plaintiffs, Plaintiffs have suffered damages, including but not limited to the loss of appreciation and income that would have been earned by the trust on funds that escheated to the State or were left in bank accounts had such funds been invested in accordance with the standard of care required of Cohn.

**COUNT III**
**Breach of Fiduciary Duty (Against Blum, Yumkas)**

41.    Plaintiffs adopt by reference the allegations contained in paragraphs 1 through 36 and 38 through 40 of the Complaint with the same effect as if herein fully set forth.

42.    Cohn carried out this continuing course of conduct in his capacity as a shareholder and employee of Blum, Yumkas, within the scope of his employment by Blum, Yumkas, and with the approval, support and assistance of Blum, Yumkas.

43.    Blum, Yumkas is responsible for the acts and omissions of and the damages caused by Cohn.

**COUNT IV**
**NEGLIGENCE (Against Cohn)**

44.    Plaintiffs adopt by reference the allegations contained in paragraphs 1 through 36 of the Complaint with the same effect as if herein fully set forth.

45.    Cohn owed Plaintiffs a reasonable duty to exercise that degree of care in carrying out the affairs of Shapiro-Flex Trust No. 9 as is commonly used in like circumstances by trustees.

46.    Cohn's duties included a) taking reasonable measures to keep track of, preserve and maximize the value of the assets of the trust; b) investing the assets

14

STP 000681

of the trust in a manner consistent with the standards reasonably to be expected of a reasonably competent trustee in these circumstances; c) taking the necessary actions to recover from the State funds of the trust that escheated to it; and d) maintaining reasonable records of the trust's affairs.

47.     By his acts and omissions, Cohn breached these duties owed to Plaintiffs.

48.     As a result of Cohn's negligence, Plaintiffs have suffered damages.

## COUNT IV
## NEGLIGENCE (Against Blum, Yumkas)

49.     Plaintiffs adopt by reference the allegations contained in paragraphs 1 through 36 and 45 through 48 of the Complaint with the same effect as if herein fully set forth.

50.     Cohn's negligent actions and omissions were carried out in his capacity as a shareholder and employee of Blum, Yumkas, within the scope of his employment by Blum, Yumkas, and with the approval, support and assistance of Blum, Yumkas.  Blum, Yumkas is responsible for the acts and omissions of and the damages caused by Cohn.

WHEREFORE, Plaintiffs demand that this Court:

A.     Order Defendant Cohn to account fully and completely for all sums held in trust or on deposit in Shapiro-Flex Trust No. 9, including damages it has sustained;

15

STP 000682

B.    Adjudge, decree and declare that Defendant Cohn has violated the Trust Agreement and breached his fiduciary duties as trustee in the particulars set out herein, for which he is personally liable and accountable;

C.    Adjudge, decree and declare that Defendant Blum, Yumkas is liable and accountable to Plaintiffs to the same extent as Defendant Cohn;

D.    Grant Plaintiffs judgment against Defendants in the amount found to be due to Plaintiffs on such accounting, including the lost appreciation of and income from assets of the trust that were abandoned or imprudently invested, with interest, together with the costs and disbursements of this action; and

E.    Grant Plaintiffs interest, costs and such other and further relief as the Court may deem necessary and proper.

### REQUEST FOR JURY TRIAL

Plaintiffs request a jury trial on all issues so triable.

Martin S. Himeles, Jr.
Deborah S. Richardson
Zuckerman, Spaeder, Goldstein,
  Taylor & Better, L.L.P.
100 E. Pratt St., Suite 2440
Baltimore, Maryland 21202
(410) 332-0444

Attorneys for Plaintiffs Roberta
Borenstein and Jeffrey Borenstein

::ODMA\PCDOCS\BALTIMORE\2325111

16

STP 000683

## TRUST AGREEMENT

I, O. Anne Borenstein of Brookline, Massachusetts, do hereby make this Irrevocable Trust Agreement with Arthur C. Strasburger, Gunther R. Berris, and Irving F. Cohn, all of Baltimore, Maryland, Trustees under this present Trust Agreement. This present Trust Agreement has been executed by me for the purpose of making a trust to be known as "Shapiro-Flex Trust No. 9 " for the benefit of my children.

