

## ZUCKERMAN, SPAEDER, GOLDSTEIN, TAYLOR & BETTER, L.L.P.

ATTORNEYS AT LAW

SUITE 2440

100 EAST PRATT STREET

BALTIMORE, MARYLAND 21202

(410) 332-0444

TELECOPIER

(410) 659-0436

MARTIN S. HIMELES, JR
(410) 332-0457
mhimeles@zuckerman.com

WASHINGTON, DC
MIAMI, FL
TAMPA, FL
NEW YORK, NY
TYSONS CORNER, VA

January 7, 2000

**WITHOUT PREJUDICE**
**FOR SETTLEMENT PURPOSES**

**BY HAND**
Irving Cohn, Esq.
Bernard Denick, Esq.
Blum, Yumkas, Mailman,
 Gutman & Denick, P.A.
1200 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, Maryland 21201

Re:  Jeffrey and Roberta Borenstein

Gentlemen:

As you know, this firm represents Jeffrey and Roberta Borenstein, beneficiaries of Shapiro-Flex Trust No. 9 (the "Trust"), established by Trust Agreement dated April 29, 1957. I have communicated with you on a number of occasions since early December, 1999 in an attempt to obtain information regarding the Trust that my clients have been unable to obtain for some time.

Since our initial communication, it has become apparent that the affairs of the Trust have been conducted in a manner that can only be described as appalling. Without cataloging the problems associated with the Trust, they are so substantial and our ability to obtain the information reasonably required to account for the Trust's assets has inexplicably met with such resistance that it has become clear we will not be able to untangle the Trust's affairs or obtain compensation for its losses without judicial involvement.

Accordingly, I have prepared a Complaint which my clients have instructed me to file in Baltimore City Circuit Court. I am forwarding a copy of the Complaint herewith in order to give you an opportunity to resolve the matter before we proceed.

::ODMA\PCDOCS\BALTIMORE\23313\1

EXHIBIT

We are hampered in any attempt to settle this matter by the lack of much of the basic information we need to complete an accounting of the Trust's assets. Nevertheless, we have been able to arrive at an understanding of the facts concerning two sets of issues, which I shall address in turn.

First, in April, 1999 my clients received Trust distributions totalling $111,222, which we are advised came from two sources. Approximately $27,000 of the funds are the proceeds of an account that was abandoned by the Trustee years ago, escheated to the State of Maryland, and was finally recovered and distributed to the Borensteins last year. The remainder of the distributions came from bank accounts in which the funds sat for years, earning little or no interest. Our best information is that the escheated funds and the funds in bank accounts were abandoned in the 1970's.

Of course, one of the duties of a Trustee is to manage the investments of the Trust in a manner that is reasonably prudent under the circumstances. By allowing funds to escheat to the State and leaving others in bank accounts that were earning little or no interest, the Trustee failed to manage the investments at all, let alone in a reasonably prudent manner. The only question is how best to measure the appreciation these funds would have realized had they been prudently invested, which I will discuss below.

Second, in 1969 the Trust acquired shares of the Windsor and Morgan mutual funds, then managed by Wellington Management Company but later taken over by The Vanguard Group. In 1989 a total of approximately $150,000 was distributed to my clients, which they were told represented the entire contents of the Vanguard accounts and a third Phoenix Growth Fund investment. The Borensteins learned for the first time last year, however, that only one-half of the Vanguard accounts had been distributed to them. The Trustee initially contended that the remaining mutual fund shares, worth approximately $323,000 as of November 30, 1999, belonged to Shapiro-Flex Trust No. 8, but in late November, 1999, acknowledged that roughly one-third of these assets belonged to Trust No. 9. It is now undisputed that at least $100,000 from the Vanguard accounts belong to Flex Trust No. 9 and is owed to the Borensteins. Ownership of the remaining contents of the Vanguard accounts, which were distributed to the beneficiaries of Trust No. 8 notwithstanding the substantial dispute concerning their ownership, is unclear. My clients believe, based on the manner in which the account was opened – without reference to a specific flex trust but using Roberta Borenstein's tax identification number – as well as irregularities in the documentation supplied to us and their own best recollections, that the entire account belonged to Trust No. 9. I recognize that you do not accept this view. Your view to the contrary, however, is difficult to reconcile with the facts I have summarized and is entitled to less weight than it might ordinarily receive in light of the absence of records of the Trust's activities and the other problems in the administration of the Trust.

