IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WESTPORT INSURANCE CORPORATION, )
                                )
                     Plaintiff, )
                                )
                                )  Civil Action No.: AMD-02-1774
vs.                             )
                                )
ST. PAUL FIRE & MARINE INSURANCE )
COMPANY,                        )
                                )
                     Defendant. )

## JOINT STIPULATED STATEMENT OF UNDISPUTED MATERIAL FACTS AND DOCUMENTS

Plaintiff, Westport Insurance Corporation ("Westport") and Defendant, St. Paul Fire & Marine Insurance Company ("St. Paul"), pursuant to this Court's order dated October 29, 2004, hereby submit their joint stipulated statement of undisputed material facts and documents

### A. The Relevant Insurance Policies

1. St. Paul issued a three-year Lawyers Professional Liability Policy, no. 619NA0039, to the law firm of Burke, Gerber & Wilen for the policy period of April 1, 1972 to April 1 1975 ("St. Paul Policy"). The St. Paul Policy named Irving Cohn ("Cohn") as an additional insured.

2. The St. Paul Policy is an "occurrence" policy, which provides coverage for claims, whenever made, provided such claims arise from an "occurrence" or "events" that occurred during the St. Paul Policy Period. The Insuring Agreements of the St. Paul Policy state, in pertinent part, as follows:

> The Company, in consideration of the payment of the agreed premium(s) and subject to the terms of this Policy and its Insuring Agreements, agrees to

1

indemnify or pay to or on behalf of the Insured in accordance with such Insuring Agreements, with respect to the occurrence of any of the therein-mentioned casualties or events during the policy period.

2.  **COVERAGE**

The Company agrees to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages arising out of the performance of professional services for others in the Insured's capacity as a lawyer and caused by the Insured or any other person for whose acts the Insured is legally liable. (The performance of professional services shall be deemed to include the Insured's acts as an administrator, conservator, executor, guardian, trustee, or any similar fiduciary capacity, but only to the extent for which in the usual attorney-client relationship the Insured would be legally responsible as attorney for fiduciary.)

3.  The St. Paul Policy also contains a defense obligation. The General Terms and Conditions section of the St. Paul Policy contains the following provision, in relevant part, concerning St. Paul's defense obligations:

> 32.  Defense, Settlement, Supplementary Payments: As respects any insurance afforded by the terms of this Policy, the Company shall:
>
> (A)  Defend in the name and on behalf of the Insured any suit against the Insured alleging injury, sickness or disease, damage or destruction, and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; . . .

4.  Westport issued a claims made and reported professional liability policy to Blum Yumkas, Gutman & Denick, P.A. ("Blum Yumkas"), No. MDL-022344-3 for the policy period of January 1, 1999 to January 1, 2000 ("the Westport Policy"). By virtue of his status as an attorney acting on behalf of Blum Yumkas, Cohn was also insured under the Westport Policy. The Westport Policy is a "claims made and reported" policy, which provides coverage for any claims made during the policy period, regardless of when the alleged acts, errors or omissions occurred, subject to the retroactive date contained in the Westport Policy.

5. The Insuring Agreement contained in the Lawyers Professional Liability Coverage Unit of the Westport Policy contains the following Insuring Agreement:

> A. The Company shall pay on behalf of any Insured all Loss in excess of the deductible which any Insured becomes legally obligated to pay as a result of Claims first made against any Insured during the Policy Period and reported to the Company in writing during the Policy Period or within sixty (60) days thereafter, by reason of any Wrongful Act occurring on or after the Retroactive Date, if any.

6. The Westport Policy also contains a Limitation of Individual Prior Acts Endorsement, which limits coverage to acts, errors or omission committed by Irving Cohn that occurred after the Westport Policy retroactive date of July 1, 1988.

7. The General Terms and Conditions section of the St. Paul Policy contains the following provision regarding the existence of other insurance:

> 35. OTHER INSURANCE. The insurance afforded by this Policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the Insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the Company's liability under this Policy shall not be reduced by the existence of such other insurance.
>
> When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the Company shall not be liable under this Policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

8. The Westport Policy contains the following provision regarding the existence of other insurance.

> VI. OTHER INSURANCE OF A PRIOR LAW FIRM
> If a Prior Firm has other insurance applicable to a Claim against the Insured(s) covered by this Coverage Unit, this Policy is specifically issued as excess insurance over and above the applicable limits of liability of all such other insurance regardless of whether such other insurance is written as primary, contributory, excess, contingent or otherwise.

