INGER, RUBERRY & GAR

ATTORNEYS AT LAW
CITICORP CENTER
SUITE 2300
500 WEST MADISON STREET
CHICAGO, ILLINOIS 60661-2511
(312) 466-8000
FACSIMILE (312) 466-8001

**FILE COPY**

MICHELLE M. BRACKE
WRITER'S DIRECT DIAL NUMBER

(312) 466-7232

May 29, 2001

Kristi A. Gleim, Esq.
Ross, Dixon & Bell
70 West Madison Street
Suite 525
Chicago, IL 60602

RE: *Various Claimants*
Westport Insured: Blum, Yumkas, Gutman & Denick, P.A.
St. Paul Insured: Irving F. Cohn
Our File No.: 02919-531 MAIL

Dear Kristi:

We represent Westport Insurance Corporation ("Westport"). As detailed below, Westport hereby submits the bills incurred in the defense of the above-captioned matters for reimbursement by St. Paul and requests that St. Paul assume the defense of these matters.

As you know, Irving Cohn ("Cohn") was previously a partner in the firm of Burke, Gerber & Wilen. A large client of the firm was Maryland Cup Company. In the late 1950s, the Shapiro family, owners of the Maryland Cup Company, formed trusts for their children and grandchildren. The trustees were Cohn, Gunther Borris, an accountant, and Arthur Strausberger. Borris resigned almost immediately, and Strausberger was killed in an automobile accident in 1986 or 1987. These trusts were known as the "Shapiro-Flex Trusts."

On June 30, 1988, Burke, Gerber dissolved and Cohn became associated with the Blum, Yumkas firm.

On January 7, 2000, Roberta and Jeffrey Borenstein's counsel wrote to the firm, and enclosed a complaint (which is now the subject of a Tolling Agreement). The draft complaint asserts five counts against the Insureds: Accounting (Count I); Breach of Fiduciary Duty Against Cohn (Count II); Breach of Fiduciary Duty Against Blum, Yumkas (Count III); Negligence Against Cohn (Count IV); and Negligence Against Blum, Yumkas (Count V). The complaint generally alleges that, over a period of twenty years, Cohn failed to account for and prudently manage the investment of trust assets. Further, Cohn failed to terminate the trust until eight years after he was required to do so (once the Borensteins turned 35 years of age).

00109

EXHIBIT D

BOLLINGER, RUBERRY & GARVEY

Kristi Gleim, Esq.
May 29, 2001
Page 2

More specifically, the allegations contained in the complaint, and those garnered from counsel's investigation, include the following: failure to account; commingling of trust assets; allowing an escheat to the state; failure to invest many funds at all; failing to keep accurate and precise records; and failing to make investments that were reasonably prudent.

First, the Borensteins allege that the assets of the various trusts were commingled with each other, rendering it difficult to determine what assets belong to which particular trust. Particularly, the assets of Trusts No. 8 (Shapiro) and No. 9 were apparently intertwined. The Borensteins allege that in 1969, the trust acquired shares of the Windsor and Morgan mutual funds, which were taken over by Vanguard Group. In 1989 (well after the date the trusts should have been dissolved by reason of the Borensteins reaching the age of 35), $150,000 was distributed to the Borensteins; however, according to the Borensteins, that amount represented only half the amount to which they were entitled. Although Cohn first contended that the monies belonged to Trust No. 8, apparently, in November of 1999, he acknowledged that roughly one-third belonged to the Borenstein Trust (No. 9). At present, there remains a dispute as to what portion belonged to No. 9, and what portion actually belonged to No. 8. The Borensteins contend they are owed $225,000, while the firm places that figure at $100,000.

The Borensteins also allege that Cohn and the firm refused to provide them with an accounting, and interfered with their attempts to obtain the documentation independently.

Second, approximately $25-27,000 belonging to the Borenstein's Trust escheated to the State of Maryland. The money was subsequently recovered by Cohn; however, for a three year period, the money earned no interest. It is unclear when exactly the escheat was discovered by Cohn; however, the money was apparently returned to the Borensteins in April of 1999.

Third, a large part of the claim concerns funds that were apparently abandoned in bank accounts, and have not been invested since the 1970s. These funds were paid to the Borensteins in April of 1999. Counsel provided various methods for computing the anticipated appreciation of the funds, had they been invested in a prudent manner. Using the S & P as a benchmark, the estimated loss by the Borenstein's counsel is $4,777,537 (assuming investment beginning in 1975).

