1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MARYLAND

3

4    WESTPORT INSURANCE CORPORATION, )

5                        Plaintiff, )

6          vs.                       ) Civil Action

7    ST. PAUL FIRE & MARINE          ) No. AMD-02-1774

8    INSURANCE COMPANY,              )

9                        Defendant. )

10

11          The deposition of MARTIN W. TERPSTRA,

12   CPA, CFE, called for examination, taken pursuant to

13   the Federal Rules of Civil Procedure of the United

14   States District Courts pertaining to the taking of

15   depositions, taken before CHERYL E. NICHOLSON, CSR

16   No. 84-1932, a Notary Public within and for the

17   County of DuPage, State of Illinois, and a Certified

18   Shorthand Reporter of said state, at Conference

19   Room A, Suite 525, Three First National Plaza, 70

20   West Madison Street, Chicago, Illinois, 60602-4261,

21   on the 14th day of May, A.D. 2004, at 2:13 p.m.

22

23

24                  00203                 



1    PRESENT:

2        BOLLINGER, RUBERRY & GARVEY,

3        (Citicorp Center,

4        500 West Madison Street, Suite 2300,

5        Chicago, Illinois 60661-2511,

6        Ph. 312-466-8000), by:

7        MS. MICHELLE M. BRACKE,

8        MR. SEAN W. CARNEY,

9            appeared on behalf of the Plaintiff,

10           Westport Insurance Corporation;

11       ROSS, DIXON & BELL, L.L.P.,

12       (Three First National Plaza,

13       70 West Madison Street, Suite 525,

14       Chicago, Illinois 60602-4261,

15       Ph. 312-759-1920), by:

16       MR. MICHAEL P. TONE,

17           appeared on behalf of the Defendant,

18           St. Paul Fire & Marine Insurance Company.

19

20

21                                              00204

22

23    REPORTED BY:   CHERYL E. NICHOLSON, C.S.R.

24                   CERTIFICATE NO. 84-1932.



ESQUIRE
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1          (WHEREUPON, the witness was duly

2          sworn.)

3      THE WITNESS:  Yes.

4          MARTIN W. TERPSTRA, CPA, CFE,

5  called as a witness herein, having been first duly

6  sworn, was examined and testified as follows:

7          DIRECT EXAMINATION

8  BY MR. TONE:

9      Q.    Good morning -- or, good afternoon.  I'm

10  Mike Tone.  I represent St. Paul.

11          Would you state your name and address for

12  the record, please.

13      A.    Martin W. Terpstra.  My work address is

14  One South Wacker Drive, Suite 800, Chicago,

15  Illinois, 60606.

16      Q.    And you're an accountant by profession?

17      A.    Yes, sir.

18      Q.    And where do you work?

19      A.    American Express Tax and Business

20  Services.

21      Q.    For how long?

22      A.    I have been with American Express and the

23  predecessor firm for 29 years.

24      Q.    And was American --

00205

ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312 782 8087 • 800 708 8087 • Fax 312 704 4950

1          If I call it American Express as opposed

2    to American Express Business Services, is that

3    acceptable to you?

4        A.    Fine.

5        Q.    Was American Express retained with

6    respect to the Blum Yumkas matters?

7        A.    Yes, we were.

8        Q.    When were you?  When was the company

9    retained?

10       A.    In the spring of 2000.

11       Q.    And were you the engagement partner, so

12   to speak?

13       A.    Yes, sir.

14       Q.    And what would your title have been in

15   terms of this engagement?

16       A.    I would have been the -- I'm the practice

17   director for professional liability services, so any

18   engagement for accounting malpractice or legal

19   malpractice matters would be under my purview.

20       Q.    And how long have you served in that

21   capacity?                              00206

22       A.    14 years.

23       Q.    Now, were you the head of the engagement

24   from American Express's standpoint?

ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1    A.    Yes.

2    Q.    From the outset?

3    A.    From the beginning until now.

4    Q.    Who retained you?

5    A.    We were retained by Eccleston and Wolf.

6    The attorney was Al Frederick.

7    Q.    And was there an engagement letter?

8    A.    Yes, there was.

9    Q.    Do you have a copy of that in your file

10   somewhere?

11   A.    Somewhere in the files.

12   Q.    All right.

13   A.    Somewhere in the 50-plus boxes, there is

14   an engagement letter.

15   Q.    And when was the engagement letter

16   authored?  On or about the time you were retained?

17   A.    Yes.

18   Q.    And what were you retained to do?

19   A.    We were retained to do trust accounting

20   for the various trust entities, escrow accounting

21   for the escrow accounts, and tax services with

22   respect to the tax matters that were involved; and

23   then a series of other projects sprung up as the

24   engagement developed a life of its own.

00207



1    Q.    What is trust accounting?

2    A.    Accounting for the receipts, the

3 disbursements, the corpus, and the income of the

4 trusts.

5    Q.    Did you undertake and complete that work?

6    A.    Yes.

7    Q.    What is escrow accounting?

8    A.    Escrow accounting would be accounting for

9 the activities, the receipts and disbursements,

10 within the law firm's escrow accounts.

11    Q.    And --

12    A.    Which could be client funds.

13    Q.    And what tax services did you render?

14    A.    Tax services with respect to -- with

15 respect to the trust, determining which tax returns

16 had been filed.  And the period involved spanned

17 from 1957 through the time of the global settlement,

18 so we looked to see, for each of the trusts, what

19 tax returns were filed in what years, both for

20 federal and for state.  Then we found out what

21 years' returns had not been prepared for, and then

22 we began to prepare such returns.

23         However, we then contacted both the IRS

24 and the various state taxing authorities about

00208

1   entering into a global settlement to basically get

2   rid of all of the delinquency notices, to be able to

3   reinstate the deposits that had been paid, and to

4   get rid of all of the penalties and interest for

5   nonfiling of returns for many, many years.

6       Q.     Do you know what, do you know how much in

7   the aggregate, American Express was paid in

8   connection with the services rendered in the Blum

9   Yumkas matter?

10      A.     Actually, I do.  It's $1,240,000 plus

11  change.  I put together a few notes and summarized

12  some of the stuff in preparation for today.

13      Q.     All right.  Now, I'm not sure I have all

14  the bills.

15      A.     You should.

16      Q.     Okay.

17      A.     We copied everything and provided them

18  for you.

19      Q.     All right.  And those bills will add up

20  to $1,240,000?

        00209

21      A.     They should.

22      Q.     All right.  And was $1,240,000, roughly,

23  was that amount -- what else was done, if anything,

24  with respect to that amount other than trust

ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1    services, trust accounting, escrow accounting, and

2    tax services?

3         A.    I can literally -- these are just at a

4    very 35,000-foot level, some of the projects that we

5    got involved with.

6              All of the trusts began April of 1957.

7    They all started out with somewhere between $2,000

8    and $5,000 of beginning capital.

9         Q.    How many trusts were there?

10        A.    There were 12 trusts with 31

11   beneficiaries, so within each of the 12 trusts, we

12   had to do subdivisions for the various

13   beneficiaries, so we were essentially dealing with

14   31 entities.

15             Then we had to read the trust documents,

16   we had to outline the trust documents, and then we

17   spoke with Jordan Berger, who is the head of our

18   Estates and Trusts Group, about developing a game

19   plan for that.