Wherever in this Trust Agreement I refer to "Trustee" or "Trustees", the said terms shall include each Trustee, Co-Trustee, Trustees or Co-Trustees, successor Trustee or successor Trustees, or alternate trustee, who may from time to time act as Trustee or Trustees under this Trust Agreement.

### INITIAL CORPUS OF TRUST

FIRST: I have simultaneously, with the execution of this Agreement, given to the Trustees the sum of Thirty-Two Hundred Dollars ($3,200.). The Trustees shall immediately divide this sum into equal shares, so that there shall be one (1) equal share for each of my children, named below, and hereinafter sometimes referred to individually as the "Primary Beneficiary" or collectively as the "Primary Beneficiaries;"

Roberta J. Borenstein
Jeffrey H. Borenstein

The sum so assigned to each share shall constitute the initial corpus of the trust for the benefit of my child for whom the Trustees have assigned said share; and each such share shall be administered by the Trustees as a separate and independent trust for said child.

I hereby reserve the right and privilege to assign by Deed or appoint under my Last Will and Testament to any share of this trust such additional cash, securities, property, contracts or other assets as I may desire, so that the same may be transferred, endorsed or otherwise made payable to, or owned by, the Trustees, and held for the Primary Beneficiary of each share.

### GENERAL MANAGEMENT OF TRUST

SECOND: The Trustees shall take possession of, receive, hold, control, manage, collect, invest and reinvest the trust property in their hands, and shall collect the income and profits arising therefrom, and pay all necessary and proper expenses for the administration of each share of this Trust and hold the same for the use, benefit and general welfare of the Primary Beneficiary.

STP 000684

DISPOSITION OF INCOME AND PRINCIPAL OF TRUST

THIRD:  During the lifetime of each Primary Beneficiary, the Trustees shall dispose of the net income and principal of the share held for the Primary Beneficiary, in accordance with the following provisions:

### DISPOSITION OF INCOME OF A SHARE

A.  So long as the Trustees hold a share of this Trust for the benefit of any child of mine, they may, within their sole and absolute discretion, either accumulate the income arising from said share, or they may distribute so much of the income to or for the account of the Primary Beneficiary, which they deem advisable.

### DISPOSITION OF PRINCIPAL OF A SHARE

B.  After a Primary Beneficiary of a share of this Trust attains the age of twenty-one (21) years, the Trustees may, at such time or times, as they, within their sole and absolute discretion deem advisable, pay over unto the Primary Beneficiary such portion or portions or all of the principal of the share of the Primary Beneficiary. When the Primary Beneficiary of a share of this Trust attains the age of thirty-five (35) years, the Trustees shall pay over and deliver absolutely unto the Primary Beneficiary any remaining balance of the share of the Trust, freed of any further trust.

The termination or exhaustion of any share of this Trust shall not effect any other share of this trust, held for any other beneficiary. Any distribution out of the principal of a share of this Trust shall be charged to said share.

### DISPOSITION OF SHARE OF TRUST UPON DEATH OF PRIMARY BENEFICIARY LEAVING DESCENDANTS SURVIVING

C.  If the Primary Beneficiary of a share of this Trust die prior to receipt by the Primary Beneficiary of the entire share of the trust, held for such Primary Beneficiary, and leave surviving children or descendants of any deceased children, the Trustees shall divide such share, as then constituted, in equal shares, per stirpes and not per capita, into as many parts as there shall be children of the deceased Primary Beneficiary and descendants of any deceased children of the said Beneficiary, so that there shall be one (1) independent part for each living child of the said Beneficiary and one (1) independent part for the living descendants of any deceased child of the said Beneficiary. The principal and income from each part of said share may be paid unto the beneficiaries, who are the children and/or descendants of the Primary Beneficiary as the Trustees shall determine. Upon each of the children and/or descendants of a deceased Primary Beneficiary attaining the age of twenty-one (21) years, the Trustees shall distribute unto said Beneficiary his part of the trust, freed, cleared and discharged of any further trust.