If we file the Complaint and conduct our own thorough analysis of the records in your possession, as well as records we obtain from other sources with the assistance of the Court, we may well locate other assets that were misplaced, abandoned or allocated erroneously to the wrong trust. In order to avoid the burden of engaging in protracted litigation, however, my clients are prepared to forego that opportunity and settle the matter now on terms that are fair in light of reasonable assumptions concerning the amounts they know are due to them.

::ODMA\PCDOCS\BALTIMORE\23313\1

To that end, we have attempted to estimate the foregone appreciation of the $111,222 finally distributed in 1999. A threshold question is how those funds would have been invested by a Trustee exercising the requisite degree of care and prudence. The ages and circumstances of the beneficiaries, the absence of any distributions or requests for them, and the prior history of investing the Trust's assets in stocks make clear that a reasonably prudent Trustee would have invested these funds in publicly traded stocks or equity mutual funds. In measuring the lost appreciation, we have therefore used as a benchmark the S&P 500 index.

A second question is the period during which appreciation would have occurred. Our best information is that the abandonment of the funds occurred during the 1970's. I readily acknowledge that it is impossible at this pre-litigation stage to know during what year or years in the 1970's the funds were abandoned or when they were first deposited in accounts that earned little or no interest; the relevant dates may have been any time during the decade, or earlier or later. For purposes of our attempt to estimate the amount of the lost, we have calculated the amount of the loss on the assumption that the funds were abandoned or at least stopped appreciating in 1975, an assumption that is more or less in the middle of the range of alternatives.

Attached as Spreadsheet A is our calculation of the value of $111,222 at the end of 1999, assuming that it was first invested in 1975 and appreciated at the rate of the S&P 500. Recognizing that the principal was distributed in 1999, the spreadsheet subtracts that distribution (as of the beginning of 1999 for simplicity). On these assumptions, the lost appreciation during that period is $4,777,537, after subtracting the $111,222 that was actually distributed in 1999.

Of course, Mr. Cohn was trustee during that entire period, and we would seek to hold him accountable for the entire loss. We would take the same position with respect to Blum Yumkas; there was a continuing course of conduct from 1975 through the present, and Blum, Yumkas is liable for the damages caused by the entire course of conduct. Recognizing that you may not concede the firm's liability for Mr. Cohn's prior acts -- a matter you may have addressed at the time he joined Blum, Yumkas -- we have also prepared and enclose Spreadsheet B, which performs the same calculations beginning in 1987, the year Mr. Cohn joined Blum, Yumkas. On the same assumptions, the lost appreciation from 1987 through 1999, after subtracting the $111,222 actually distributed, is $912,559.

To the lost appreciation must be added the amount due on account of the Vanguard mutual fund investments. I understand that you concede that roughly $100,000 is due to the Borensteins, and we believe an additional $225,000 is due.

The total amount due to the Borensteins, using these approximations, thus approaches $5 million counting from 1975, and is between $1,012,000 (lost appreciation of $912,000 lost appreciation plus $100,000 from the Vanguard mutual fund accounts) and $1,235,000 ($912,000 plus $323,000 from the Vanguard accounts) counting from 1987. Neither of these amounts includes any other losses that might be identified in the course of an accounting, although under the circumstances there is every reason to believe that others exist. These amounts are estimates,

::ODMA\PCDOCS\BALTIMORE\23313\1

to be sure. But they provide the best foundation we have at this time for a determination of the amount of the Borensteins' losses, and the amount of a settlement that would be appropriate.