9. Under Maryland law, the Westport Policy contains an "excess" other insurance clause, and the St. Paul Policy contains a "pro rata" other insurance clause.

**B.   The Underlying Claims**

10. Irving Cohn ("Cohn") acted as Trustee for numerous trusts originally created by members of the Shapiro family in the late 1950s and early 1960s. At the time of inception of the trusts, Cohn was a partner in the firm of Burke, Gerber & Wilen. In 1972-1975, during the St. Paul Policy period, Cohn was acting as a Trustee, and was still employed with Burke, Gerber & Wilen. In 1988, Burke, Gerber & Wilen dissolved, at which point Cohn became associated with the firm of Blum, Yumkas, Gutman & Denick, P.A. Cohn continued to act as Trustee while associated with Blum Yumkas.

11. The underlying claims asserted by the numerous beneficiaries of the Shapiro Flex trusts alleged conduct that occurred from the 1970's through at least 1999. The beneficiaries alleged that, during the 1970's, Cohn allowed trust assets to escheat to certain states, did not deposit dividend checks into the Trusts, which checks date back to 1972, and did not file appropriate tax returns. The claimants alleged that funds that were apparently abandoned in bank accounts, and had not been invested since the 1970s.

12. Various beneficiaries of the Shapiro trusts contacted Cohn threatening litigation for Cohn's alleged mishandling and mismanagement of the Shapiro trusts and requested accountings of the various Shapiro trusts. These claims asserted conduct by Cohn that was alleged to have occurred, in part, during the St. Paul Policy period, and were alleged to be first made during the Westport Policy period.

13. In September of 1999, Westport first received notice of a potential claim against Irving Cohn, based on several letters sent by Sam Shapiro (Roberta Borenstein's uncle) to the

4

firm. This potential claim concerned Trust No. 8, the beneficiaries of which are Ronald, Kenneth and Susan Shapiro. The notice of potential claim advised that "one or more Trusts may potentially have a claim against our member (Irving F. Cohn) and/or our Firm for malpractice." About that time, various beneficiaries of the Shapiro Trusts began contacting Cohn and Blum Yumkas threatening litigation for Cohn's alleged mishandling and mismanagement of the trusts.

14. Upon receipt of the notice, by letter dated November 1, 1999, Westport advised Blum Yumkas "we will continue to monitor the developments on this potential claim . . . if a claim is pursued, it will be necessary for you to forward a complete copy of your file on this matter." Westport further stated "[t]his letter is not intended to waive or invalidate any coverage defenses which may become apparent after further investigation into this potential claim or after receipt and review of the requested information, or receipt and review of any additional litigation or Complaint which may be filed against you in this matter."

15. By letter dated January 7, 2000, the Borensteins, through counsel, wrote to Cohn and Blum Yumkas, which letter enclosed a copy of a draft complaint against Cohn and Blum Yumkas. Counsel stated, in pertinent part, as follows:

> Since our initial communication, it has become apparent that the affairs of the Trust have been conducted in a manner that can only be described as appalling. Without cataloging the problems associated with the Trust, they are so substantial and our ability to obtain the information reasonably required to account for the Trust's assets has inexplicably met with such resistance that it has become clear we will not be able to untangle the Trust's affairs or obtain compensation for losses without judicial involvement.
>
> Accordingly, I have prepared a Complaint which my clients have instructed me to file in Baltimore City Court. I am forwarding a copy of the Complaint herewith in order to give you an opportunity to resolve the matter before we proceed.

\* \* \*

In order to avoid the time and expense of litigation, my clients are willing to accept a settlement of $800,000, which would cover all amounts due from the Trust, including lost appreciation, the amount in the Vanguard mutual fund accounts and any other unknown claims. I am under instructions to file the Company if this offer has not been accepted by the close of business one week from today.