The complaint contains a prayer for damages seeking the return of any funds due the Borensteins, a declaration that Cohn breached his fiduciary duty, and that Blum, Yumkas is liable for Cohn's breach, damages including the lost appreciation of and income from assets of the trust that were abandoned or imprudently invested, with interest, and the costs of the action.

On October 28, 1999, Blum, Yumkas forwarded to Westport a copy of a letter dated October 25, 1999, from Sam Shapiro (Roberta Borenstein's uncle) to Irving Cohn, which stated:

00110

BULLINGER, RUBERRY & GARVEY

Kristi Gleim, Esq.
May 29, 2001
Page 3

> As You know from that letter [an October 22, 1999 letter to Bernard Denick], it is my intention to bring legal action against You and the law firm of Blum, Yumkas, Mailman, Gutman & Denick for violation of fiduciary responsibilities and mismanagement of assets regarding the 1963 trusts my brother, Arthur, established for his three children.
>
> You can avoid this legal action by providing the information requested in my October 22 letter.
>
> This is the only way out!

On October 31, 2000, Marshall Waller wrote to Blum, Yumkas and requested an audit of the 1960 Marshall Waller Trust. In March of 2000, Blum, Yumkas further advised Westport that Eric Waller (Marshall's brother) also requested an accounting of the 1960 trusts created by his mother, Anne Shapiro Waller. The request was made by Waller's attorney, William McDaniel, Esq., who wrote to Blum, Yumkas on March 29, 2000. In May of 2000, Blum, Yumkas advised that it had discovered approximately $83,144.37 worth of undeposited checks that should have gone into the 1960 trust for Eric Waller. Counsel for Waller subsequently requested audits of both the Susan Waller and Eric Waller trusts and, on July 18, 2000, Blum, Yumkas advised that it was asking Irving Cohn to pay for the audits. On July 20, 2000, Irving's counsel advised that Cohn was not willing to take any responsibility for the costs of any audit in relation to the matter. The 1960 Waller trusts are distinct from the Shapiro Flex trusts, and were created by separate instrument in 1960. As you know, Eric Waller recently filed suit against Irving Cohn, Blum, Yumkas, and Westport regarding both the 1960 trusts, and Shapiro Flex Trust No. 3.

In May of 2000, counsel for Marion Smith provided notice to Blum, Yumkas of a claim against Irving Cohn. On October 5, 2000, counsel for Christine Geer (nee Burton), provided similar notice. It appears that on October 2, 1973, Christine O. Burton executed a Trust Agreement with an initial corpus of $1,000 appointing David Gerber, Esq., Charles R. Connor, and Catherine R. Oppenheim[1], Esq. as Trustees. One month later, Gerber died, and Irving Cohn became a substitute Trustee. According to Cohn and Connor, Ms. Oppenheimer managed the trust from 1974 through 1996. Mr. Connor believes that someone threw out the trust records while he was in the hospital. Some records were in the possession of Blum, Yumkas, and have been produced to Cohn's counsel, Chris Davis, and to the plaintiffs. However, the parties are unable to locate any records for the time period of 1974-1990. Presently, there is a "gentlemen's

---

[1] Ms. Oppenhein was employed by Burke, Gerber & Gilen. She passed away in 1996.

BOLLINGER, RUBERRY & GARVEY

Kristi Gleim, Esq.
May 29, 2001
Page 4

agreement," as the claimants have agreed to hold off the filing of a suit while counsel continues its investigation.

From the onset of these matters, the parties have attempted to determine what, if any, other insurance policies existed that might potentially provide coverage for this claim. Ultimately, in May of 2001, Irving Cohn's defense counsel located some of the policies issued by St. Paul to Burke, Gerber, Cohn's previous firm.

On May 23, 2000, Phil C. Smith, Esq. of Hearne & Bailey, P.A. wrote to David H. Cohen of the Harry Cohen Insurance Agency regarding the Shapiro Flex trusts. A copy of the letter is attached. On May 31, 2000, Mr. Smith apparently spoke with Joe Schmitt at St. Paul regarding the Irving F. Cohn matter. On June 1, 2000, Mr. Smith wrote as follows:

> ". . . pursuant to our telephone conversation, I have enclosed a copy of a Complaint that we received from one of the beneficiaries of the Trust that were administered by Mr. Cohn. Please note that at this time this Complaint has not been filed or served."