20             And then we started receiving boxes and

21   boxes and boxes of documents, which we inventoried

22   and Bates-stamped.                              00210

23        Q.    Now, what were those documents?

24        A.    Those documents were, they included:  Tax

1    returns; correspondence; brokerage statements; some

2    accounting, because Mr. Cohn was both a CPA and a

3    JD, and, in the very early years, he attempted to do

4    both the accounting and the legal services for the

5    trust, so there were some general ledgers prepared;

6    and then bank statements and other sorts of

7    investment statements.  So that's what the first

8    shipment of documents contained.

9                Then there were boxes and boxes of

10   dividend checks, interest checks that had been sent

11   to Mr. Cohn as trustee, that were never deposited

12   into the bank accounts for the various trusts.  And,

13   so, initially, what was done is, all of those checks

14   that had never been cashed were supposed to be

15   imaged and put on CD-ROMs.  Many of the images were

16   illegible, or the images wouldn't open up, so then

17   we had the boxes sent, and then we worked with both

18   the CD-ROMs and the boxes.

19                Working off the CD-ROMs, we were able to

20   identify about $800,000-some worth of uncashed

21   checks.  Then we found another $270,000-some worth

22   of checks that were not on the CD-ROMs, and so each

23   of those checks were identified, given numbers, and

24   then accumulated for purposes of trying to mitigate

00211



ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1  damages and going back and contacting the issuers of

2  the checks.  And we prepared summaries of these,

3  both by payor and by payee, and then we contacted

4  the companies.  Some of them, such as Exxon and

5  Mobil were still in business, and we were able to

6  try to work through them in order to get refunds.

7  In the cases of other companies, that no longer

8  exist, we then started working through all of the

9  different states to try to find -- and I think we

10  searched literally every state in the country --

11  trying to see if there was any abandoned property

12  for any of the trusts, trying to find money out

13  there.  And that's what is called the escheat

14  project and is also called, in some places, the

15  CD-ROM project.

16      Q.    Was all of the work that you just

17  described -- would it be within the general category

18  of trust accounting?

19      A.    It would fall within trust accounting.

20  It's all part of accounting for the trusts and what

21  should have been deposited as the checks were

22  received.  They should have been in the bank

23  statements at that point in time, but they weren't.

24      Q.    How much money did you owe on the account



ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1    for, that you got back or recovered?

2        A.    I don't know that number offhand.

3        Q.    Is it contained in any report that you

4    prepared?

5        A.    Possibly.

6        Q.    Did you ever provide anyone with a budget

7    for the work that would be undertaken?

8        A.    We had talked about a budget very early

9    on, and we had a budget at one point of $800,000.

10   And then, as the CD-ROM project and the escheat

11   project, and as additional entities such as we

12   started finding -- various escrow accounts that had

13   some of the money from the trusts in it -- these

14   were all projects that were added on as the

15   engagement progressed.

16       Q.    With whom did you work in terms of

17   reporting your progress?

18       A.    We worked with Al Frederick literally

19   throughout the project.  From the beginning until

20   the present, we've been working with Al Frederick of

21   Eccleston and Wolf in Baltimore.  And then we worked

22   with Bob Johnson, Kathy Mastoris, and Kristina

23   Miller from Westport Insurance.            00213

24       Q.    Are there any other activities that you

ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1    performed?  And I realize these are relative

2    generalizations that you've talked about, but are

3    there any other activities of any significant sense

4    that would be within the ambit of trust accounting,

5    that you've not talked about?

6        A.    Well, in the area of trust accounting, we

7    literally abstracted every bank statement and

8    brokerage statement that was available within the

9    42-year period, for literally hundreds of bank and

10   brokerage accounts.  We had to trace down, in some

11   cases, what happened to various savings and loans,

12   where we had a passbook that just ended and then the

13   savings and loan would disappear, so then we'd start

14   tracking down, trying to see what happened to that

15   bank and see where account numbers got transferred

16   to, and then we found additional monies that were

17   available in some of these accounts that were still

18   out there.

19        We literally accounted for every cash

20   receipt, disbursement, dividend, interest, stock

21   purchase, stock sale, gain, loss, stock splits

22   throughout the 42-year period as best as we could

23   find them within the limitation of the documents

24   that were available.                    00214

1     And there had been a flood in Mr. Cohn's

2  office at one point in time, and there were some

3  documents that were so wet they were unusable, and

4  so then we were literally contacting banks and

5  brokerage companies and everybody else, trying to

6  get copies of statements going way back, or trying

7  to find them through other alternative sources.

8  And, again, we did the best we could.

9     Q.    Any other things you did or any function

10  that you performed or task performed within the

11  ambit of trust accounting?

12     A.    I'll sort of go through my very

13  high-level list, here.

14     We reconciled the bank accounts for every

15  one of the bank accounts that we located.

16     We attempted to reconcile to the

17  accounting records that Mr. Cohn had prepared,

18  because his tax returns, as he was preparing them,

19  would trace back to those accounting records, and we

20  wanted to determine if the tax returns that he was

21  preparing were accurate based on the information as

22  it really existed.                          00215

23     We split things up into the 12 trusts.

24  And then there was the master trust or master

1    checking account, because there was one commingled

2    accounts that serviced the 12 trusts.

3            Then we were looking for any cash

4    receipts that should have been received but were not

5    received.  For instance, for every security that was

6    held, we went back and traced to see what sort of

7    dividend income was being paid.  For instance,

8    Exxon, you'd expect to see four dividends a year.

9    We looked to see how many dividends were actually

10   received and banked within a year; then we'd trace

11   into how many were actually deposited, compare that

12   to how many were on the escheat list; and then, if

13   there were any others that were missing, we would

14   try to track those down or put those on a missing

15   items list.

16           And the same thing.  We were tracing

17   stocks that would appear on a brokerage statement

18   and then disappear, several months later, trying to

19   find out what happened to the securities.  In many

20   cases, the securities would be issued.  Instead of

21   being held in street name by the brokerages, they

22   would be issued by Mr. Cohn, and then Mr. Cohn would

23   hold them.

24           So that's what we've thrown together,

                                                00216



1    briefly, in terms of notes for the trust accounting

2    area.

3            I've also got an area called tax matters;

4    then additional accounting; and then the escheat

5    project; and then damage analysis.

6        Q.    All right.  My second question is,

7    what -- general question is -- what services were

8    performed in terms of the escrow accounting work?

9        A.    In terms of the escrow accounting work,

10   we looked at the and obtained the bank accounts,

11   passbooks, checkbooks for the old Burke Gerber

12   Willan and Francomano escrow accounts, which

13   appeared to have been used as a slush fund, for lack

14   of a better term, and then we also saw transactions

15   that were going in and out of there.  In addition to

16   the 31 Flex trust entities, there were a number of

17   54 other Shapiro family trusts that had checks going

18   in and out of these accounts at various points in

19   time.  So what we were doing is, we had a list of

20   the other Shapiro family accounts, and so we were

21   pulling out transactions that related to the

22   non-Flex trust/Shapiro family accounts.  And as I

23   said, we found 54 other Shapiro family entities that

24   were passing in and out of these entities at various

00217

1   points in time.