-2-

STP 000685

## DISPOSITION OF SHARE OF TRUST UPON DEATH OF SURVIVING DESCENDANT OF THE PRIMARY BENEFICIARY

D.  In the event of the death of a child or descendant of a deceased Primary Beneficiary leaving other descendants of said deceased Primary Beneficiary surviving, the Trustees shall divide the part of a share to which said child or descendant was entitled equally among the other living children or descendants of the Primary Beneficiary per stirpes and not per capita.  If a trust is being held hereunder for the benefit of said other children or descendants, the amount shall be added to said trust and distributed according to its terms.  If there is no trust for any of said children or descendants, his share shall be distributed to him, freed, cleared and discharged of any further trust.

## DISPOSITION OF SHARE OF TRUST UPON DEATH OF PRIMARY BENEFICIARY LEAVING NO DESCENDANTS SURVIVING

E.  In the event of the death of the Primary Beneficiary of a share of this Trust, prior to the distribution of the entire share of the trust to said Primary Beneficiary, leaving no surviving children or descendants, or in the event of the death of all of the descendants of a deceased Primary Beneficiary, prior to complete distribution of the share for the Primary Beneficiary, the Trustees shall divide said share of the Trust into as many equal parts as there shall be brothers and/or sisters of the deceased Primary Beneficiary and/or descendants of deceased brothers and/or sisters, in equal shares, per stirpes and not per capita.  If the Trustees be then holding a share of this Trust for any such beneficiary, then said beneficiary's part shall be added to said share and distributed according to its terms.  If there is no share being held for any such beneficiary, his share shall be distributed to him freed, cleared and discharged of any further trust.

## EMERGENCY DISTRIBUTIONS OF PRINCIPAL

F.  At any time while the Trustees are holding a share of this Trust for a child of mine, they may distribute unto the Primary Beneficiary of a share of this Trust each sum or sums from the principal of such share, which they deem reasonable, to provide for the education of the said Primary Beneficiary, to help said Primary Beneficiary maintain the station of life to which the Primary Beneficiary is accustomed, or which the Trustees may deem reasonable to meet any emergencies occurring in the life of said Beneficiary, such as serious accident or illness, to help to establish the said Beneficiary in business or in a profession, or for the wedding expenses of such Beneficiary.  In making such distribution from the principal of the share of the Trust held for such Primary

STP 000686

Beneficiary, the Trustees shall take into consideration the size of the share of the Trust, as then constituted, the other income and resources of the Beneficiary, and the purposes for which the Beneficiary shall require the distribution. Such distribution shall represent a charge against the share of the Trust which is held for such Primary Beneficiary.

### TREATMENT OF UNDISTRIBUTED INCOME

G. Any income remaining undistributed within sixty-five (65) days after the close of the year established for any share of the Trust for income tax purposes shall be added to and become a part of the principal of the share of the trust out of which it arises.

### DISPOSITION UPON FAILURE OF ANY SHARE OF TRUST

H. In the event that any share of the Trust shall not be distributable under the provisions herein set forth, then the Trustees shall transfer and pay over the balance of such share of the Trust, as then constituted, freed and cleared of any trust, unto those persons at such time or times who would be the distributees of my personal estate and the heirs of my real estate, had I at such time or times died intestate, owing no debts, seized and possessed of such portion or portions of the Trust, domiciled in the State of Maryland, and in the proportions to which such person or persons would be entitled to distribution in case of such intestacy, save that none of the property shall in any event revert to me or my estate.

### VESTING OF TRUST UNDER RULE AGAINST PERPETUITIES

FOURTH: Having in mind the Rule against Perpetuities and laws imposing restraints on alienation and accumulation of income, this trust shall end, unless sooner terminated under other provisions hereof, twenty-one (21) years from and after the death of the last survivor of my children as are living at this time, any provision of this Trust Agreement to the contrary notwithstanding, and thereupon the property held in trust shall be distributed, freed of all trusts, to the persons then entitled to receive the income thereof in the proportions in which they are then entitled thereto.