My clients believe – and I have advised them that they are correct – that their claims are quite strong. Indeed, the liability of both prospective defendants is in my view quite clear. I say this, in all candor, with no great pleasure; it is never a cause for celebration when a member of the bar has not comported himself in a manner that is consistent with the standards to which we hold ourselves, and that is particularly true when he is a partner in a firm of the stature of Blum, Yumkas. Having said that, however, I should be equally clear that my clients are determined to recover a fair measure of what is due them, and in light of their complete inability even to obtain information for months, they are not willing to delay their efforts for an extended period of time.

In order to avoid the time and expense of litigation, my clients are willing to accept a settlement of $800,000, which would cover all amounts due from the Trust, including lost appreciation, the amount in the Vanguard mutual fund accounts and any other unknown claims. I am under instructions to file the Complaint if this offer has not been accepted by the close of business one week from today.

I look forward to hearing from you.

Very truly yours,

Martin S. Himeles, Jr.

MSH/mlh

cc:   Ms. Roberta Borenstein
      Mr. Jeffrey Borenstein

::ODMA\PCDOCS\BALTIMORE\23313\1

LAW OFFICES

# HEARNE & BAILEY, P. A.

FREDERIC E. WIERMAN
CHARLES R. DASHIELL, JR.
CHRISTOPHER F. DAVIS
PHILIP C. SMITH

CHARLES E. HEARNE, JR. (1909 - 1995)
JAMES P. BAILEY (1922 - 1987)

COLONIAL BUILDING
128 EAST MAIN STREET
SALISBURY, MD 21801

PLEASE REPLY TO:

P. O. BOX 138
SALISBURY, MD 21803-0138

TELEPHONE: (410) 749-5144
FAX NO:  (410) 749-5273
e-mail:
psmith@shore.intercom.net

May 23, 2000

Mr. David H. Cohen
Harry Cohen Insurance Agency, Inc.
2209 Maryland Avenue
Baltimore, MD 21218

RE:  My Client:    Irving F. Cohn, Esq.
     Policy No.:   619NA0039

Dear Mr. Cohen:

As you know, we represent Irving F. Cohn. The purpose of this letter is to request insurance coverage for Mr. Cohn in response to allegations that Mr. Cohn has committed professional malpractice.

I have reviewed a stack of Insuring Agreements in which your company appears to be the agent. There is an Agreement that covers the effective year beginning April 1, 1972, and an Agreement that covers the effective year beginning April 1, 1974. It appears to me from reviewing these Insuring Agreements that this Agreement provides occurrence-type coverage. It appears from the facts in this case that Mr. Cohn is alleged to have malpracticed during the years of 1972 and 1974. I do not have the Insuring Agreement for 1973, but I would assume that it would be the same company and coverage. I request that you please check your files to see if there is also coverage for the year 1973 on the same policy. If you will note, the policy for 1972 and 1974 is the same number. If there is a policy for the year 1973, then we hereby make a claim against the 1972, 1973 and 1974 policy for insurance coverage. I have attached a copy of the Insuring Agreement for 1972 and 1974, to this letter. At the time the Insurance Agreement was issued, you will notice that Burke, Gerber and Wilen employed Mr. Cohn. Mr. Cohn is listed on the Insuring Agreement as a lawyer who is insured by that Agreement.

The allegations against Mr. Cohn stem from his involvment in several trusts set up for the Shapiro Family. It appears that Mr. Cohn, while at Burke, Gerber and Wilen, supervised the creation of these trusts. There were twelve trusts set up with thirty-one beneficiaries. Mr. Cohn served as the only trustee on these trusts.

Mr. David H. Cohen, Esq.
May 23, 2000
Page 2

### A. SUMMARY OF THE FACTS OF THE CASE

The case, although not filed in Court, would, according to potential Plaintiffs' counsel be filed in Maryland's Federal District Court or the Circuit Court for Baltimore City. Potential Plaintiffs Roberta Borenstein and Jeffrey Borenstein (hereinafter "Plaintiffs"), are residents of Connecticut and Massachusetts respectively. Jeffrey Borenstein is the brother of Roberta Borenstein. Plaintiffs seek damages from Irving F. Cohn (hereinafter "Cohn"), who is an individual residing in Baltimore, Maryland, a member of the Maryland Bar Association, as well as a Certified Public Accountant. Mr. Cohn is the sole remaining Trustee of and Plaintiffs are the beneficiaries under the Trust Agreement (hereinafter "Trust Agreement") dated April 28, 1957, between D. Anne Borenstein, Grantor, and Arthur C. Strasburger, Gunther R. Borris and Irving F. Cohn, Trustees. Co-Defendant, Blum, Yumkas, is a professional corporation organized and operating its principal place of business in Baltimore, Maryland. Mr. Cohn has been a principal of the firm since he joined in July of 1987.