16. The Complaint was not filed. Instead, on January 10, 2000, the parties entered into a Tolling Agreement, in consideration for the continued retention of counsel, and an accountant, to provide an accounting and evaluate the numerous claims against Cohn.

17. In February or March of 2000, Al Frederick, Esq. of Eccleston and Wolf retained Martin A. Terpstra, an accountant, to provide services in connection with the defense of the claims, including trust accounting for the various trust entities, escrow accounting for the escrow accounts, and tax services with respect to the tax matters that were involved. Terpstra also developed a "game plan" for the trusts; inventoried various trust documents and uncashed checks; searched for escheated funds; and provided a full accounting of each trust from its inception.

18. In May of 2000, Cohn's defense counsel discovered the existence of the St. Paul Policy, and, on May 31, 2000, by telephone, advised St. Paul of the beneficiaries' claims.

19. On May 23, 2000, Westport supplemented its reservation. Westport agreed to retain counsel to represent Cohn's and Blum Yumkas' interests with respect to the claims against them.

20. On June 1, 2000, Cohn's counsel provided St. Paul with a copy of the draft Borenstein complaint, which complaint named Cohn as a defendant.

21. In response to the notice, St. Paul initially advised Cohn's counsel that "St. Paul intended to send a more comprehensive statement of its coverage position." St. Paul did not

6

respond to the notice, request any additional information from Cohn regarding these matters, or otherwise agree to defend Cohn against these matters. St. Paul had no further communication with Cohn regarding these matters until May 3, 2001.

22. On April 6, 2001, Westport provided St. Paul with a copy of the lawsuit filed by another trust beneficiary in the Circuit Court for Baltimore City, styled <u>Eric Waller v. Blum, Yumkas, Mailman, Gutman & Denick, P.A. and Irving Cohn and Westport Insurance Corporation</u> (the "Waller Suit").

23. The Waller Suit was filed on March 27, 2001, and named Blum Yumkas, Irving Cohn, and Westport as defendants. The Waller Suit alleged mishandling of the Shapiro-Flex Trust 3 by Cohn. Waller also alleged by that by early 2000, Westport, with the participation of Cohn and Blum, undertook to retain American Express PBS Tax and Business Services in Chicago, Illinois to audit the Flex Trusts. The suit asserted the following causes of action: Breach of Trust against Cohn and Blum, Yumkas (Count I); Breach of Contract against Cohn and Blum, Yumkas (Count II); Negligence against Cohn and Blum, Yumkas (Count III); Conspiracy against Cohn, Blum, Yumkas and Westport (Count IV); and Breach of Contract against Westport (Count IV). The parties answered, denying the allegations of the Waller suit.

24. On May 3, 2001, St. Paul sent a letter to Cohn regarding the Waller Suit. In its May 3, 2001, letter, St. Paul acknowledged receipt of notice of the "circumstances relative to Irving F. Cohn's involvement as Trustee of the so-called Shapiro Flex Trusts," including its receipt on June 1, 2000 of the draft Borenstein complaint. St. Paul stated that "we understand that, to date, the <u>Borenstein</u> complaint has not been filed." St. Paul reserved its rights, including "its rights as to whether the Policy requires that a claim be made or suit be brought during the policy period in order for coverage to apply." St. Paul also stated that it did not consider the

7

notice to constitute a "tender" under Maryland law, and advised Cohn as follows: "Please notify us immediately should Mr. Cohn choose to tender the Waller Complaint to St. Paul for defense and/or indemnity."

25. On May 29, 2001, Westport responded to its Insured's tender of the Waller suit. In the letter, Westport advised Cohn that St. Paul Insurance Company had the primary duty to defend Irving Cohn for this matter, but stated that if St. Paul did not meet its obligations to Irving Cohn, Westport would agree to pay reasonable fees and costs to defend Irving F. Cohn in this matter, subject to a reservation of rights. By letter dated April 3, 2002, after Cohn's counsel advised Westport that St. Paul had not agreed to pay all defense costs incurred with respect to the Waller suit, Westport agreed to pay the other 50% of defense costs, subject to a full reservation of rights.