We were advised by Phil Smith, counsel for Irving Cohn, on February 16, 2001 as follows: "Enclosed is the tender letter to St. Paul as well as the letter of confirmation of my telephone conversation with Jose Schmitt of St. Paul Insurance Company. I have talked to Joe Schmitt of St. Paul on two occasions and he has informed me that he is reviewing the file for coverage and that he intends to send us a letter stating the position of St. Paul and coverage. At this time, I have still not received St. Paul's position on coverage from Mr. Schmitt."

To our knowledge, St. Paul never responded to Cohn's notice. St. Paul never inquired regarding the status of the Borenstein matter, or requested any further information regarding the other trusts. Despite Cohn's tender, St. Paul declined to participate in the defense, or provide its coverage position.

Similarly, on April 6, 2001, we tendered to St. Paul the lawsuit filed against Irving Cohn by Eric Waller. Despite the contentions in your recent letter to Irving Cohn, Westport's tender is sufficient to invoke St. Paul's obligation to defend, as the St. Paul Policy requires only that notice be given "by or on behalf of the Insured." See *Scottsdale Ins. Co. v. American Empire Surplus Lines Ins. Co.*, 791 F.Supp. 1079, 1084 (1992), overruled, in part, on other grounds, by *Sherwood Brands v. Htfd. Acc. & Indem. Co.*, 347 Md. 32, 698 A.2d 1078 (Md. 1997).

We also wish to point out Maryland case law that contradicts your letter. If you review the decision of the Maryland Supreme Court in *Sherwood Brands v. Htfd. Acc. & Indem. Co.*, you will learn that in Maryland an insured is not obligated to formally tender a lawsuit for defense. Moreover, an insurer is liable for pre-tender costs especially when, as here, the insurer has

00112

BOLLINGER, RUBERRY & GARVEY

Kristi Gleim, Esq.
May 29, 2001
Page 5

breached its obligation to defend. The Court described the situation, as here, where an insurer declines to defend for some other reason than late notice (here, no reason at all), the situation

> is the most clear cut. . . If, . . . the court concludes that the claim was potentially within the policy coverage and that, as a result, the insurer did breach its duty to defend, the insurer is liable for all damages incurred by the insured as a result of that breach. (*Citations omitted*). In that setting as well, the timing of the notice is ordinarily irrelevant. If the delay in giving notice is not a factor in the insurer's decision not to defend—if it would have declined the defense in any event based on its mistaken conclusion that there was no potential coverage—the insurer should not later be allowed to use the delay as a bar to reimbursing the insured for the reasonable expenses incurred in defending the covered claim. 698 A.2d at 1086-87.

St. Paul Fire & Marine Insurance Company issued Policy No. 619NA0039 to Burke, Gerber & Wilen for the policy period of April 1, 1972 through April 1, 1975. St. Paul has thus far refused to provide a copy of the Policy to Westport and, despite the representations contained in your letter, has not produced a copy to Irving Cohn's counsel. We have, however, reviewed a copy of portions of the Policy provided to Irving Cohn's counsel by his insurance agent.

The Policy states:

> The Company, in consideration of the payment of the agreed premium(s), and subject to the terms of this Policy and its Insuring Agreements, agrees to indemnify or pay to or on behalf of the Insured in accordance with such Insuring Agreements, with respect to the occurrence of any of the therein-mentioned casualties or events during the policy period.

The Policy was billed in annual installments. The first year's premium was due at inception, with subsequent premium to "be determined at the rates in effect at each anniversary" to be due at each subsequent anniversary.

The Policy contains the following provision:

> 39. MULTI-YEAR POLICY. If this Policy is issued for a period of more than one year, the limits of the Company's liability shall apply separately to each consecutive annual period thereof.

00113

BOLLINGER, RUBERRY & GARVEY

Kristi Gleim, Esq.
May 29, 2001
Page 6

In the General Terms and Conditions section, the St. Paul Policy contains the following "Other Insurance" clause:

> 35. OTHER INSURANCE. The insurance afforded by this Policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the Insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the Company's liability under this Policy shall not be reduced by the existence of such other insurance.
>
> When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the Company shall not be liable under this Policy for a greater proportion of the loss than that stated in the applicable contribution provision below:
>
> ***

Both Westport Policies contain the following clause:

> VI. OTHER INSURANCE OF A PRIOR LAW FIRM
> If a Prior Firm has other insurance applicable to a Claim against the Insured(s) covered by this Coverage Unit, this Policy is specifically issued as excess insurance over and above the applicable limits of liability of all such other insurance regardless of whether such other insurance is written as primary, contributory, excess, contingent or otherwise.