2        Q.    What do you mean by "slush account"?

3        A.    It was a bank account where client funds,

4   and, in addition to Shapiro/Flex accounts and

5   Shapiro other family monies, there were a number of

6   other companies, entities, or cash that flowed

7   through that account, so it appeared as if Irving

8   Cohn was using that for a wide variety of different

9   clients.

10       Q.    Was this one bank?

11       A.    I believe it was; but it may have changed

12  banks at point to point, and there may have been

13  different account numbers at different points in

14  time, because my notes showed it as accounts, in the

15  plural.

16       Q.    What --

17             Have you told me all about the accounting

18  and the escrow services you rendered, just

19  generally?

20       A.    I've given you the CNN headline news

21  version as opposed to the full, expanded version.

22       Q.    I understand.

23             How about the tax services?  What did you

24  do in terms of the tax services?            00218





1    A.    Okay.  And this is, again, the headline

2    version.

3        We had to determine what federal and

4    state income taxes returns had been filed and what

5    returns were missing, so we literally had to --

6    Q.    For whom?

7    A.    For each of the Shapiro/Flex trust

8    entities, so the 12 trusts, 31 beneficiaries, and

9    going from 1957 through the year 2000, 2001, as the

10   case may be at the time.

11       So we determined which ones were filed,

12   which ones weren't.

13       The ones that were filed, we looked at

14   them.  We tried to trace the information to the

15   accounting information that we had gathered to

16   determine the accuracy of them.

17       In the early years, Mr. Cohn appeared to

18   have been doing a very good job with accounting and

19   filing the tax returns.

20       At a certain point in time, we were

21   informed that the family stopped wanting to pay him

22   for doing the accounting work on these, and they cut

23   back on his fees, at which point in time, he quit

24   doing a good and credible job on the accounting, and

00219



1  the accounting just went to heck after that point in

2  time.

3           So we determined which tax returns were

4  in fact accurate.

5           We assembled the information that was

6  necessary to prepare the returns for the missing

7  years.

8           We had to accumulate and attempt to

9  settle a myriad of delinquency notices.  There were

10  literally small stacks of delinquency notices on

11  each and every one of the trusts, and Jordy Berger

12  and his team were working with the IRS and the

13  various states to settle out the delinquency

14  notices.

15           And then, working with the IRS, since

16  Jordy is formerly with the IRS, he found the right

17  people to start engaging in global settlement talks,

18  which ultimately were successful, and a tremendous

19  amount of both fees and penalties and interest were

20  abated, old prepayments, where Mr. Cohn literally

21  send checks to the IRS and the various states and

22  then never file returns, we were able to get credit

23  for deposits that had been made but were no longer

24  valid because the statute of limitations had passed.

                                              00220



1    We were able to get those reinstated and applied

2    towards the global settlement, so there was a

3    tremendous amount of good work that was done with

4    respect to closing out the IRS and the state tax

5    matters.

6         Q.    How much was saved in the aggregate?  Do

7    you have any idea?

8         A.    Probably hundreds of thousands.

9         Q.    All right.  What else did you do,

10   taxwise, that you haven't told me about?

11        A.    That's the headline news version of the

12   tax project.

13        Q.    And then the fourth thing you talked

14   about, I think, was the escheat project.

15        A.    The escheat project.

16        Q.    And what did you do in connection with

17   that project?

18        A.    That was the project that I've described,

19   where we initially received the CD-ROMs with all of

20   the checks that had never been deposited for both

21   interest and dividends.  And as they were cleaning

22   out Mr. Cohn's offices at the Blum Yumkas law firm,

23   they kept finding and sending us additional boxes.

24   Literally right up until the end, they kept sending

00221

1  us more and more boxes.  And, then, as I told you

2  earlier, we had the problem where we found large

3  numbers of checks that had never made it to the

4  CD-ROM, as well as then working with the images that

5  were either illegible or the images that couldn't be

6  opened, and that was the process of determining just

7  how much was out there in terms of checks that had

8  never been deposited, and those would truly be

9  damage items.

10        So the boxes containing the original

11  checks were sent to us.  We then noted that many of

12  the checks had not been imaged.  We determined to

13  the best of our ability the total amounts of

14  undeposited checks by both payee and payor, and then

15  we literally started contacting all of the payors

16  that we could still find, to get ahold of them to

17  see if we could work out getting those checks

18  canceled and then getting new checks issued.  And

19  then we started contacting all of the states, going

20  through their abandoned property programs, and there

21  were recoveries under these efforts.

22        Q.    What abandoned property did you locate?

23        A.    I didn't work on that particular part of

24  it.  That was handled by the state and local tax

00222



LINKING TESTIMONY, TRADITION AND TECHNOLOGY
*Chicago:* 312 782 8087 • 800 708 8087 • Fax 312 704 4950

1   team.

2       Q.      Were there any other major areas of the

3   four that you've told me about?

4       A.      Well, then there was the damage analysis

5   work that was done.  And all of this work was done

6   pretty much under the direction of Judge Grimm, as

7   we were getting ready for the meeting in April of

8   2002 out in Baltimore.  And that's where we pulled

9   together various binders, again working under Al

10  Frederick's direction, to try and determine how much

11  was owed and what the damages were to each and every

12  one of the parties.

13      Q.      And you've told me, but I've forgotten.

14  When were you retained?

15      A.      We would have been retained in March of

16  2000.  Our first bill went out in April of 2000, so

17  I assume it was either February or March of 2000.

18      Q.      And then?  I'm not going to -- happily

19  forever, I'm not going to go through each and every

20  one of these, but I just want to make sure I'm

21  reading these right.  I'm looking at your bill for

22  services rendered for the period ending April 23,

23  2000.  Can I come over here and show you this --

24      A.      Sure.

                                              00223



1    Q.    -- just to make sure I understand this.

2    MS. BRACKE:  Can I see too?

3    MR. TONE:  Sure.

4 BY MR. TONE:

5    Q.    And I'm looking.  This is the third page

6 of this bill.  And can you just go through this --

7    A.    What we would have --

8    Q.    -- and tell me what these entries

9 signify.

10    A.    -- this is the employee number, would be

11 each of our employee identification numbers within

12 the firm; then the employee's last name and

13 initials; the date the services were performed; what

14 the activity code would be, such as L02 would be

15 case management; and then how many units were

16 charged on that day, each unit being six minutes.

17    Q.    All right.  So, to determine how many,

18 how much time was spent, I would multiply 6 times

19 13?

20    A.    Uh, no.  That would be -- 13 times 6,

21 that would be 13 units at -- that would be 1.3

22 hours.

00224

23    Q.    So it's .1?

24    A.    It would be one hour and three-tenths of

1    an hour.

2        Q.    Okay.

3        A.    So these are tenths of an hour.

4        Q.    I understand.  So 10 would be an hour.

5        A.    10 is one hour.

6        Q.    All right.

7              And then I notice sometimes you've got

8    additional items, or entries, under "DESCRIPTION."

9    What do those signify?

10       A.    These would be diary entries that were

11   made.  And some people, more so than others, tend to

12   be more descriptive or less descriptive in their

13   diary descriptions.  I tend to, as a force of habit,

14   put a lot of descriptions after my entries.  Some of

15   them, if it's just merely looking at documents,

16   "document review" will be considered in and of

17   itself to be descriptive enough for a half hour, but

18   generally, if there's a meeting, a phone call, or

19   something else, then the timekeeper will put in

20   additional notes.