### SPENDTHRIFT PROVISIONS

FIFTH: The Trustees shall make all payments to be made hereunder only to the person or persons entitled thereto and upon the following terms, conditions, and provisions. All such payments shall be made directly into the hands of the person or persons entitled thereto and not into the hands of any other person or corporation whatsoever, whether claiming by his authority or otherwise, so that the said payments may not be liable for the debts, contracts, or engagements of

STP 000687

any such person or persons thereunto entitled. No such person or persons have any right to alienate, anticipate, commute, pledge, encumber, or assign any such payments. Deposits to the credit of the account of any Primary Beneficiary, entitled to payment hereunder, in any bank or trust company, shall, however, be deemed to be the equivalent of payment into the hands of such person, and if the person entitled to receive payments hereunder be an infant, under twenty-one (21) years of age, or a person of unsound mind, whether actually adjudicated a lunatic or not, the Trustees may expend the amount due to the said infant, or person of unsound mind, for the account of such person, or the Trustees may pay the same to such person or persons, corporation or corporations, as may be acting as parent, guardian (legal or natural), or trustee of such infant or incompetent. The receipt of such person or corporation shall be a full and complete discharge to said Trustees for any sums so paid.

## POWERS OF TRUSTEES

NINTH: Not in derogation of, or in limitation upon the power, authority, and discretion conferred upon the Trustees by law, I do hereby give and bestow upon the said Trustees, and their successors and survivors in the trust, the following additional authority, powers, discretion, immunity and exoneration:

### POWER TO CONDUCT BUSINESS

A. I hereby specifically grant unto the Trustees the power to conduct, either as principal or as partner, any going business, or the interest in any going business, which may be a part of the Trust at any time, and I direct that the said Trustees, while acting in good faith and exercising due care under this power, shall not be held liable or responsible for any loss or depreciation in the value of the trust, I further direct that any Trustee hereunder may receive a salary from said business or compensation for services rendered in such business in a capacity other than as Trustee without liability to the trust or any beneficiary thereof.

### POWER OF INVESTMENT

B. The Trustees shall have full power to invest, reinvest, and change the investments under this Trust Agreement from time to time, and for that purpose and for either purposes, without previous application to, or subsequent ratification by, any Court of Law, Equity or Probate, and for such consideration, and on such terms as to said Trustees shall seem advisable, to sell at public or private sale, to lease, whether or not the terms of such lease shall or may extend beyond the duration of any trust, to borrow, mortgage, pledge, hypothecate, improve, sub-divide, develop, grant, assign, convey, bargain, transfer, exchange, and in any



STP 000688

manner conditionally or absolutely to dispose of all or any part of the Trust wherever and as often as they deem it advisable or proper so to do, without obligation on the part of any purchaser or purchasers, or any other persons dealing with the Trustees, to see to the application of the purchase money or other consideration passing to the Trustees. Said Trustees are also authorized and empowered to execute, acknowledge and deliver any and all instruments in writing, and to do any and all matters and things necessary, required or advisable to be done in connection with the performance of their duties hereunder. The Trustees are expressly authorized and empowered to execute a Power of Attorney or Trust Agreement whereby a person or persons or a corporation, bank, or trust company may be authorized and appointed to act for the said Trustees and to hold title to such property of any nature whatsoever, which may be a part of the principal of the trust, whenever the Trustees determine that such action shall be for the best interests of the trust.

Said Trustees, within their sole and absolute discretion and judgment, are hereby expressly authorized and empowered to invest and reinvest the trust property in such securities, common and preferred stocks, and other property, real or personal, or both, or such life insurance policies upon the life or lives of any Primary Beneficiary hereunder or any person in whom the beneficiary may have an insurable interest, including any Trustee hereunder. The Trustees are hereby authorized to hold as investments of the trust herein created such property, real, personal, or mixed, as may come into their hands through its administration, until such time or times as said Trustees, in their discretion, shall deem it advisable to and can dispose of the same for the greater advantage of the Trust. Said Trustees are authorized and empowered, in their sole and absolute discretion, to allow, pay, compromise, compound, enforce, waive, accept, or give real or personal security for, or give time without taking any security for, or refer to arbitration, any debts, or demands whatsoever which may be owing from or to, or be made upon or against or in behalf of the Trust, whether the same be legally enforceable or not, and upon such evidence as they shall think sufficient.