Trust Formation:

In 1957, the children and spouses of the Shapiro Brothers, who owned a well-established Maryland Corporation known as Maryland Cup, established twelve irrevocable trusts, the primary beneficiaries of which were the Grantors' children. The Plaintiffs herein are two of the children of the original Grantors (grandchildren of the Shapiro Brothers). Gunther Borris withdrew as a Trustee soon after the establishment of the Trusts and Arthur Strasburger died in 1987. Thus, Irving F. Cohn is the sole surviving Trustee of the Flex Trusts. Jeffrey and Anne Borenstein are the sole beneficiaries of Shapiro Flex Trust No. 9. The Trust Agreement provided that when the beneficiaries reached 21 years of age, the Trustee **could,** in his discretion, distribute to the beneficiaries' portions of principal. At age 35, the Trustee "shall pay over and deliver absolutely unto the primary beneficiary, any remaining balance of the share of the Trust, freed of any further Trust."

It is alleged that Mr. Cohn failed to comply with the mandatory age 35 distribution, failed to file numerous tax returns that resulted in funds escheating to the estate of approximately $500,000.00 of which approximately $27,000.00 will allegedly belong to Sharpiro Flex Trust No. 9. It is alleged that Mr. Cohn failed in his fiduciary obligation to identify accounts and manage them with a reasonable degree of care and prudence, as he is required to do under Maryland Law.

Having reviewed all of the documents pertaining to the claim, it appears that the claims fall into two basic catagories. The first category is a claim pertaining to the distribution made to the Borensteins in April of 1999, in the amount of $111,222.00. Plaintiffs claim that, of that distribution, $27,000.00 of the funds are proceeds of an account that was abandoned by Mr. Cohn, escheated to the State of Maryland, and were finally recovered and distributed to the Borensteins in 1999. The remainder of the funds allegedly came from bank accounts in which the funds allegedly sat in for "years" earning little or no interest. Plaintiffs allege that in this part of the claim, Mr. Cohn failed to exercise his duty to manage the investments of the Trust in a reasonably prudent manner and that their damages in relation to that claim, total $4,777,537.00. This damage calculation is based upon Plaintiffs' claim that the funds would have been invested in publicly-traded stocks or equity mutual funds. In measuring the lost appreciation, they used a benchmark of the S & P 500 Index and provided a lost appreciation schedule, said schedule being attached to this letter showing how they calculated the loss.

Mr. David H. Cohen
May 23, 2000
Page 3

      The second segment of claims relates to uncashed, undeposited, unnegotiated checks, which were found in Mr. Cohn's office in January and February of the year 2000. My initial meeting in the law offices of Blum, Yumkas, with Al Frederick, counsel for Blum, and Andrew Graham, counsel for Blum, revealed the existence of these checks, which I understand have been turned over to accountants in Chicago so that a full accounting can be made as to what the total amount is of the checks that weren't negotiated or deposited. I can report that from my own personal inspection of the checks, there were probably thousands of checks that were bundled together. A random sampling of these checks revealed checks dated back into **the 1970s** through the 1980s and possibly the 1990s. I do not believe that Plaintiffs are aware of the scope of the checks that have been discovered and have no way of reporting to you at this point, what the potential claims or damages may be in relation to those checks.

      At this time, there has not been any suits filed. However, it will only be a matter of time because of the checks in Mr. Cohn's possession, which date through 1972, 1973 and 1974. Please contact me as to whether you will provide coverage for these claims on the undeposited checks dated in 1972, 1973 and 1974.

                                          Very truly yours,

                                          Philip C. Smith

PCS/sdf

F:\Users\SF\34237M