26. Also on May 29, 2001, Westport, through counsel, provided St. Paul with further information regarding the claims asserted against Cohn by other beneficiaries of the Shapiro Trusts

27. In Westport's May 29, 2001 letter, Westport advised St. Paul that there were multiple claims asserted against Cohn alleging conduct that occurred during the St. Paul policy period, and that, as such, St. Paul had the primary duty to defend Cohn.

28. Westport also advised St. Paul of an additional claim by Marion Smith and Christine Geer, two claimants not associated with the Shapiro Flex beneficiaries. Westport advised St. Paul that it received notice of claims by these individuals, based upon conduct occurring from 1974 through 1996. Westport advised that "Presently, there is a "gentlemen's agreement,"as the claimants have agreed to hold off the filing of a suit while counsel [defense counsel for Cohn] continues its investigation."

29. On July 12, 2001, St. Paul responded to Westport's May 29, 2001 letter. St. Paul continued to deny its obligation to defend Cohn against any claims apart from the Waller Suit. With respect to the Waller suit, St. Paul stated, in part, as follows:

> It is St. Paul's position that St. Paul should pay only for defense costs attributable to professional services occurring from April 1, 1972 to April 1, 1975, and that Westport should pay for wrongful acts occurring during the 13 years arguably covered by its policies. This leaves 27 years for which Mr. Cohn and his firms have no available insurance coverage, which risk, according to Forty-Eight Insulations, 633 F.2d 1212, should be borne by Mr. Cohn and/or his firms. Due to the harshness of this result, as we understand that Mr. Cohn and his firms have no resources with which to pay for Mr. Cohn's defense, St. Paul agrees to bear 20 percent of Mr. Cohn's defense costs and expenses on a going-forward basis, with Westport to bear the remaining 80 percent. This allocation is consistent with the indemnity allocation Westport has already established and agreed to with St. Paul.

30. St. Paul contended, and continues to contend, that it had no obligation to provide Cohn with a defense to any of the claims asserted against Cohn, with the exception of the Waller Suit. With respect to the Waller Suit, St. Paul ultimately agreed to pay only 50% of defense costs incurred.

31. To defend Irving Cohn, Westport incurred fees and expenses from four sources, which expenses totaled $1,539,363.28:

| | | |
|---|---|---|
| 1. | Eccleston & Wolfe (primary defense counsel): | $135,589.23 |
| 2. | Hearne & Bailey (Cohn's defense counsel on non-Waller matters) | $ 76,442.53 |
| 3. | Adelberg, Rudow (Cohn's defense for Waller suit) | $ 81,062.40 |
| 4. | American Express Tax & Business Services (accounting expert) | $1,246,269.12 |

### C. Westport's Declaratory Action

32. On January 17, 2001, Westport filed a Complaint for Rescission and Declaratory Relief in this Court, no. 01 CV 00141. Westport amended its Complaint to add all known claimants against Irving Cohn as necessary party defendants, which included the following parties: Roberta Borenstein, Jeffrey Borenstein, Ronald Shapiro, Kenneth Shapiro, Susan

9

Shapiro, Eric F. Waller, Arlette Shapiro Mosher, Frederick Shapiro, Roger D. Shapiro, Michael J. Shapiro, Douglas Shapiro, Peter Chernis, Marilyn Chernis Morris, Donald R. Shapiro, Randi Shapiro Cohen, Cindi Shapiro, Herbert M. Bank, Penny Bank, Jane Shapiro, Eileen Shapiro Eaves, Jack Kontigias, Albert Shapiro, Barbara P. Adler, Earl W. Shapiro, James A. Shapiro, Sue Pariser Moss, Christine Geer, Marion Groves Smith, Mary Ann Carley, Mabel Groves Downs, George Groves, Hammilton Coutrell, Mark T. Willen, Marshall A. Smith, and Bertha Smith.

33.   St. Paul participated in the settlement of the claims asserted against Cohn, which settlement was mediated and facilitated by the Honorable Judge Paul Grimm.

34.   Ultimately, the parties reached a global settlement of all known claims against Cohn, including the Shapiro Trust claims, and subject to a mutual release of all parties. However, St. Paul and Westport agreed to except the present dispute.