"Prior firm" is defined in the Policy as:

> Any law firm or professional corporation engaged in the private practice of law for which any lawyer listed in the application was a partner, officer, director, stockholder, shareholder, or employee prior to such lawyer joining the Named Insured;

In Maryland, as in most states, an "excess" clause trumps a "pro rata" clause. In other words, an excess clause in one policy conflicts with a pro rata clause from a concurrently effective policy, the court will disregard the pro rata clause in favor of the excess clause. *Nolt v. U.S.F.&G*, 329 Md. 52, 617 A.2d 578 (1993); *Consolidated Mutual Ins. Co. v. Bankers Ins. Co. of Penn.*, 244 Md. 392, 223 A.2d 594 (1966). The Westport Policy plainly provides that it is "excess" over any other insurance policy covering an insured while employed by a "prior firm." The St. Paul Policy, on the other hand, provides that the St. Paul Policy is primary, regardless of whether other insurance exists, and states that St. Paul will participate pro-rata with any other

00114

BOLLINGER, RUBERRY & GARVEY

Kristi Gleim, Esq.
May 29, 2001
Page 7

insurer. St. Paul is therefore primary with respect to these matters, and Westport is obligated to defend only after the St. Paul Policy is exhausted.

You previously intimated that St. Paul did not have a duty to defend or, apparently, respond to Cohn's tender of the draft Borenstein complaint because no "suit" was actually filed. As you know, the Borenstein claimants agreed to sign a tolling agreement, and refrain from filing the suit, only because the Insured retained counsel, and an accountant, to attempt to identify what, if any, funds were due to the Borensteins. Your argument appears to be that Irving Cohn, to obtain a defense from St. Paul, should have refused Borenstein's request, and instead awaited service of the suit, without taking any steps to avoid litigation, and potential ultimate liability.

We respectfully disagree, and believe that a Maryland court will also disagree. Faced with this issue, courts have generally agreed that the term "suit," without more, should be construed to provide a form of "litigation insurance" that will protect against any and all attempts to assess liability against the insured which are based on covered activities. *See Continental Cas. Co. v. Cole*, 809 F.2d 891, 896 (D.D.C. 1987); and *Alderman v. Hanover Insurance Group*, 169 Conn. 603, 363 A.2d 1102 (1975) (holding that the duty to defend clause required the insurer to pay expenses incurred by the insured in a pre-suit settlement when a suit was threatened but not filed). *See also Ryan v. Royal Ins. Co. of America*, 916 F2d 731 (1st cir. 1990) ("To argue that the word "suit" is to be accorded talismanic significance brings to the language of the policy a precision that the drafter omitted and that the parties were not bound to anticipate . . . We are unprepared to say that the cryptic phrases "any suit" and "legally obligated to pay: unqualified by clear and unmistakable language in the policy's text, necessary require (1) that a civil case be commenced in a court of law before the duty to defend arises and (2) that a money judgment be entered against the insured before the payment obligations vest [*citations omitted*]").

The Borenstein claimants drafted a suit, which is clearly potentially within the scope of coverage provided by the St. Paul policy, and which clearly sought "damages." Likewise, all other claimants, those with "Shapiro-Flex" trusts and otherwise, have agreed to refrain from filing suits only after being advised that counsel, and accountants, would be retained to investigate the matters. As such, St. Paul had an obligation to step up and defend its Insured, regardless of whether formal proceedings had commenced. St. Paul did not do so and, in fact, never responded to the Insured's tender. We know of no law, in Maryland or otherwise, that permits an insurer to sit idle after notice of a claim, or threatened suit, without providing so much as an acknowledgment letter.

Enclosed are copies of many of the bills generated by defense counsel for all of the foregoing matters. In general, to avoid duplication of efforts and expenses, Alvin Frederick, Esq. has taken the lead in the defense. The bills, which also include the costs of an accountant retained to audit the trusts, and to assist in resolving the tax matters, total $876,609.76. We are continuing to compile any remaining bills, and will provide them as soon as they are available.

00115

BULLINGER, RUBERRY & GARVEY

Kristi Gleim, Esq.
May 29, 2001
Page 8

  Finally, please also note that on the face of the St. Paul Policy, it indicates that the "former policy no." was 681NA0511. Therefore, it appears that St. Paul had prior coverage for Burke, Gerber & Wilen. We and Irving Cohn would appreciate it if St. Paul would check its records in this regard.

  We look forward to your prompt response.

Very truly yours,

Michelle M. Bracke

Michelle M. Bracke

MMB/sgb

cc: Kristina Miller, Westport Insurance Corporation (432600)
  Andrew J. Graham
  David B. Applefeld

00116