21       Q.    Okay.  And on the second page of this

22   bill, the April 23, 2000 bill, you've got a list of

23   various individuals.  These are all people within

24   American, employees of American Express, who worked

00225

1    on the matter?

2        A.    Yes, sir.

3        Q.    Under your direction?

4        A.    Yes, sir.

5        Q.    And I've just taken out one example, but

6    this bill is consistent with the methodology of

7    billing for the entire matter?

8        A.    Absolutely.

9        Q.    There are a couple of descriptions that I

10   want to ask you about.    What is "DATA ENTRY OF

11   CHECKS"?    What is undertaken with respect to that

12   service?

13       A.    Data entry of checks would be we would be

14   sitting there with boxes of checks.    That would be

15   entering the date, the check number, the payee and

16   the amount of the check into the -- we used Quicken

17   as the software program for this project.

18       Q.    And these would be checks made payable to

19   whom or to what?

20       A.    Well, it would be dependent on what type

21   of check it was.    For instance, if we're looking at

22   cash receipts for the trust, then it would be checks

23   received by the trust.    If it's cash disbursements,

24   then it would be checks disbursed by the trust.    If

00226

1    we're talking about the escheat checks, then that

2    would be who the payor was -- for instance, again,

3    to use Exxon -- and then a dividend check for

4    such-and-such a period, and the date and the amount

5    of the check. So it could, you know, depending upon

6    which transaction we're dealing with, it would

7    basically in all cases be:  the date; some

8    description of who either the payee is or who the

9    payor is; and the amount of the check; and then what

10   it relates to.

11        Q.    What is "SHAPIRO TRUST INVENTORY"?  I saw

12   that designation.

13        A.    "SHAPIRO TRUST INVENTORY" would be the

14   inventory of the documents. And the Shapiro Trusts

15   would be the group of the 12 trusts, 31

16   beneficiaries. Various timekeepers would

17   alternately use Shapiro/Flex Trust, Shapiro Trusts,

18   Shapiro-Flex, depending upon whatever entered their

19   mind at that point.

20        Q.    And what inventory is being taken of the

21   trust documents?

22        A.    This would be an inventory of the

23   documents.

24        Q.    Okay.  The trust documents?

00227

1    A.    The inventory of the trust documents, the

2  inventory of all the checks, the inventory of all

3  the bank passbooks, the inventory of all the bank

4  statements, brokerage statements, inventory of all

5  the correspondence and, literally, stock certificate

6  books, in some cases.

7    Q.    Westport's counsel has provided me

8  with three large books that I have reviewed.  Can

9  you identify those.

10    A.    Yes, sir.

11          In the sequence of if you are trying to

12  make these user-friendly, this was a starting point

13  from the time at which Irving Cohn joined Blum

14  Yumkas.  He joined Blum Yumkas as of July 1st of

15  1988.

16    Q.    And what's the heading of that?

17    A.    "Shapiro/Flex Trusts Balance Sheet – June

18  30, 1988."

19    Q.    All right.

20    A.    So what we tried to do was determine what

21  the holdings were of the trusts at the time Mr. Cohn

22  joined the Blum Yumkas firm.

23    Q.    All right.  And that is, is this, the

24  first document that you prepared, is a summary

00228

ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312 782 8087 • 800 708 8087 • Fax 312 704 4950

1  document, if you will?

2     A.    No.  We've prepared other reports or

3  letters with analyses in them, but this is -- these

4  were -- the report binders that were used at the

5  settlement meeting.  And in April of --

6     Q.    And that's the starting point?

7     A.    That was.

8     Q.    This is the starting point?

9     A.    This was considered the starting point,

10 after it was determined that 1957 through 1988 could

11 not be reliably and economically put together --

12    Q.    All right.

13    A.    -- because of missing information.  This

14 was a point at which we had reasonably good

15 information, from this point all the way through

16 June of 2001.

17    Q.    All right.  Can you write Book No. 1 on

18 that thing so we'll all remember what that is.  That

19 is the starting point book.

20              (WHEREUPON, the witness so

21              indicated.)

                                          00229

22 BY MR. TONE:

23    Q.    All right.  And what is the next book, in

24 terms of being user-friendly, in sequence?


ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312 782 8087 • 800 708 8087 • Fax 312 704 4950

1      A.    Then this would be a book entitled

2   "Shapiro/Flex Trusts - Schedule of Cash Receipts and

3   Cash Disbursements for the Period July 1, 1988

4   through June 20, 2001."

5          Do you want to put "2" on here?

6      Q.    Yes.

7              (WHEREUPON, the witness so

8              indicated.)

9   BY THE WITNESS:

10     A.    And this would -- this book would --

11  encompass all cash received and all cash disbursed

12  through these trusts, from this period, basically,

13  July 1st of 1988 through June 20th of 2001, and then

14  this is the ending point.

15         So this is your starting point.

16  BY MR. TONE:

17     Q.    Book 1 is the starting point?

18     A.    Book 2 is what took place between July of

19  '88 and June of 2001.

20         And then the third book, which is

21  entitled "Shapiro/Flex Trusts Balance Sheet - June

22  20, 2001," is the ending point.

23         So you want me to title this Book 3?

24     Q.    Thank you.

                                    00230

1                (WHEREUPON, the witness so

2                indicated.)

3    BY MR. TONE:

4        Q.    Other than these reports which you've

5    labeled, at my request, Books 1, 2, and 3, what

6    other general reports were provided --

7        A.    We --

8        Q.    -- as a result of your work?

9        A.    We've provided a number of letters to

10   Mr. Frederick with damage analysis in it.

11              We've provided schedules of escheat

12   checks that were never received, both from CD-ROM

13   and then from the supplemental analysis, going

14   through all of the boxes.

15              And I'm sure I'm forgetting something

16   else, but I'm doing this from memory --

17       Q.    I understand.

18       A.    -- and most of these took place four

19   years ago.

20       Q.    I understand.

21              Are there any tax service reports that

22   you generated?

23       A.    I don't know.  I would have to talk to

24   Jordy Berger or John Bird to find out.

ESQUIRE
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1    Q.    How about -- how about for the escheat

2  project?  Were there --

3    A.    The escheat project would be the

4  schedules of checks not deposited by payee and

5  payor, so we did prepare a detailed schedule of

6  everything from the CD-ROM and then all of the

7  supplemental checks.

8    Q.    And what about for the escrow accounting?

9  Are there reports with respect to the escrow

10  accounting?

11    A.    I don't know if we ever issued a final

12  report on that, but we have detailed spreadsheets,

13  from beginning points to ending points, with all of

14  the transactions in between on those.  And we have

15  just a massive amount of computer space for all of

16  the transactions that took place on this thing over

17  42 years.  Our network administrators would love to

18  get that space freed up.

19    Q.    And what was the objective of the escrow

20  accounting?