### POWER TO RETAIN SEPARATE SHARES OF TRUST AS A WHOLE

C. Any provision in this Trust Agreement to the contrary notwithstanding, the Trustees, when directed to divide the trust property or any portion thereof into parts or shares, may consider said trust property, or portion thereof, as having been divided into such parts or shares, without making any actual physical division thereof until such time as division may be necessary by reason of the

-4-

STP 000689

termination of a trust or the withdrawal of all of the trust principal. Each such part or share shall be held by the Trustees as a separate trust or share in the same manner as if such division had in fact been made.

The Trustees are directed to treat each share as a separate trust. However, in the event of an interpretation by ruling, decision or opinion that these shares shall be considered as one trust, then the Trustees may, in the best interests of these trusts, physically divide the trust property and execute such supplemental agreement as will give effect to my intention to establish a separate trust for each of my children, hereinbefore named.

### NONLIABILITY OF TRUSTEES FOR ERRORS OF JUDGMENT

D. Said Trustees, while acting in good faith and exercising due care, shall not be liable or held responsible for any loss or depreciation in the value of the Trust resulting from any of the investments or reinvestments made or retained as aforesaid. Wherever herein the Trustees are vested with any discretionary powers, the exercise by the Trustees of such discretion shall be final and conclusive and no beneficiary shall have any right to contest or question the exercise of such discretion or to compel such discretion to be exercised in any particular manner, and the Trustees shall not be liable to any beneficiary by reason of the exercise of such discretionary powers.

### POWER TO TITLE TRUST PROPERTY IN NOMINEE

E. The Trustees may, in their sole and absolute discretion, cause the securities or other investments that may, from time to time, comprise the trust or any part thereof to be registered in their name as Trustees hereunder, in the name of their nominee (or in the individual names of the Trustees), or may take and keep them unregistered and may retain the same or any part thereof in such condition that they will pass by delivery.

### POWER TO DETERMINE ITEMS OF INCOME OR PRINCIPAL

F. The Trustees shall determine, in their sole discretion, whether any payments received shall constitute income or principal, and whether any disbursements made shall be made from income or principal.

### POWER TO DISTRIBUTE ASSETS IN CASH OR PROPERTY

G. Whenever the Trustees are required, pursuant to the provisions of this Trust Agreement, to divide the principal of the trust into parts or shares, or to distribute such parts or shares, they are hereby authorized and empowered, in their sole discretion, to make such division or distribution in kind or money, or partly in kind and partly in money, and for the purpose of such allotment, the judgment of the Trustees concerning the propriety thereof, and the relative value for the purpose of division or distribution of the property and securities so

STP 000690

allotted, shall be binding and conclusive on all persons and corporations interested therein.

## POWER TO VOTE AND EXCHANGE STOCK

I. The Trustees are authorized and empowered to vote in person or by proxy with or without power of substitution upon all stocks or other securities held by them; to exchange the securities of any corporation for other securities issued by the same, or by any other corporation at such times and upon such terms and conditions as the Trustees shall deem proper; to consent to the reorganization, consolidation, merger or liquidation of any corporation, or to the sale or lease of its property, or any portion thereof, to such corporation; and upon such reorganization, consolidation, merger, liquidation, sale or lease to exchange the securities held by them for the securities or stock issued in connection therewith; to pay all assessments, subscriptions and other sums of money as the Trustees may deem expedient for the protection of their interest, as holder of any stocks, bonds, or other securities of any corporation, and to exercise any option conferred in any stocks, bonds, or other securities and to make any and all necessary payments therefor, and generally, to exercise in respect to all stocks, bonds or other investments held by the Trustees hereunder, all rights, powers and privileges as are or may be lawfully exercised by any person owning similar property in his or her own right, provided, however, that the Trustees shall not be required to make any of the payments herein provided, except from the principal of the trust.