# INDEX OF STIPULATED DOCUMENTS

## (Chronological Index)

The parties hereby stipulate that the following constitute true and accurate copies of documents identified by one or both of the parties as material to issues raised by the parties' respective cross motions for summary judgment.

| TITLE | DATE | PAGE |
|---|---|---|
| St. Paul Policy no. 6129NA0039 | 04/01/72 | 00001-00048 |
| Westport Policy no. MDL-022344-3 | 01/01/99 | 00049-00070 |
| Letter from Westport to Blum, Yumkas | 11/01/99 | 00071-00073 |
| Letter from Michael Himeles, Esq. of Zuckerman, Spaeder, Goldstein, Taylor & Better to Irving Cohn and Blum, Yumkas. | 11/07/00 | 00074-00077 |
| Tolling Agreement between Borensteins and Blum, Yumkas and Cohn. | 01/10/00 | 00078-00082 |
| Letter from Westport's counsel, Jeffrey A. Goldwater, Esq. and Michelle M. Bracke, Esq. to Blum, Yumkas. | 05/23/00 | 00083-00089 |
| Letter from Cohn's counsel, Philip C. Smith, Esq. to David Cohn. | 05/23/00 | 00090-00092 |
| Letter from Cohn's counsel, Philip C. Smith, Esq. of Hearne & Bailey to Joe Schmitt at St. Paul. | 06/01/00 | 00093 |
| Letter from Joe Schmitt at St. Paul to Cohn's counsel, Philip C. Smith and Christopher S. Davis of Hearne & Bailey. | 05/03/01 | 00094-00101 |
| Letters from Westport 's counsel, Michelle M. Bracke of Bollinger, Ruberry & Garvey, to Blum, Yumkas' counsel, Andrew J. Graham of Kramon & Graham, and Cohn's counsel, David B. Applefeld, Esq. of Adelberg, Rudow, Dorf & Hendler. | 05/29/01 | 00102-00108 |

| TITLE | DATE | PAGE |
|---|---|---|
| Letter from Westport's counsel, Michelle M. Bracke, Esq. of Bollinger, Ruberry & Garvey to St. Paul's counsel, Kristie Gleim, Esq. of Ross, Dixon & Bell. | 05/29/01 | 00109-00116 |
| Letter from St. Paul's counsel, Kristie Gleim, Esq. of Ross, Dixon & Bell to Westport's counsel, Michelle M. Bracke, Esq. of Bollinger, Ruberry & Garvey. | 07/12/01 | 00117-00124 |
| Letter from Westport's counsel, Michelle M. Bracke, Esq. of Bollinger, Ruberry & Garvey to Cohn's counsel, David B. Applefeld of Adelberg, Rudow, Dorf & Hendler. | 04/03/02 | 00125-00126 |
| Westport's Complaint | 05/22/02 | 00127-00133 |
| St. Paul's Answer and Counterclaim | 06/27/02 | 00134-00142 |
| Westport's Requests to Admit | 06/15/04 | 00143-00177 |
| St. Paul's Responses To Westport's Requests to Admit | 07/13/04 | 00178-00183 |
| Westport's Interrogatories to St. Paul | 06/15/04 | 00184-00191 |
| St. Paul's Responses to Westport's Interrogatories | 09/03/04 | 00192-00200 |
| Westport's Statement Of Incurred Fees and Expenses | 08/29/03 | 00201-00202 |
| Deposition of Martin W. Terpstra. | 05/14/04 | 00203-00248 |

Respectfully Submitted,

**WESTPORT INSURANCE CORPORATION**

By: _____
One of its Attorneys

Michelle M. Bracke, Esq., admitted pro hac vice
Sean T. Carney
BOLLINGER, RUBERRY & GARVEY
500 West Madison Street
Suite 2300
Chicago, IL 60661
Telephone: (312) 466-8000


**ST. PAUL FIRE & MARINE INSURANCE COMPANY**

By: _____
One of its Attorneys

Michael P. Tone, Esq., admitted *pro hac vice*
ROSS, DIXON & BELL
Three First National Plaza, Suite 525
Chicago, IL 60602
Telephone: (312) 759-1920