21    A.    The objective of the escrow accounting

22  was to determine to what extent that account was

23  used for Flex trust transactions and to determine

24  how much, if any, Flex trust money went through that

00232

1   account, and to try and, basically, determine whose

2   assets were in that account.   What we were trying to

3   do was pull together as much money as possible, from

4   any source possible, in order to build up the estate

5   of the Flex trusts.   One of the things we were told

6   to do is literally go through and try and find any

7   and all bank accounts that might still be open, to

8   try and find how many assets out there can be

9   recoverable, in order to build up the amount of

10  money to be distributed to the beneficiaries.

11       Q.    What was the name of the escrow account?

12       A.    The one I can remember and I saw, just in

13  some notes I had, was account for the old Burke

14  Gerber Willan and Francomano escrow account, so that

15  would be the law firm prior to joining Blum Yumkas.

16       Q.    Is that the only escrow account you

17  looked at?

18       A.    I believe so.

19       Q.    You don't remember the names of the

20  others?

21       A.    No.

22       Q.    Okay.                        00233

23       A.    And the important thing about those

24  escrow accounts is that after Mr. Cohn joined Blum

1  Yumkas, he kept the escrow accounts from his old law

2  firm open and kept using them for transactions, and

3  that's one of the reasons why we really focused on

4  those, is, at a time when he should not have been

5  using those accounts and should not have been

6  keeping those accounts opened, those accounts were

7  still open, and he was still using them to a

8  significant extent.  And that's one of the reasons

9  why the term "slush fund" came into use.

10      Q.    Is there any other work that you

11  performed, in a generic, conclusionary description,

12  that you've not told me about?  And I realize you've

13  given me the CNN version, as you say.

14      A.    I've really tried to go through the

15  invoices, accumulate who worked on it, how many

16  hours we worked on it.  It scares me to see how much

17  we discounted our fees on this project, but -- and

18  accumulate, in a couple of nice, compact little

19  areas, what we did over a period of close to two

20  years, at which we were working on this on a really

21  concerted-effort basis.  The last two years, 2003

22  and so far in 2004, there hasn't been that much

23  work.  During the year 2002, there hasn't been as

24  much.  The real concerted efforts on this were the

00234



1    year 2000 and the year 2001.

2        Q.    Do you know how many of your -- the

3    employees?  And I can show you the bills if you want

4    me to.  How many of the employees identified on

5    those bills were full-time on this project for a

6    period of time or were not?

7        A.    Oh, I can tell you that.

8        Q.    Okay.

9        A.    Because I did -- I worked on the project

10   from beginning to end.  And then I had a couple of

11   other senior people from my team that worked on this

12   project literally from beginning until end.  And

13   then we drew from our audit staff some of the top

14   young auditors to do the work on the data entry.

15   And considering that it was data entry work,

16   Westport negotiated a substantial discount on the

17   fees for that type of work.

18       Q.    And what was that discount?

19       A.    Well, I can, you know, just on some of

20   the people, here.

21            My standard billing rate would have been

22   at this point in time anywhere from $250 to $295 an

23   hour, and my rate throughout this project was $157

24   on average, so that's a huge discount.



ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312 782 8087 • 800 708 8087 • Fax 312 704 4950

1        On some of the other individuals, the two
2   guys who have the largest number of hours on the
3   job, their billing rates were in the, probably,
4   $230s, and they billed out at $175 apiece.
5        Then we had a number of other managers,
6   who would have been billing anywhere from $175 to
7   $200, and their average time came in about $150.
8        Our staff people billed at an average
9   rate of $95 an hour, and their standard rate during
10  this period would have been $110, $120.
11       And then our paraprofessionals were
12  billed at roughly $85 an hour.
13       Q.    Is that how the discount was achieved:  A
14  reduction in your hourly rate?
15       A.    Yes.  And there were one or two projects
16  where I simply did not bill for my time.
17       Q.    And what were those?
18       A.    That was the meeting in Baltimore where
19  myself and another individual were going out to
20  Baltimore, and in order to provide the best service,
21  I wanted to bring along the individual who had work
22  ed on the engagement with me the most, and so rather
23  than have two people billing for the same meeting, I
24  wrote off my time, and we billed the other

00236

ESQUIRE
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312 782 8087 • 800 708 8087 • Fax 312 704 4950

1  individual's time for that.  And so my time written

2  off for that was 23.5 hours.

3      Q.    Have you made a calculation or do you

4  know, the aggregate, the amount of the discount?

5      A.    Several hundred thousand dollars.  In the

6  aggregate, it appears to be at least $300,000.

7      Q.    And so American Express was paid roughly

8  $1,240,000, and there was a discount of roughly

9  $300,000?

10     A.    Correct.  And, in addition to that,

11  there's probably a number of my hours that, just

12  knowing what the Westport billing procedures are, if

13  one of my individuals was already clocking for a

14  certain meeting, and then I sat in on the same call,

15  I wouldn't bill my time for that; so in addition to

16  the hours I did charge for this engagement, there's

17  innumerable additional hours that I didn't bill for

18  because Westport wouldn't allow it.

19     Q.    Do you know how many hours were spent in

20  total on the project, roughly?

21     A.    If I had a calculator, I could actually

22  sit here and probably add them up.

23     Q.    That's all right.  Just if you --

24     A.    We're probably looking at --

00237

1    Q.    I'll accept --

2    A.    -- at least 6,000 hours, maybe 7,000

3 hours.

4    Q.    That's an estimate rate?

5    A.    That's an estimate.

6    MR. TONE:  Okay.  That's all I have.

7         We'll -- I want this ordered, please.

8         Do you want us to read and sign it?

9    MS. BRACKE:  Why don't we read and sign it.

10   MR. TONE:  Good.

11        Thanks for your time.

12             FURTHER DEPONENT SAITH NAUGHT.

13             (Time noted:  3:03 p.m. CST.)

14

15

16

17

18

19

20

21

22

23

24

00238

ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312 782 8087 • 800 708 8087 • Fax 312 704 4950

1

2          IN THE UNITED STATES DISTRICT COURT

3            FOR THE DISTRICT OF MARYLAND

4

5    WESTPORT INSURANCE CORPORATION, )

6                        Plaintiff, )

7              vs.                    ) Civil Action

8    ST. PAUL FIRE & MARINE           ) No. AMD-02-1774

9    INSURANCE COMPANY,               )

10                       Defendant. )

11

12          I hereby certify that I have read the

13    foregoing transcript of my deposition given at the

14    time and place aforesaid, consisting of Pages 1 to

15    36, inclusive, and I do again subscribe and make

16    oath that the same is a true, correct and complete

17    transcript of my deposition so given as aforesaid,

18    and includes changes, if any, so made by me.

19

20                    MARTIN W. TERPSTRA, CPA, CFE

21    SUBSCRIBED AND SWORN TO before me

22    this        day of              , A.D.        .