## LIKE POWER TO ALL TRUSTEES

I. All powers, duties and responsibility herein bestowed upon the Trustees are hereby bestowed upon the Trustee or Trustees acting hereunder from time to time.

## POWER TO SEEK EXPERT ADVICE

J. Whenever the Trustees shall require expert advice or assistance, in carrying out the terms of this Trust Agreement or exercising any power, or in any matter arising under this Trust Agreement, they shall be permitted to consult and employ such person or persons as they may require, at such fees as they may deem reasonable, and the said fees shall constitute an expense of the administration of the Trust.

## DEFINITIONS

K. Wherever the term "child", "children", "descendant", or "descendants" is used in this Trust Agreement, it is my intention that the said terms shall include child, children, descendant and descendants, by both, or

-5-

STP 000691

either, blood or adoption. Wherever I have used pronouns of the masculine gender in this Trust Agreement, I direct that they shall apply to persons of both the male and female sex, where the sense so requires.

### POWER TO DETERMINE QUESTIONS ARISING UNDER TRUST AGREEMENT

L. If any question should arise concerning the construction and administration of this Trust Agreement, or any clause, matter, or thing therein contained or with relation thereto, the Trustees, acting either on their own judgment or under professional advice, and upon such evidence as they shall think fit, may determine such question by writing under their hands; and such determination shall be final and binding on all persons interested under this Trust Agreement.

### UNANIMOUS ACTION BY TRUSTEES REQUIRED

X. There shall be unanimous consent of the Trustees as to all matters of discretion and as to all action by the Trustees.

### POWER TO RESIGN

M. Any Trustee, who may be acting hereunder from time to time, is hereby given the right at any time, by sending notice by registered mail, to the last known address or addresses of the other Trustee or Trustees, to resign at the expiration of the period of thirty (30) days from the date of such mailing. Such resignation shall become full and effective, and thereafter the Trustee so resigning shall be discharged from any further duties or obligations hereunder. Such right of resignation shall be a continuing one and any Trustee acting hereunder from time to time shall have a like right to resign. Upon the resignation becoming full and effective, the Trustee so resigning from the trust shall transfer, pay over, and deliver the trust property then in his hands to the remaining Trustee or Trustees, and the receipt of such remaining Trustee shall be a full acquittance and discharge to the Trustee so resigning.

### APPOINTMENT OF ADDITIONAL OR SUCCESSOR TRUSTEES

G. The Trustees, subject to the specific limitation set forth below, are authorized, in their discretion, upon unanimous consent, to nominate and appoint an additional Trustee or Trustees or a successor Trustee or Trustees. Any such appointment shall be made by an instrument in writing, duly signed and executed by all of the Trustees, then acting as Trustees. Thereupon, such new Trustee or Trustees shall be vested with all the powers and duties granted to and imposed upon the Trustees herein named, or their successors as herein provided. The additional Trustee or Trustees may be either an individual or a corporation. In the event, however, that the Trustees nominate and appoint a corporate Trustee,

STP 000692

as either an additional or successor trustee, the individual Trustees, acting hereunder from time to time, shall have the right of removal of the corporate Trustee. The right of appointment and the right of removal, as herein provided, shall be continuing rights.

In the event that the removal of the corporate trustee shall be determined upon by the individual Trustees, who are then acting hereunder, the said individual Trustees shall do so by an instrument in writing, duly signed, sealed, acknowledged, and delivered to the corporate trustee and, upon the receipt thereof, the corporate Trustee, then acting, shall no longer act under the Trusts herein created, and shall transfer, pay over, and deliver the trust property then in its hands to the remaining Trustees, and the receipt of the remaining Trustees to the corporate Trustee so resigning shall be a full acquittance and discharge to the corporate Trustee so ceasing to act.