23

24          Notary Public

                                        00239

ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312 704 4950

```
 1                    Notary Public
 2     STATE OF ILLINOIS )
 3                       ) SS.
 4     COUNTY OF C O O K )
 5              I, CHERYL E. NICHOLSON, a Notary Public
 6     within and for the County of DuPage, State of
 7     Illinois, and a Certified Shorthand Reporter of said
 8     state, do hereby certify:
 9              That previous to the commencement of the
10     examination of the witness, the witness was duly
11     sworn to testify the whole truth concerning the
12     matters herein;
13              That the foregoing deposition transcript
14     was reported stenographically by me, was thereafter
15     reduced to typewriting under my personal direction,
16     and constitutes a true record of the testimony given
17     and the proceedings had;
18              That the said deposition was taken before
19     me at the time and place specified;
20              That I am not a relative or employee or
21     attorney or counsel, or a relative or employee of
22     such attorney or counsel for any of the parties
23     hereto, or interested directly or indirectly in the
24     outcome of this action.
                                                00240
```

ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312 782 8087 • 800 708 8087 • Fax 312 704 4950

1        IN WITNESS WHEREOF, I do hereunto set my

2   hand and affix my seal of office at Chicago,

3   Illinois, this 3rd day of June , 2004.

4

5

6                *Cheryl E. Nicholson*

7             Notary Public, DuPage County,

8             Illinois.

9             My commission expires 04/01/06.

10

11  C.S.R. Certificate No. 84-1932.

12                                    OFFICIAL SEAL
                                      CHERYL E NICHOLSON
13                                    NOTARY PUBLIC, STATE OF ILLINOIS
                                      MY COMMISSION EXPIRES:04/01/06
14

15

16

17

18

19

20

21

22

23

24                                  00241



LINKING TESTIMONY, TRADITION AND TECHNOLOGY
*Chicago*: 312 782 8087 • 800 708 8087 • Fax 312 704 4950

1

2                              I N D E X

3                                                    PAGE/LINE

4    WITNESS:

5    Martin W. Terpstra, CPA, CFE

6       Direct Examination by Mr. Tone              3/7

7                         E X H I B I T S

8                             (None)

9         C E R T I F I E D   Q U E S T I O N S

10                            (None)

11      C O N F I D E N T I A L   P O R T I O N S

12                            (None)

13

14

15

16

17

18

19

20

21

22

23

24                                            00242

E S Q U I R E™
D E P O S I T I O N   S E R V I C E S

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

MARTIN W. TERPSTRA, CPA, CFE, MAY 14, 2004

**A**

abandoned
  10:11 20:20
  20:22
abated 18:20
ability 20:13
able 7:2 9:19
  10:5 18:22
  19:1
Absolutely 24:8
abstracted 12:7
accept 36:1
acceptable 4:3
account 10:24
  12:15 14:1
  16:2,3,7,13
  30:22 31:1,2
  31:11,13,14
  31:16
accountant 3:16
accounted
  12:19
accounting 4:18
  5:19,20 6:1,2
  6:7,8,8 8:1,1
  9:2,4 10:18,19
  10:20 12:4,6
  13:11,17,19
  15:1,4,8,9
  16:17 17:15
  17:18,22,24
  18:1 30:8,10
  30:20,21
accounts 5:21
  6:10 9:12
  11:12 12:10
  12:17 13:14
  13:15 14:2
  15:10,12,18
  15:20,22 16:4
  16:14 31:7,24
  32:1,5,6,6
accumulate
  18:8 32:15,18
accumulated
  9:24
accuracy 17:16
accurate 13:21
  18:4
achieved 34:13
action 1:6 37:7
  38:23
activities 6:9
  11:24 12:3
activity 22:14
add 7:19 35:22

added 11:14
addition 15:15
  16:4 35:10,15
additional
  11:11 12:16
  15:4 19:23
  23:8,20 35:17
address 3:11,13
administrators
  30:17
affix 39:1
aforesaid 37:14
  37:17
afternoon 3:9
aggregate 7:7
  19:6 35:4,6
ago 29:19
ahold 20:16
AI 5:6 11:18,20
  21:9
allow 35:18
alternately
  25:17
alternative 13:7
ambit 12:4
  13:11
AMD-02-1774
  1:7 37:8
American 3:19
  3:22,24 4:1,2
  4:5,24 7:7
  23:24,24 35:7
amount 7:23,24
  18:19 19:3
  24:16 25:4,9
  30:15 31:9
  35:4
amounts 20:13
analyses 27:3
analysis 15:5
  21:4 29:10,13
apiece 34:4
appear 14:17
appeared 2:9
  2:17 15:13
  16:7 17:17
appears 35:6
applied 19:1
April 8:6 21:7
  21:16,22
  23:22 27:5
area 12:6 15:2,3
areas 21:2
  32:19
assembled 18:5
assets 31:2,8
assume 21:17

attempt 18:8
attempted 9:3
  13:16
attorney 5:6
  38:20,21
audit 33:13
auditors 33:14
authored 5:16
authorities 6:24
available 12:8
  12:17,24
average 33:24
  34:7,8
A.D 1:21 37:22

**B**

B 40:6
back 10:1 11:1
  13:6,19 14:6
  17:23
Balance 26:17
  28:21
Baltimore
  11:21 21:8
  34:18,20
bank 9:6,12
  10:22 12:7,9
  12:15 13:14
  13:15 15:10
  16:3,10 26:3,3
  31:7
banked 14:10
banks 13:4
  16:12
based 13:21
basically 7:1
  25:7 28:12
  31:1
basis 32:21
Bates-stamped
  8:22
began 6:22 8:6
beginning 5:3
  8:8 11:19
  30:13 33:10
  33:12
behalf 2:9,17
believe 16:11
  31:18
BELL 2:11
beneficiaries
  8:11,13 17:8
  25:16 31:10
Berger 8:17
  18:11 29:24
best 12:22 13:8
  20:13 34:20

better 15:14
bill 21:16,21
  22:6 23:22,22
  24:6 34:16
  35:15,17
billed 34:4,8,12
  34:24
billing 24:7
  33:21 34:3,6
  34:23 35:12
bills 7:14,19
  33:3,5
binders 21:9
  27:4
Bird 29:24
Blum 4:6 7:8
  19:22 26:13
  26:14,22
  31:15,24
Bob 11:22
BOLLINGER
  2:2
book 27:17,19
  27:23 28:1,10
  28:17,18,20
  28:23
books 26:6,8
  29:5
boxes 5:13 8:20
  8:21,21 9:9,9
  9:17,18 19:23
  20:1,10 24:14
  29:14
BRACKE 2:7
  22:2 36:9
briefly 15:1
bring 34:21
brokerage 9:1
  12:8,10 13:5
  14:17 26:4
brokerages
  14:21
budget 11:6,8,9
build 31:4,9
Burke 15:11
  31:13
business 3:19
  4:2 10:5

**C**

C 38:3 40:8,10
calculation 35:3
calculator
  35:21
call 4:1 23:18
  35:14
called 1:12 3:5

10:13,14 15:3
canceled 20:18
capacity 4:21
capital 8:8
CARNEY 2:8
case 17:10
  22:15
cases 10:7 12:11
  14:20 25:7
  26:6
cash 12:19 14:3
  16:6 24:22,23
  28:2,3,11,11
cashed 9:14
category 10:17
CD-ROM 10:15
  11:10 20:4
  29:12 30:6
CD-ROMs 9:15
  9:18,19,22
  19:19
Center 2:3
certain 17:20
  35:14
certificate 2:24
  26:5 39:10
Certified 1:17
  38:6
certify 37:12
  38:7
CFE 1:12 3:4
  37:20 40:4
change 7:11
changed 16:11
changes 37:18
charge 35:16
charged 22:16
check 24:15,16
  24:21 25:3,5,9
checkbooks
  15:11
checking 14:1
checks 9:10,10
  9:13,21,22,23
  10:2,21 15:17
  18:21 19:20
  20:3,7,11,12
  20:14,17,18
  24:11,13,14
  24:18,22,24
  25:1 26:2
  29:12 30:4,7
CHERYL 1:15
  2:23 38:4
Chicago 1:20
  2:5,14 3:14
  39:1