However, anything to the contrary notwithstanding, my Trustees shall nominate one (1) of my brethren as the first additional or successor Trustee, as the case may be. If none of them accept or is able to accept such appointment, then my Trustees shall nominate and appoint one (1) of my first cousins to be such successor or additional Trustee.

## APPOINTMENT OF MANAGING TRUSTEE

7. The Trustees shall have the authority to designate one among them as a managing Trustee, or other nominee or nominees in their behalf, with authority to execute documents, sign checks for withdrawal of trust funds from any bank accounts maintained by the Trust and to do such other acts as may be delegated by the Trustees to him, subject at all times to audit by the remaining Trustees and the termination of said delegation of power at any time.

## INTERPRETATION OF TRUST UNDER MARYLAND LAW

SEVENTH: It is agreed that any interpretation of this Trust Agreement or interpretation of the manner in which the Trust is administered, shall be made in accordance with the laws of the State of Maryland and the decisions of the Courts of said State.

IN WITNESS WHEREOF, I have executed this Irrevocable Trust Agreement this 28th day of April, 1967.

WITNESS:

_____          _____ (SEAL)
                                    D. Jane Bornstein

-10-

STP 000693

WITNESS:                          ACCEPTED:

_____         _____ (SEAL)
                                  Arthur C. Strasberger

_____         _____ (SEAL)
                                  Esther R. Perrin

_____         _____ (SEAL)
                                  Irving F. Cohn

State of _____ }
                 } TO WIT:

Before me, a Notary Public, in and for the State and County aforesaid, personally appeared D. Anna Borenstein, who made oath in due form of law that she has executed the aforegoing instrument for the purpose therein contained, and acknowledged the same to be her act.

_____
Notary Public

STP 000694

Executive Offices

Suite 202
106 Old Court Road
Baltimore, Maryland 21208
Phone : (410) 486-3100
Fax : (410) 653-3978

January 20, 1999

*Certified Mail/Return Receipt Requested*

Ms. Roberta Bornstein
18 Windy Ridge Place
Wilton, Connecticut  06897

RE:  *SHAPIRO FLEX TRUST*

Dear Roberta:

In April of 1957, the Shapiro Family established the Flex Trust. The primary beneficiaries to be the third generation.

In establishing the Trusts, each of the four Shapiro brothers' families had a 25% interest in the Trust. Once divided into quarters, the Family interests were further diluted down by the number of second generation members in each Family. As a result, twelve Trusts were established of varying interest. The initial corpus and future contributions to each Trust were to be consistent with the Family ownership formula.

Each individual Flex Trust was to be divided so that there would be one (1) equal share for each third generation child of that second generation Family. The Trustee was then to establish separate and independent Trusts within each Family Flex Trust for each child accounting for their securities, cash inflows and disbursements. Unfortunately, this was not carried out in most instances.

The terms of each Trust further stipulate that *"when the primary beneficiary of a share of this Trust attains the age of thirty-five (35), the Trustees shall pay over and deliver absolutely unto the primary beneficiary any remaining balance of the share of the Trust, freed of any further interest."*

To expedite the closing of the Flex Trusts and subsequent distribution of all assets, Irvin Flax, director of the accounting firm, Harry B. Gorfine and Company, has been working closely with the Trustee to insure accountability to each Flex Trust. This process has been difficult and ongoing for almost three (3) years. The Trusts go back more than forty (40) years. The assets included brokerage accounts, passbook savings accounts, money market funds, stored securities as well as abandoned funds recovered from the State of Maryland, Unclaimed Property Section. The abandoned funds were quite substantial and, in most instances, had been held by the State for some time, interest free.

STP 000695

Ms. Roberta Bornstein
January 20, 1999
Page Two

The establishment and maintenance of separate and independent Trusts within each Flex Trust were not always kept in accordance with good accounting standards. The exact account balance for each beneficiary is cloudy at best, as each beneficiary may have drawn funds from "their" Flex Trust. the drawings may have differed between their brothers and sisters. We are asking each Flex Family to split the assets or, if unwilling to, devise their own formula for splitting their assets. Reconstructing separate accounts more than forty (40) plus years may be prohibitively expensive. *There is cash in every account, even accounts that previously had been closed and dispersed.* The Flex accounts vary in size according to the Family ownership formula as established. Most important, is the point in time at which cash was drawn from the Trust by the beneficiaries and the amount drawn.