Citicorp 2:3
Civil 1:6,13
  37:7
cleaning 19:21
client 6:12 16:3
clients 16:9
clocking 35:13
close 32:19
closing 19:4
CNN 16:20
  32:13
code 22:14
Cohn 9:2,11
  13:17 14:22
  14:22 16:8
  17:17 18:20
  26:13,21
  31:24
Cohn's 13:1
  19:22
come 21:23
commencement
  38:8
commingled
  14:1
commission
  39:8
compact 32:18
companies 10:4
  10:7 13:5
  16:6
company 1:8
  2:18 4:8 37:9
compare 14:11
complete 6:5
  37:16
computer 30:15
concerning
  38:10
concerted 32:24
concerted-eff...
  32:21
conclusionary
  32:11
Conference
  1:18
connection 7:8
  19:16
considered
  23:16 27:9
considering
  33:15
consistent 24:6
consisting 37:14
constitutes
  38:15
contacted 6:23

MARTIN W. TERPSTRA, CPA, CFE,  MAY 14, 2004

habit 23:13
half 23:17
hand 39:1
handled 20:24
happened 12:11
  12:14 14:19
happily 21:18
head 4:23 8:17
heading 26:16
headline 16:20
  17:1 19:11
heck 18:1
held 14:6,21
hereto 38:22
hereunto 38:24
high-level 13:13
hold 14:23
holdings 26:21
hour 22:24 23:1
  23:3,4,5,17
  33:23 34:9,12
hourly 34:14
hours 22:22
  32:16 34:2
  35:2,11,16,17
  35:19 36:2,3
huge 33:24
hundred 35:5
hundreds 12:9
  19:8

**I**

idea 19:7
identification
  22:11
identified 9:23
  33:4
identify 9:20
  26:9
illegible 9:16
  20:5
Illinois 1:17,20
  2:5,14 3:15
  38:1,6 39:2,7
imaged 9:15
  20:12
images 9:15,16
  20:4,5
important
  31:23
included 8:24
includes 37:18
inclusive 37:15
income 6:3 14:7
  17:4
indicated 27:21
  28:8 29:2

indirectly 38:22
individual
  34:19,21
individuals
  23:23 34:1
  35:13
individual's
  35:1
information
  13:21 17:14
  17:15 18:5
  27:13,15
informed 17:21
initially 9:13
  19:19
initials 22:13
innumerable
  35:17
instance 14:5,7
  24:21 25:2
Insurance 1:4,8
  2:10,18 11:23
  37:5,9
interest 7:4
  9:10 12:20
  18:19 19:21
interested 38:22
inventoried
  8:21
inventory 25:11
  25:13,14,20
  25:22 26:1,2,2
  26:3,4
investment 9:7
invoices 32:15
involved 5:22
  6:16 8:5
IRS 6:23 18:12
  18:15,16,21
  19:4
Irving 16:7
  26:13
issued 14:20,22
  20:18 30:11
issuers 10:1
items 14:15
  20:9 23:8

**J**

JD 9:3
job 17:18,24
  34:3
John 29:24
Johnson 11:22
joined 26:13,14
  26:22 31:24
joining 31:15

Jordan 8:17
Jordy 18:11,16
  29:24
Judge 21:6
July 26:14 28:3
  28:13,18
June 26:17
  27:16 28:4,13
  28:19,21

**K**

K 38:3
Kathy 11:22
keeping 32:6
kept 19:23,24
  32:1,2
know 7:6,6 11:2
  25:5 29:23
  30:11 33:2,19
  35:4,19
knowing 35:12
Kristina 11:22

**L**

L 40:10
labeled 29:5
lack 15:13
large 20:2 26:8
largest 34:2
law 6:10 19:22
  31:15 32:1
ledgers 9:5
legal 4:18 9:4
letter 5:7,14,15
  letters 27:3 29:9
level 8:4
liability 4:17
life 5:24
limitation 12:23
limitations
  18:24
list 13:13 14:12
  14:15 15:19
  23:22
literally 8:3
  10:10 11:18
  12:7,9,19 13:4
  17:5 18:10,20
  19:24 20:15
  26:5 31:6
  33:12
little 32:18
loan 12:13
loans 12:11
local 20:24
locate 20:22
located 13:15

long 3:21 4:20
longer 10:7
  18:23
looked 6:18
  14:9 15:10
  17:13 31:17
looking 14:3
  21:21 22:5
  23:15 24:21
  35:24
loss 12:21
lot 23:14
love 30:17
L.L.P 2:11
L02 22:14

**M**

M 2:7
Madison 1:20
  2:4,13
major 21:2
malpractice
  4:18,19
management
  22:15
managers 34:5
March 21:15,17
Marine 1:7 2:18
  37:8
Martin 1:11 3:4
  3:13 37:20
  40:4
MARYLAND
  1:2 37:3
massive 30:15
master 13:24,24
Mastoris 11:22
matter 7:9 24:1
  24:7
matters 4:6,19
  5:22 15:3
  19:5 38:11
mean 16:2
meeting 21:7
  23:18 27:5
  34:18,23
  35:14
memory 29:16
merely 23:15
methodology
  24:6
MICHAEL
  2:16
MICHELLE
  2:7
Mike 3:10
Miller 11:23

mind 25:19
minutes 22:16
missing 14:13
  14:14 17:5
  18:6 27:13
mitigate 9:24
Mobil 10:5
money 10:12,24
  11:13 30:24
  31:3,10
monies 12:16
  16:5
months 14:18
morning 3:9
multiply 22:18
myriad 18:9

**N**

N 40:1,8,10,10
  40:10
name 3:11
  14:21 22:12
  31:11
names 31:19
National 1:19
  2:12
NAUGHT
  36:12
necessary 18:6
negotiated
  33:16
network 30:17
never 9:11,14
  18:22 19:20
  20:3,8 29:12
new 20:18
news 16:20
  19:11
nice 32:18
NICHOLSON
  1:15 2:23
  38:4
nonfiling 7:5
non-Flex 15:22
Notary 1:16
  37:24 38:4
  39:6
noted 20:11
  36:13
notes 7:11 15:1
  16:14 23:20
  31:13
notice 23:7
notices 7:2 18:9
  18:10,14
number 11:2
  15:16 16:5

22:10 24:15
  29:9 34:2,5
  35:11
numbers 9:23
  12:15 16:13
  20:3 22:11

**O**

O 38:3,3 40:8
  40:10,10,10
oath 37:16
objective 30:19
  30:21
obtained 15:10
offhand 11:2
office 13:2 39:1
offices 19:22
Oh 33:7
Okay 7:16 17:1
  23:2,21 25:24
  31:22 33:8
  36:6
old 15:11 18:20
  31:13 32:1
ones 17:11,12
  17:13
open 9:16 31:7
  32:2,7
opened 20:6
  32:6
opposed 4:1
  16:21
order 10:6 31:4
  31:9 34:20
ordered 36:7
original 20:10
outcome 38:23
outline 8:16
outset 5:2
owe 10:24
owed 21:11