We have finally reached the point where we will close all the Flex Trusts and make a disbursal of all assets on hand thru December 31, 1997. A final disbursement of income earned during the year 1998 will be sent shortly thereafter. Assets cannot be disbursed until we receive your instructions as to how your family wishes to divide their Flex Trust. For reasons previously stated, we strongly urge an equal division of assets. All necessary tax information will be supplied to you by March 31, 1999. The final tax return will be filed by the trust.

Your Flex Trust Number _____ 7 _____ contains cash only. As such, a check for your share will be issued shortly after receipt of the executed *Instruction Document "A"* and the agreement of your same trust beneficiaries to split the assets equally or other agreed upon asset division.

If you have a need for additional information, you may contact me directly at 410-486-3100 or the accountant, Irv Flax at 410-539-5474.

Cordially,

Herbert M. Bank

HMB:lt
Encls.

textst2.hmb

STP 000696

11/24/99  04:25 FAX 610 503        VANGUARD EMP LIT                    ☎ 002



THE **Vanguard** GROUP.

November 24, 1999

BY FAX AND FIRST CLASS MAIL
Roberta Borenstein
18 Windy Ridge Place
Wilton, CT 06897-2924

Dear Ms. Borenstein:

We are in the process of reviewing statements of the Shapiro-Flex Trust to determine whether we are able to answer your questions about trust investments. Specifically, you asked us to provide you with information on the initial investments made into the Windsor Fund and the W.L. Morgan Growth Fund (now the Vanguard/Morgan Fund). Since those investments occurred before The Vanguard Group assumed recordkeeping responsibilities for either Fund, I cannot guarantee that we will have the statements in our files. I will keep you informed of our progress in locating the information.

We will not, however, release information on activity that occurred in the Trust after 1989, the year in which you received a distribution from the Trust. As we discussed, although you may have acted as a broker for the Trusts in 1969 and 1970, you were never a broker for The Vanguard Group. Your name remains on our system simply as a historical note. It does not give you any legal authority to act on behalf of the Trust, or to request information on the Trust's investments. Only the trustee, Irving F. Cohn, has the authority to direct Vanguard to release account information.

In an attempt to resolve your concerns, Vanguard contacted Mr. Cohn's office to seek his approval for us to release account information to you. Mr. Cohn specifically requested that Vanguard not release Trust account information to you. Since Mr. Cohn is the registered Trustee, Vanguard is obligated to abide by his direction.

Vanguard's General Counsel, R. Gregory Baron, has been fully apprised of your requests and our response to those requests. He agrees that we have no authority to override the Trustee's direction on releasing Trust records.

You have indicated that you intend to redeem your individually registered accounts at Vanguard if you do not receive Trust account statements. While we regret that you believe this may be necessary, we strongly encourage you to review the Fund's prospectus before doing so, particularly the explanation on redeeming shares. You may redeem an unlimited amount of your shares by telephone and have the proceeds sent to

Post Office Box 1600, Valley Forge, Pennsylvania 19482-1600
610-669-1000 · www.vanguard.com

DEC 03 1999 12:23                                    12037622578            PAGE.02

STP 000697

Ms. Borenstein
November 24, 1999
Page Two

your address of record. Should you wish to have the proceeds sent to an address other than your address of record, you must request the distribution in writing under a signature guarantee. Our Client Services Associates will be happy to explain our requirements to you and can be reached, toll free, at 1-800-662-2739.

Again, we would prefer that you continue to view Vanguard as an important part of your investment strategy. But we cannot comply with your request to release records on any account for which you are neither the registered owner nor an authorized agent. We trust you understand our position.

Sincerely,

Pauline C Scalvino

Pauline C. Scalvino
Principal and Associate Counsel

cc:    R. Gregory Barton

STP 000698