**P**

P 2:16 40:10
page 22:5 23:21
Pages 37:14
PAGE/LINE
  40:2
paid 7:3,7 14:7
  35:7
paraprofessio...
  34:11
part 10:20
  20:23
particular
  20:23
parties 21:12

MARTIN W. TERPSTRA, CPA, CFE,  MAY 14, 2004

34:9
standpoint 4:24
start 12:13
  18:17
started 8:7,20
  10:8 11:12
  20:15,19
starting 26:12
  27:6,8,9,19
  28:15,17
state 1:17,18
  3:11 6:20,24
  10:10 17:4
  19:4 20:24
  38:1,5,7
statement 12:7
  12:8 14:17
statements 9:1
  9:6,7 10:23
  13:6 26:4,4
states 1:1,14
  10:9 18:13,21
  20:19 37:2
statute 18:24
stenographic...
  38:13
stock 12:20,21
  12:21 26:5
stocks 14:17
stopped 17:21
street 1:20 2:4
  2:13 14:21
stuff 7:12
subdivisions
  8:12
subscribe 37:15
SUBSCRIBED
  37:21
substantial
  33:16
successful 18:18
such-and-such
  25:4
Suite 1:19 2:4
  2:13 3:14
summaries 10:2
summarized
  7:11
summary 26:24
supplemental
  29:13 30:7
supposed 9:14
sure 7:13 21:20
  21:24 22:1,3
  29:15
sworn 3:2,6
  37:21 38:10

**T**

T 40:6,8,8,10,10
taken 1:12,15
  24:5 25:20
  38:17
talk 29:23
talked 11:8 12:2
  12:5 19:13
talking 25:1
talks 18:17
task 13:10
tax 3:19 5:21,22
  6:13,14,15,19
  8:2,24 13:18
  13:20 15:3
  16:23,24
  17:19 18:3
  19:4,12 20:24
  29:21
taxes 17:4
taxing 6:24
taxwise 19:10
team 18:12 21:1
  33:11
tell 22:8 33:7
tend 23:11,13
tenths 23:3
term 15:14 32:9
terms 4:15
  11:16 15:1,8,9
  16:24 20:7
  27:24
Terpstra 1:11
  3:4,13 37:20
  40:4
testified 3:6
testify 38:10
testimony 38:15
Thank 28:24
Thanks 36:11
thing 14:16
  19:13 27:18
  30:16 31:23
things 13:9,23
  31:5
think 10:9
  19:14
third 22:5 28:20
thousand 35:5
thousands 19:8
three 1:19 2:12
  26:8
three-tenths
  22:24
thrown 14:24
time 5:16 6:17

10:23 13:2
  15:19 16:1,14
  17:10,20,23
  18:2 22:18
  26:13,21 32:4
  33:6,22 34:7
  34:16,24 35:1
  35:1,15 36:11
  36:13 37:14
  38:18
timekeeper
  23:19
timekeepers
  25:16
times 22:18,20
title 4:14 28:23
today 7:12
told 16:17 19:10
  20:1 21:3,13
  31:5 32:12
Tone 2:16 3:8
  3:10 22:3,4
  27:22 28:16
  29:3 36:6,10
  40:5
top 33:13
total 20:13
  35:20
trace 12:10
  13:19 14:10
  17:14
traced 14:6
tracing 14:16
track 14:14
tracking 12:14
transaction
  25:6
transactions
  15:14,21
  30:14,16,23
  32:2
transcript
  37:13,17
  38:12
transferred
  12:15
tremendous
  18:18 19:3
tried 17:14
  26:20 32:14
true 37:16
  38:15
truly 20:8
trust 5:19,20
  6:1,15 7:24
  8:1,15,16 9:5
  10:18,19 12:4

12:6 13:11,24
  15:1,16 17:7
  24:22,23,24
  25:11,13,17
  25:21,24 26:1
  30:23,24
trustee 9:11
trusts 6:4,18 8:6
  8:9,10,11,18
  9:12 10:12,20
  11:13 13:23
  14:2 15:17
  17:8 18:11
  25:14,15,17
  26:17,21 28:2
  28:12,21 31:5
trust/Shapiro
  15:22
truth 38:10
try 10:6,9 14:14
  21:10 31:1,6,8
trying 9:24
  10:11,12
  12:14 13:5,6
  14:18 26:11
  31:2
two 32:19,21
  34:1,15,23
type 24:20
  33:17
typewriting
  38:14

**U**

U 40:8
Uh 22:20
ultimately
  18:18
uncashed 9:20
undeposited
  20:14
understand
  16:22 22:1
  23:4 29:17,20
undertake 6:5
undertaken
  11:7 24:11
unit 22:16
United 1:1,13
  37:2
units 22:15,21
  27:20 28:7,9
unusable 13:3
use 25:3,17 32:9
user-friendly
  26:12 27:24

**V**

valid 18:24
variety 16:8
various 5:20
  6:24 8:12
  9:12 11:12
  12:11 15:18
  15:24 18:13
  18:21 21:9
  23:23 25:16
version 16:21
  16:21 17:2
  19:11 32:13
vs 1:6 37:7

**W**

W 1:11 2:8 3:4
  3:13 37:20
  40:4
Wacker 3:14
want 21:20
  24:10 28:5,23
  33:3 36:7,8
wanted 13:20
  34:21
wanting 17:21
way 13:6 27:15
went 14:6 18:1
  21:16 30:24
weren't 10:23
  17:12
West 1:20 2:4
  2:13
Westport 1:4
  2:10 11:23
  33:16 35:12
  35:18 37:5
Westport's 26:7
wet 13:3
we'll 27:18 36:7
we're 24:21
  25:1,6 35:24
we've 11:20
  14:24 27:2
  29:9,11
WHEREOF
  38:24
wide 16:8
Willan 15:12
  31:14
witness 3:1,3,5
  27:20 28:7,9
  29:1 38:9,9,24
  40:3
Wolf 5:5 11:21
work 3:13,18
  6:5 10:6,16
  11:7,16 15:8,9

17:22 19:3
  20:17,23 21:5
  21:5 29:8
  32:10,23
  33:14,15,17
  34:21
worked 9:17
  11:18,21
  23:24 32:15
  32:16 33:9,11
working 9:19
  10:8 11:20
  18:12,15 20:4
  21:9 32:20
worth 9:20,21
wouldn't 9:16
  35:15,18
write 27:17
written 35:1
wrote 34:24

**X**

X 40:1,6

**Y**

year 14:8,10
  17:9 32:23
  33:1,1
years 3:23 4:22
  6:19,21 7:5
  9:3 17:17
  18:7 29:19
  30:17 32:20
  32:21
young 33:14
Yumkas 4:6 7:9
  19:22 26:14
  26:14,22
  31:15 32:1

**$**

$1,240,000 7:10
  7:20,22 35:8
$110 34:10
$120 34:10
$150 34:7
$157 33:23
$175 34:4,6
$2,000 8:7
$200 34:7
$230s 34:4
$250 33:22
$270,000-some
  9:21
$295 33:22
$300,000 35:6,9
$5,000 8:8

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087    800.708.8087    FAX 312.704.4950

00247